1  John R. Clemency (Bar No. 009646)
   Lindsi M. Weber (Bar No. 025820)
2  **GALLAGHER & KENNEDY, P.A.**
3  2575 East Camelback Road
   Phoenix, Arizona 85016-9225
4  Telephone:   (602) 530-8000
   Facsimile:   (602) 530-8500
5  Email:       john.clemency@gknet.com
                lindsi.weber@gknet.com
6  *Attorneys for Debtors*
7

8           **IN THE UNITED STATES BANKRUPTCY COURT**

9              **FOR THE DISTRICT OF ARIZONA**

10 | In re: | Chapter 11 Proceedings |
11 | | |
   | DUNLAP OIL COMPANY, INC., | Case No. 4:12-bk-23252-BMW |
12 | | |
   | QUAIL HOLLOW INN, LLC, | Case No. 4:12-bk-23256-BMW |
13 | | |
14 | Debtors. | (Jointly Administered) |
15 | Filing applies to: | |
16 | DUNLAP OIL COMPANY, INC. ☐ | |
17 | QUAIL HOLLOW INN, LLC ☐ | |
18 | BOTH ☒ | |
19

20
     **FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF**
21   **FIRST AMENDED JOINT PLAN OF REORGANIZATION**
         **DATED FEBRUARY 14, 2013**
22

23

24

25

26

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..........................................................................................................1

II. OVERVIEW OF CHAPTER 11 .................................................................................1

    A.    Information Regarding the Plan and Disclosure Statement. ...................1

    B.    Representations..........................................................................................2

III. BACKGROUND & EVENTS LEADING TO FILING.............................................2

    A.    Background of DOC Operations. ..............................................................2

    B.    Theodore ("Ted") Dunlap Background .....................................................5

    C.    Inventory and other Personal Property of DOC .......................................6

    D.    Sources of Information ..............................................................................7

    E.    CCB, Compass, Jackson, and Cox Security Interests ..............................7

    F.    Background of QHI ................................................................................ 10

    G.    Interrelated Business Operations between DOC and QHI ...................... 11

    H.    Events Leading to Chapter 11 Filing ...................................................... 11

IV. POST-PETITION PROCEEDINGS AND EVENTS ............................................ 11

    A.    Summary of Key Events Related to the Bankruptcy Case. .................... 11

        1.    Filing of Bankruptcy Petition ..................................................... 11

        2.    Retention of Professionals. .......................................................... 12

        3.    First-Day Motions ....................................................................... 12

V. DESCRIPTION OF ASSETS AND THEIR VALUE ............................................ 13

    A.    Assets and Property. ............................................................................... 13

VI. FINANCIAL CONDITION AND ANALYSIS ..................................................... 13

    A.    Present Operations. ................................................................................. 13

    B.    Future Operations. .................................................................................. 14

VII. SOURCES OF INFORMATION ......................................................................... 14

VIII. SUMMARY OF THE PLAN ............................................................................. 14

    A.    Classification and Treatment of Claims and Interests. .......................... 14

        1.    Class 1 (Secured Tax Claims) ..................................................... 15

        2.    Class 2 (Secured Claims) ............................................................ 15

        3.    Class 3 (Unsecured Claims) ........................................................ 15

        4.    Class 4 (Equity Security Interests in DOC) ................................ 15

        5.    Class 5 (Membership Interests in QHI) ....................................... 15

    B.    Summary of Treatment of Unclassified Claims. .................................... 15

        1.    Administrative Claims................................................................. 15

        2.    Administrative Claims Bar Date. ................................................ 15

        3.    Priority Tax Claims. .................................................................... 15

    C.    Summary of Treatment of Unimpaired Classes. .................................... 16

        1.    Class 4 (Equity Security Interests in DOC) ................................ 16

    D.    Summary of Treatment of Impaired Classes. ......................................... 16

        1.    Class 1 (Secured Tax Claims) ..................................................... 16

        2.    Class 2 (Secured Claims) ............................................................ 19

        3.    Class 3 (Unsecured Claims). ....................................................... 25

　　　　4.　　Class 5 (Membership Interests in QHI) ...................................................... 26
IX. OVERVIEW OF ADDITIONAL PLAN PROVISIONS .......................................... 26
　　A.　Implementation of the Plan & Conditions to Effectiveness. ........................... 26
　　　　1.　　Conditions Precedent to Occurrence of Effective Date ........................... 26
　　　　2.　　Implementation.................................................................................. 27
　　B.　Resolution of Claims, Demands, and Causes of Action................................... 27
　　　　1.　　Preservation of Debtors' Claims, Demands, and Causes of Action......... 27
　　　　2.　　Procedure for Determination of Claims. ................................................ 28
　　C.　Treatment of Executory Contracts................................................................. 28
　　　　1.　　Assignment, Assumption or Rejection of Executory Contracts.. ............ 28
　　　　2.　　Rejection of Executory Contracts ......................................................... 28
　　　　3.　　Assumption of Other Executory Contracts ............................................ 28
　　　　4.　　Rejection Claims Bar Date ................................................................... 29
　　D.　Miscellaneous Plan Provisions. ..................................................................... 29
　　　　1.　　Retention of Jurisdiction ..................................................................... 29
　　　　2.　　General Injunction .............................................................................. 29
　　　　3.　　Vesting ............................................................................................... 30
　　　　4.　　Payment of Statutory Fees and Filing of Quarterly Reports .................... 30
X. FEDERAL TAX CONSEQUENCES ..................................................................... 30
　　A.　No Federal Tax Consequences. ...................................................................... 30
XI. VOTING PROCEDURES AND REQUIREMENTS............................................... 30
　　A.　Parties Entitled to Vote.................................................................................. 30
　　B.　Procedures for Voting.................................................................................... 30
　　　　1.　　Submission of Ballots.......................................................................... 30
　　　　2.　　Procedures for Vote Tabulation ............................................................ 31
　　　　3.　　Withdrawal of Ballots .......................................................................... 31
　　　　4.　　Questions and Lost or Damaged Ballots ................................................ 31
　　C.　Summary of Voting Requirements. .................................................................. 31
XII. LIQUIDATION ANALYSIS ................................................................................ 32
XIII. CONFIRMATION OF THE PLAN ..................................................................... 32
　　A.　Confirmation Hearing.................................................................................... 32
　　B.　Objections to Confirmation. .......................................................................... 32
　　C.　Requirements for Confirmation of the Plan. .................................................... 32
　　　　1.　　Confirmation Under Section 1129(a) of the Bankruptcy Code .............. 32
　　　　2.　　Debtors Believe the Plan Satisfies Bankruptcy Code
　　　　　　　Requirements.................................................................................... 33
XIV. ALTERNATIVES TO THE PLAN ...................................................................... 36
RECOMMENDATION AND CONCLUSION .............................................................. 36

Case 4:12-bk-23252-BMW　　Doc 219　　Filed 03/08/13　　Entered 03/08/13 13:49:41　　Desc
　　　　　　　　　　　　　Main Document　　　Page 3 of 39

# I.
# INTRODUCTION

Pursuant to 11 U.S.C. § 1125, Dunlap Oil Company, Inc. ("DOC") and Quail Hollow Inn, LLC ("QHI" and together with DOC, the "Debtors"), the debtors and debtors-in-possession in the above-captioned bankruptcy cases, hereby submit this *First Amended Disclosure Statement in Support of First Amended Joint Plan of Reorganization dated February 14, 2013* (the "Disclosure Statement"). The purpose of this Disclosure Statement is to provide adequate information to the holders of claims or interests in this matter so that they may make an informed judgment in exercising their right to vote for acceptance or rejection of the *First Amended Joint Plan of Reorganization dated February 14, 2013* (the "Plan"), a copy of which is attached as Exhibit "A". **THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN IN ORDER TO MAXIMIZE THE RECOVERY OF YOUR CLAIM.**

Capitalized terms used in this Disclosure Statement will correspond to terms defined in the Plan and the Bankruptcy Code. Terms used in this Disclosure Statement that are also defined in the Plan are defined solely for convenience; and the Debtors do not intend to change the definitions of those terms from the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, the Plan is, and will be, controlling.

# II.
# OVERVIEW OF CHAPTER 11

## A.      Information Regarding the Plan and Disclosure Statement.

The objective of a Chapter 11 case is the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization or liquidation. A Chapter 11 plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and equity interests in a debtor. After a plan has been filed, the holders of claims and equity interests are permitted to vote to accept or reject the plan. Before a debtor can solicit acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable you to make an informed decision in exercising your right to accept or reject the Plan. Therefore, this Disclosure Statement provides relevant information about the Debtors, their property and financial condition, and the Plan.

This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement contains sufficient information for the Debtors to transmit the Plan and Disclosure Statement to Creditors and to solicit acceptances of the Plan.

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

After the Bankruptcy Court has granted approval of this Disclosure Statement and there has been voting on the Plan, the Bankruptcy Court will conduct a Confirmation Hearing concerning whether the Plan should be approved. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtors that will present a tally of the votes accepting or rejecting the Plan cast by those entitled to vote. Accordingly, all votes are important because they can determine whether the Plan will be confirmed. Once confirmed, the Plan is essentially a new contract between the Debtors and their Creditors and is binding on all Creditors and other parties-in-interest in the Debtors' Bankruptcy Cases regardless of whether any particular Creditor voted to accept the Plan.

**THIS DISCLOSURE STATEMENT IS NOT THE PLAN. FOR THE CONVENIENCE OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL CONTROL.**

**B.** <u>**Representations.**</u>

This Disclosure Statement has not been subjected to a certified audit; however, it has been prepared in part from information compiled by the Debtors from records maintained by it in the ordinary course of its business or from information received by the Debtors from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement. Nevertheless, the inclusion of financial information in this Disclosure Statement and exhibits is subject to adjustment, and the Debtors reserve all rights to object to or challenge any Claims that are filed or asserted in the Cases.

This is a solicitation by the Debtors only and is not a solicitation by their attorneys, agents, financial advisors, or accountants. No statements or information concerning the Debtors or their assets or securities are authorized, other than those set forth in the Disclosure Statement.

**III.**
**BACKGROUND & EVENTS LEADING TO FILING**

A more extensive background on the Debtors is provided in the *Declaration of Theodore Dunlap in Support of Debtor's Chapter 11 Petitions and Early Case Filings* filed on October 24, 2012 at Dkt. #2.

**A.** <u>**Background of DOC Operations.**</u>

Dunlap Oil Company ("<u>DOC</u>") is an Arizona corporation formed in 1959. In 1969, DOC built the Willcox Truck Plaza. Willcox Truck Plaza consists of a full service

2

restaurant, gas and diesel fuel, showers and laundry services. The station is now operating as an unbranded unit under the Doc's brand.

In 1971, DOC started construction of Gordon's Market, which would later become Dunlap Plaza, with other retail outlets being added from 1972-1975. Dunlap Plaza is one of two shopping centers in Willcox. Currently, Dunlap Plaza is being anchored by Hometown IGA. Ace Hardware and Family Dollar also operate retail outlets in Dunlap Plaza. During 1975-1976, DOC built the Benson Café. Benson Café is now called Benson Little General. DOC ceased the restaurant operation, but maintained the retail operations. In 1997, DOC added fuel back to the site, which is currently branded as a Texaco station.

In or about 1982, DOC became a Chevron Jobber, and in 1991, began to supply Chevron Dealer locations with Chevron branded fuel. From 1982 through 1999, DOC focused largely on its supply operations for Chevron branded fuel and related services. In 1985, DOC completed construction of the Sierra Vista Little General station and retail location. Sierra Vista Little General is currently flying the Chevron flag. In 1990, DOC built the Benson Unocal Station. At the time, DOC was seeking a second, alternative, brand of gasoline in addition to its existing Chevron/Texaco stations. This site was later converted to the Chevron brand. The Benson site is currently not being operated.

In 1992, DOC constructed the Thatcher Chevron. Thatcher Chevron was DOC's first unit to use the vaulted tank system (some say it was the first vaulted tank system in the State of Arizona). The vaulted tank system is a secondary containment system in which steel tanks are placed inside a concrete containment system. The Thatcher Chevron is currently branded with Doc's house brand. In 1993, DOC built the Sierra Vista Chevron station. The Sierra Vista Chevron is currently branded as a Chevron station.

In 1994, DOC completed construction of the Pinetop Chevron station. The Pinetop Chevron is currently branded as a Chevron station. In 1997, DOC purchased a closed Circle K station in the San Jose section of Bisbee, Arizona. In the course of a comprehensive remodel, DOC added canopies and new fuel dispensers. In 1998, DOC added an automatic car wash and a spray car wash bay. This site is currently being operated as San Jose Chevron station.

In 1999, DOC committed to adding a fueling portion to the Ajo Station. This is a unique location for DOC as the fuel sold at this location is commissioned-based. Dunlap owns the fuel improvements but does not operation the convenience store. Also in 1999, DOC built the Payson Chevron station, in part from funds provided by Compass Bank BBVA ("Compass").

3

Throughout the early 2000's, DOC utilized a revolving line of credit from Compass in the original maximum amount of $1.4 million. In 2001, DOC purchased the Marana Freeway Chevron station from Stan Gladden, a former Chevron dealer that DOC had supplied with Chevron fuel. The purchase price for the Marana Freeway station was $3 million, of which $2.4 million was financed by a loan from Compass.

From 2005 to 2008, DOC purchased "Tenders" from the Western Refining refinery in El Paso, Texas. DOC then shipped the product to Arizona via the Kinder Morgan East Pipeline to Tucson and Phoenix. As the price of fuel continued to rise, the demand for DOC's unbranded fuel was substantial, and DOC couldn't sell its product fast enough. However, the pipeline business also exposed DOC to a more aggressive customer and credit risk. These factors caused DOC's revolving line of credit with Compass to expand to $3.5 million, which required additional collateral. In light of these increased risks, expenses, cash requirements, and customer dynamics, DOC made its last shipment in November 2008.

In November 2006, DOC purchased three existing stations in Green Valley, Arizona from Coxco for a purchase price of $10 million. Canyon Community Bank ("CCB") financed $8 million of the purchase prices and the Cox Family Trust carried $2 million. This transaction occurred near the height of the economic market. Shortly after the purchase of the three Green Valley stations in 2007 construction commenced on the frontage road and Continental. From April 2009 to February 2011, the I-19/Continental road off-ramp was closed, which greatly affected the day-to-day business of these locations.

In May of 2007 DOC purchased the Trejo Chevron dealer contracts, pursuant to a purchase agreement that provided for 1.75 cents per gallon during the first year, 1.5 cents per gallon during the second year, and 1.25 cents per gallon during the third year.

In or about November 2009, Compass closed DOC's operating accounts and moved the DOC portfolio to its Special Assets or "work-out group." On December 16, 2009, DOC sold eighteen existing Chevron dealer contracts to Jackson Oil Company ("Jackson"). Jackson paid 8 cents per gallon for the dealer contracts. As a part of this transaction, DOC signed a supply agreement with Jackson for the fourteen DOC operated stations.

In January 2012, DOC received an offer from Reay's Ranch Investors LLC for $2,575,000 for four of the DOC stations - Marana Freeway Chevron, San Jose Chevron, Sierra Vista Little General and Sierra Vista Chevron. These four stations served as collateral for the Compass loan obligations. This offer was rejected by Compass. In July 2012, Jackson submitted an offer to purchase nine locations for $5,475,000. This offer

included stations that served as collateral for the Compass, CCB, and Cox obligations. The Jackson offer was for the following locations:

| Site | Lienholder |
|------|-----------|
| Pinetop Chevron | CCB |
| Grand Texaco | CCB |
| Payson Chevron | Cox Family Trust |
| Sierra Vista Little General | Compass |
| Marana Freeway Chevron | Compass |
| Sierra Vista Chevron | Compass |
| San Jose Chevron | Compass |
| Benson Little General | Compass |
| Benson Chevron | |

The Jackson offer was turned down by both CCB and Compass. On August 31, 2012 Jackson increased its offer to $5,975,000 and agreed to loan DOC an additional $500,000 (thereby increasing its prior offer by a total of $1 million of additional consideration). This offer was also rejected by both CCB and Compass, despite DOC's offer to extend carry back loans to both lenders on all offers.

On September 24, 2012, DOC received a Notice of a Trustee's Sale from CCB relating to the Pinetop Chevron. On September 26, 2012, DOC received a Notice of Trustee's Sale from CCB relating to the Green Valley Supercenter and the Grand Texaco in Green Valley. On September 28, 2012, CCB served a summons and complaint upon DOC, Truck Plaza Cafe ("TPC"), a former operating entity for the location in Thatcher, Arizona that was merged with DOC prior to the Petition Date), QHI, Kenneth and Carol Dunlap, Theodore and Christine Dunlap, Calvin Allred as the Trustee of the Kenneth T. Dunlap and Carol A. Dunlap Irrevocable Trust #1 and Trust #2, and the Trustees of the Kenneth T. Dunlap and Carol A. Dunlap Revocable Trust.

**B.    Theodore ("Ted") Dunlap Background**

Theodore "Ted" Dunlap started working at DOC in 1993. He was initially involved in the design and construction of the Sierra Vista Chevron. After the construction of the Sierra Vista location was complete, Ted moved to Sierra Vista to operate the store. DOC later hired a manager and at that time Ted moved to the DOC main office in Willcox. At the main office, Ted's father ensured that he covered all the basics of the business - from bobtail driver, to dispatcher, to restaurant manager, and quite a few other roles in between.

5

In 1996, Ted took the lead in updating the Retail Automation of all DOC retail sites. As a part of this process, DOC installed back office computers in all stores and added automated scanning to the DOC sites. After upgrading the technology at the locations, Ted became supervisor of the company locations and was in charge of the day-to-day operations. In June of 2000 Ted's father retired, and around that time he ceased making day-to-day decisions for the company, but remained as President of the company until recently, when Ted was named President. In addition to his roles with DOC, Ted has served on the Board of Directors of the Arizona Petroleum Marketers Association and the Chevron Texaco Petroleum Marketers Association.

## C.  Inventory and other Personal Property of DOC

DOC's inventory consists of gasoline, diesel and propane stored outside. Inside each store is fully stocked with typical convenience store items for resale. Personal property also includes fixtures, coolers, software and other items used in the convenience stores.

Credit card transactions are run daily by Chevron and the proceeds are paid directly to Jackson to the extent necessary to pay for the fuel provided by Jackson to DOC. When Jackson bills for fuel, the credit cards receipts on hand are offset, and the net amount is wired from a bank account. In DOC's financial statements, the gross amounts of the credit cards on hand with Chevron are listed as an asset. The accounts payable for fuel from Jackson are also listed as a liability at the gross amount of the invoice.

## D.  Pre-Petition Merger of Truck Plaza Café and DOC

Truck Plaza Café ("TPC") was an operating entity formed in 1970 to own and operate the Willcox Truck Plaza located in Willcox, Arizona. Prior to the Petition Date, on or about October 16, 2012, TPC was merged into DOC pursuant to duly authorized and executed articles of merger and corresponding documents filed with the Arizona Corporation Commission. TPC owned real property consisting of the Willcox Truck Plaza located at 1190 W. Rex Allen Dr., Willcox, Arizona; and Benson Little General located at 696 N. Ocotillo Road, Benson, Arizona 85602; along with corresponding fuel and sales inventory for both locations estimated in the amount of $153,000. Willcox Truck Plaza is encumbered by a lien in favor of Cox. Benson Little General is encumbered by a recorded Internal Revenue Service tax lien. In addition, the applicable County taxing authorities assert liens for real and personal property taxes against both locations. Finally, TPC listed accounts payable in the amount of approximately $39,363 as of the merger date.

**E.** **Sources of Information**

Values assigned to the real property and improvements at the various stations were taken from appraisals obtained by CCB and Compass, as well as management estimates.

Merchandise inventories are taken annually by a private service, and adjusted monthly by staff pursuant to sales. Oil inventory is taken quarterly by staff. Fuel inventories are electronically maintained on a daily basis.

The Debtors use Moeller & Bryce, PC to prepare their tax returns and compiled financial statements on an annual basis. Monthly statements are prepared by Jim Martin, DOC's controller.

**F.** **CCB, Compass, Jackson, and Cox Security Interests**

A chart reflecting the various real property owned by the Debtor, and the corresponding lien interests asserted by the various secured creditors, is attached to this Disclosure Statement as Exhibit "B".

*PINEDA ASSERTS:*

*Pineda disputes the Debtors' valuation of its collateral as set forth in Exhibit "B" and asserts that Debtors' valuations are based upon outdated appraisals. Prior to transferring to Pineda its interest in its loans to DOC, Compass Bank obtained appraisals of all of the real property collateral as of August 1, 2012. The appraisals make the assumption that all property tax liens on the property have been paid. In fact, as disclosed herein, there is approximately $775,000 of senior real and personal property tax liens encumbering the properties. When the tax liens are taken into consideration, the value of Pineda's interest in the real property collateral for Pineda's claim is approximately $5,230,485, itemized as follows. Pineda is in the process of seeking updated appraisals and reserves the right to present updated or additional valuation evidence at any other hearing or proceeding in this bankruptcy:*

| *PROPERTY* | *APPRAISED AMOUNT* | *TAX LIENS* | *VALUE OF INTEREST* |
|---|---|---|---|
| *759 S. Haskell Ave., Willcox* | *$350,000* | *$91,674* | *$258,326* |
| *1288 S. Highway 92, Bisbee* | *$700,000* | *$25,104* | *$674,896* |
| *696 N. Ocotillo Road, Benson* | *$140,000* | *$32,348.00* | *$107,652* |
| *Quail Hollow Motel, 699 N. Ocotillo Road, Benson* | *$1,900,000* | *$300,674* | *$1,599,326* |
| *13968 N. Sandario Road,* | *$925,000* | *$74,715* | *$850,285* |

7

| | | | |
|---|---|---|---|
| Marana | | | |
| 1796 E. Fry Blvd., Sierra Vista | $470,000 | $41,656 | $428,344 |
| 1860 S. Highway 92, Sierra Vista | $870,000 | $78,798 | $791,202 |
| Shopping Center - 902 - 918 W Rex Allen | $650,000 | $129,546 | $520,454 |
| **Total Values** | **$6,005,000** | **$774,515** | **$5,230,485** |

*CCB ASSERTS:*

*CCB disputes the values of the collateral asserted by Debtors. Debtors' values are based on appraisals from January 2011. CCB asserts these values are outdated, especially given that newer appraisals were provided to Debtor, which were completed in February 2012. Additionally, CCB has commissioned new appraisals of the collateral. Debtors' are aware of and are cooperating with CCB's appraisers to complete the new appraisals. CCB reserves the right to utilize the new appraisals in any hearing or preceding concerning the valuation of the collateral. CCB's clamed values are set forth below:*

*CCB obtained appraisals of the real property securing its claims in February 2012, and the rolling stock in September 2011. Copies of the various appraisals were provided to counsel for the Debtors on January 11, 2013. CCB has retained appraisers who are currently conducting additional appraisals, in cooperation with representatives of the Debtors. CCB reserves the right to supplement this information, and present the updated appraisals at any hearing concerning this matter.*

*The values Debtors include in their Disclosure Statement come from older appraisals, dated January 2011, which CCB also provided to Debtors' counsel on January 11, 2013, or are the self-serving opinion of value of the management of Debtor. CCB's 2012 appraisal values also assume that the unpaid tax amounts have been paid, and so to get a true value based on the February 2012 Appraisals, the outstanding tax amounts must be deducted from the values.*

| *Property* | *Debtors' Value* | *Appraised Value (February 2012)* | *Tax Liens* | *Interest Value (February 2012)* |
|---|---|---|---|---|
| *171 W. Continental* | *$3,030,000.00** | *$2,935,000.00** | *$122,357.00* | *$2,812,643.00* |
| *1051 W. Beta* | *$2,850,000.00** | *$2,835,000.00** | *$168,426.00* | *$2,666,574.00* |

8

| | | | | |
|---|---|---|---|---|
| *61 W. Esperanza* | *$385,000.00* | *$300,000.00* | *$38,489.00* | *$0[1]* |
| *971 E. White Mtn. Blvd.* | *$850,000.00* | *$660,000.00* | *$37,725.00* | *$622,275.00* |
| *TOTALS:* | *$7,115,000.00* | *$6,730,000.00* | *$366,997.00* | *$6,101,492.00* |

*\* Includes value for adjacent vacant lot.*

Debtors ignore the more recent appraisals provided to them in favor of appraisals indicating a higher value, which are more than 2 years old. Additionally, CCB's preliminary 2013 appraisals indicate that the real properties' condition and value have substantially deteriorated.

Compass allegedly perfected its security interest in various items of personal property of DOC by filing a UCC-1 Financing Statement in the Office of the Secretary of State of Arizona on November 2, 2000 as Record No. 01144515, a UCC Financing Statement Amendment (Continuation) filed on September 21, 2005, and a UCC Financing Statement Amendment (Continuation) filed on August 11, 2011 (together, the "Compass UCC"). In addition, upon information and belief, Compass has also recorded various deeds of trust relating to real property owned by DOC and QHI. Upon information and belief, on or about November 7, 2012, Compass sold its loans with the Debtors to Pineda Grantor Trust II ("Pineda"). Pineda filed proofs of claim on January 28, 2013 (Claim No. 47 in DOC's case and Claim No. 3 in QHI's case).

CCB allegedly perfected its security interest in various items of personal property of DOC by filing a UCC-1 Financing Statement in the Office of the Secretary of State of Arizona on December 27, 2006 as Record No. 200614591289, a UCC Financing Statement Amendment (Continuation) filed on July 7, 2007, a UCC Financing Statement filed on December 27, 2006 as Record No. 200614591290, and a UCC Financing Statement Amendment (Continuation) filed on July 7, 2007 (together, the "CCB UCC"). In addition, upon information and belief, CCB has also recorded various deeds of trust relating to real property owned by DOC.

*CCB ASSERTS:*

*CCB has additionally alleged a perfected security interest in the rolling stock of DOC. CCB provided copies of the security interests filed against the titles of the rolling stock with the Arizona Department of Transportation, in the Proof of Claim filed by CCB*

---

[1] *Debtors have abandoned this leased property and have stopped paying the lease payments. Debtor's draft Plan calls for this property to be returned to the Landlord.*

*at [Claim Nos. 45 and 46 in DOC's case and Claim Nos. 4 and 5 in QHI's case].*

Jackson allegedly perfected its security interest in various items of personal property of DOC by filing a UCC-1 Financing Statement in the Office of the Secretary of State of Arizona on June 26, 2012 as Record No. 201216970183 (the "Jackson UCC"). In addition, upon information and belief, Jackson has also recorded a deed of trust relating to the Thatcher Doc's Food Stop location.

Upon information and belief, the Cox Family Trust has recorded deeds of trust relating to real property owned by DOC.

**G.**     **Background of QHI**

In 1986, Kenneth and Carol Dunlap completed construction on a 69-room outside corridor Best Western hotel located in Willcox, Arizona (the "Hotel"). In 1995, an additional twenty rooms were added to the 300 section of the Hotel. In 2005, the Hotel experienced management changes. The previous manager had been at the site since day one, and the transition to new management was difficult. During this time period, the Hotel required substantial upgrades and the overall performance suffered.

In October 2005, due largely to the inexperienced management and transition problems, the Hotel lost the Best Western brand. The Hotel operated unbranded for a period while another brand was located. The Hotel operated unbranded until December 2005, however, the Hotel was not receiving enough reservations without a brand. As a result of the lack of brand, online sales suffered along with the Hotel's average daily rate.

The Hotel was rebranded to Baymont Inn and Suites in December 2005. The rebranding required the Hotel to add a breakfast center and convert two rooms to suites. At the time, Baymont was under the La Quinta umbrella for reservations. Despite the fact that the Hotel was under the same reservation system as La Quinta, the Hotel did not receive sufficient reservations to support its ongoing operations.

With the Hotel struggling in late 2006, management entered into negotiations to return to the Best Western brand. The negotiations were successful and in May of 2007, with all of the required upgrades completed, the Hotel was rebranded back to Best Western.

The Hotel has been used as collateral intermittently for the last twenty years with respect to various indebtedness with Compass owing from DOC .

10

**H.      Interrelated Business Operations between DOC and QHI**

DOC and QHI share common ownership, officers, and directors. DOC and QHI are co-obligors on various indebtedness and obligations, have loaned money or otherwise covered expenses at various times, and there are undisputed intercompany obligations owed to and from DOC and QHI.  As just one example, DOC handles all payroll obligations for QHI, and employees of both operations receive their paychecks and W-2s from DOC.  QHI then reimburses DOC for the payroll and related expenses on monthly basis.  As another example, the QHI Hotel serves as collateral for certain indebtedness owed by DOC to Compass.

The interests of the DOC and QHI are aligned with respect to the debts and obligations owed to various creditors and the equity interest holders.  Both Debtors filed their respective Chapter 11 cases in an effort to preserve the going concern value of their property and to reorganize.

**I.      Events Leading to Chapter 11 Filing**

DOC and QHI faced a number of challenges that necessitated a Chapter 11 filing.  Primarily, the drastic increase in fuel prices and the attendant business problems and losses caused thereby, have hampered DOC's efforts to conduct its business. The Debtors also owed significant amounts in payroll taxes, and had commenced repayment pursuant to a restructured payment plan with the Internal Revenue Service.  Finally, despite repeated and substantial efforts to restructure the existing debts with their lenders outside of Court, the Debtors were unable to reach agreement and various secured creditors initiated foreclosure proceedings against the Debtors' property.  In light of the financial situation facing DOC and QHI, management determined that filing a Chapter 11 case would provide the Debtors with the necessary breathing room and ability to restructure their obligations.

**IV.**
**POST-PETITION PROCEEDINGS AND EVENTS**

**A.      Summary of Key Events Related to the Bankruptcy Case.**

While more detailed information related to the events in the Bankruptcy Case can be obtained by accessing the Bankruptcy Court's CM/ECF filing system and reviewing the filings in Case Nos. 4:12-bk-23252-JMM and 4:12-bk-23256-JMM, the following is a summary of certain key bankruptcy-related proceedings and events associated with this Bankruptcy Case:

**1.      Filing of Bankruptcy Petition**.  On October 24, 2012 (the "Petition Date"), DOC and QHI both filed voluntary Chapter 11 bankruptcy petitions with the United

11

States Bankruptcy Court for the District of Arizona. The bankruptcy cases are currently being jointly administered under Bankruptcy Case No. 4:12-bk-23252-JMM.

**2. Retention of Professionals**. On October 24, 2012, the Debtors filed the *Application for Entry of Interim and Final Orders Under 11 U.S.C. § 327(A) Authorizing the Employment of Gallagher & Kennedy, P.A. as General Bankruptcy and Restructuring Counsel to the Debtor* (Dkt. #7) seeking authorization for Gallagher & Kennedy, P.A. ("G&K") to perform legal services for the Debtors in these proceedings, including provide legal advice with respect to the powers and duties of a debtors-in-possession; prepare necessary legal papers; appear in court and assist with any disposition of assets by sale or otherwise. No objections were received. On or about October 30, 2012, the Court entered its Order approving the retention of G&K as general counsel to the Debtors (Dkt. #43).

Also on October 24, 2012, the Debtor filed the *Application for an Order Under 11 U.S.C. § 327(A) Authorizing the Employment of Peritus Commercial Finance LLC as Financial Advisor to the Debtors* (Dkt. #5) seeking authorization for Peritus Commercial Finance LLC ("Peritus") to provide Debtors financial advice relating to this case. A final hearing on the Peritus Application was held on November 13, 2012. At the hearing, the Court denied the application without prejudice.

**3. First-Day Motions**. The following Motions were filed by the Debtors on or about the Petition Date, and a hearing on the First Day Motions was conducted on October 26, 2012:

**(a) Joint Administration**. Debtors filed the *Motion to Transfer Case Assignment and for Joint Administration* (Dkt. #3) to preserve judicial and estate resources, avoid duplication of efforts and reduce the time and expense associated with administering the Debtors' cases. On October 30, 2012, an *Order for Joint Administration* was entered by the Bankruptcy Court. *See* Dkt. #37.

**(b) Cash Collateral.** Debtors filed the *Emergency Motion to Approve Use of Cash Collateral* (Dkt. #9) to request authorization of the use of cash collateral needed to allow the Debtors to operate their businesses and reorganize, and grant replacement liens to creditors who demonstrate a perfected interest in the Debtors' cash collateral. An interim Order was entered by the Court on October 26, 2012 (Dkt. #33) following a hearing. No objections were received and a final Order was entered following a hearing on November 13, 2012 (Dkt. #59).

**(c) Utility Services.** Debtors filed the *Emergency Motion for an Order Determining Adequate Assurance of Payment for Future Utility Services* (Dkt. #10). At the October 26, 2012 hearing the Court granted adequate assurance to the utility

12

companies on the condition that post-petition payments are kept current by the Debtor. *See*, Dkt. #44.

        **(d)**     **Employee Wages and Salaries.**   Debtors filed the *Emergency Motion for and Order Authorizing the Payment of Pre-Petition Employee Wages, Salary, and Other Compensation and Authorizing Banks to Honor Checks for Employee Obligations* (Dkt. #11) in order to make payroll and satisfy employee and other compensation obligations. The Order was approved by the Court and entered on October 30, 2012 (Dkt. #30). Accordingly, the wage and employee claims listed on Schedule E of Debtors' Schedules have been satisfied pursuant to the Court's approval for immediate payment of such claims.

        **(e)**     **Critical Vendors.**   Debtors filed the *Motion for Interim Order Authorizing the Debtors to Pay Pre-Petition Claims of Critical Vendors and Approving Ongoing Payment Arrangements with Jackson* (Dkt. #12) to request the provision of critical supplies and services, including fuel, oil, beverages and food products, and related goods and services in order to continue operations of the DOC Stations and QHI Hotel. At the October 26, 2012 hearing the Court limited the approval of payments to Jackson Oil only. *See* Dkt. #39.

        **(f)**     **Bank Accounts.**   Debtors filed the *Motion for an Order Authorizing Maintenance of Debtors' Existing Bank Accounts and Cash Management System* (Dkt. #13). An interim Order approving the Motion was entered on October 31, 2012 (Dkt. #45).

**V.**

**DESCRIPTION OF ASSETS AND THEIR VALUE**

**A.**     **Assets and Property.**

    Attached as Exhibit "B" to this Disclosure Statement is a listing and description of the real property and improvements owned by the Debtors. Additional information regarding the Debtors' assets and property is set forth in the Statement and Schedules filed at Dkt. #36 (DOC) and #37 (QHI).

**VI.**

**FINANCIAL CONDITION AND ANALYSIS**

**A.**     **Present Operations.**

    The persistent economic downturn, slowdown in tourist activities, and wide fluctuations in fuel prices in recent years have negatively impacted the Debtors' cash flow and ability to service debt. Debtors are current on all ordinary course post-petition obligations. The Debtors continue to produce income over operating expenses throughout the course of this case.

13

**B.      Future Operations.**

　　With streamlined operations consisting of approximately half of the Debtors' prior locations, combined with the debt restructuring set forth in the Plan, the Reorganized Debtors will continue to operate under their current management.

　　Prior to and since the Petition Date, the Debtors have received inquiries from potential purchasers for some of the Properties.  If these inquiries result in sales, which Debtors expect to occur, additional income from sales will be generated to fund the Plan.

## VII.
## SOURCES OF INFORMATION

　　The financial information contained in this Disclosure Statement is derived from a number of sources.  Values ascribed to Debtors' Assets were provided by the Debtor, appraisals conducted by third parties, or market comparisons.  Information on Claims of Creditors was obtained from the financial records of the Debtors and the statements and schedules on file in the Bankruptcy Case.

　　The information contained in this Disclosure Statement represents the Debtors' best estimate in light of current market conditions and past experience.   All the information provided is subject to change and represents the best information available at the time, the actual results may differ.

## VIII.
## SUMMARY OF THE PLAN

　　The following provides a summary of the overall structure and classification of claims against or interests of or in the Debtors and is qualified in its entirety by reference to the Plan, which is attached as <u>Exhibit "A"</u>.   The statements in this Disclosure Statement include summaries of the provisions contained in the Plan.  This summary does not purport to be a complete statement of all terms in the Plan, and reference is made to the Plan for the full and complete statement of such terms.   The Plan controls the treatment of Claims against and Equity Interests of and in the Debtors and other parties-in-interest.   Where Claims are divided into subclasses in the Plan, each subclass will be considered to be a separate class for all confirmation purposes, including treatment and voting on the Plan.

**A.      Classification and Treatment of Claims and Interests.**

　　The Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code.  The Plan states whether each Class of Claims or Equity Interests are impaired or unimpaired.  The Plan provides the treatment each Class will receive under the Plan.   In accordance with the requirements of the Bankruptcy Code, Allowed Administrative Expense Claims and Priority Tax Claims are not set forth in Classes and are not entitled to vote on the Plan. The Allowed Claims against the Debtors' Estates are divided into the following classes:

14

**1.** **Class 1 (Secured Tax Claims)**. Class 1 consists of all Allowed Secured Tax Claims against the Debtors.

**2.** **Class 2 (Secured Claims)**. Class 2 consists of all Allowed Secured Claims against the Debtors other than Secured Tax Claims, in the amounts set forth below for each respective secured creditor.

**3.** **Class 3 (Unsecured Claims)**. Class 3 consists of all Allowed Unsecured Claims held against the Debtors by all Unsecured Creditors, including deficiency claims of secured creditors.

**4.** **Class 4 (Equity Security Interests in DOC).** Class 4 consists of the equity security interests of the shareholders of DOC.

**5.** **Class 5 (Membership Interests in QHI).** Class 5 consists of the membership interests of the shareholders of QHI.

**B.** **Summary of Treatment of Unclassified Claims.**

**1.** **Administrative Claims**.

Every Creditor holding an Allowed Administrative Claim against the Debtors will be paid, in full satisfaction of its Allowed Claim: (a) fully and in Cash on or before the Effective Date if the Claim is then an Allowed Claim; (b) fully and in Cash when and if the Claim becomes an Allowed Claim after the Effective Date; or (c) as otherwise agreed in writing by the Creditor holding the Allowed Administrative Claim or ordered by the Bankruptcy Court. Administrative Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Administrative Claims.

**2.** **Administrative Claims Bar Date.** Proofs of claim (or, for Professional Charges, fee applications) requesting payment of administrative costs and expenses incurred prior to the Effective Date pursuant to Sections 507(a)(2) and 503(b) of the Bankruptcy Code must be served and filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date; provided, however, that proofs of claim will not be required with respect to any unpaid post-petition operating expenses incurred in the normal course of the Debtors' business prior to the Effective Date. Any such Claim that is not served and filed within this time period will be forever barred. Any Claims for fees, costs, and expenses incurred by any Chapter 11 Professionals after the Effective Date will be paid in the ordinary course of the Debtors' business.

**3.** **Priority Tax Claims.** To the extent Priority Tax Claims exist on the Effective Date, holders of Allowed Priority Tax Claims will be (a) paid in full on the later

15

of the Effective Date or the allowance of the Claim, or (b) over a period not exceeding five (5) years after the Petition Date. Priority Tax Claims will be allowed in the principal amount of the tax due as of the Petition Date, with interest at the applicable statutory rate, without penalties. In the event that the Debtors elect to make periodic payments rather than pay any or all Priority Tax Claims in full on the Effective Date, Priority Tax Claims will be paid: (i) in equal monthly installments; (ii) with interest at an appropriate rate to be determined in accordance with 11 U.S.C. § 511; (iii) with payments beginning within thirty days after the Effective Date, (iv) all in accordance with 11 U.S.C. § 1129(a)(9).

The failure of the Debtor to comply with the provisions of the Plan concerning liability for Allowed Priority Tax Claims, which includes but is not limited to the failure to make full and timely payments, shall constitute a default under the Plan. If the Debtor fails to cure the default within ten (10) days after written notice of default delivered to the Debtor and to its counsel, the entire balance due and owing on the Allowed Priority Tax Claims shall be immediately due. In the event of an uncured default, holders of Allowed Priority Tax Claims may enforce the entire amount of their claim and exercise any and all rights and remedies under applicable non-bankruptcy law, including but not limited to State law collection procedures and any other such relief as may be deemed appropriate by the Bankruptcy Court.

**C.** **Summary of Treatment of Unimpaired Classes.**

**1.** **Class 4 (Equity Security Interests in DOC).**

The shareholders of DOC will retain their respective equity security interests in DOC. Class 4 Claims are unimpaired pursuant to the Plan and votes to accept or reject the Plan will not be solicited from Creditors holding Class 4 Claims.

**D.** **Summary of Treatment of Impaired Classes.**

**1.** **Class 1 (Secured Tax Claims).**

The Class 1 Claims are for real estate and personal property taxes assessed by various Arizona Counties against the Debtors' Property, as well as secured tax claims asserted by the Arizona Department of Revenue ("ADOR"). Holders of Allowed Class 1 Claims will retain their liens on any Assets of the Debtors that serve as security for repayment of Allowed Class 1 Claims. Class 1 Claims are impaired and holders of Allowed Class 1 Claims will be entitled to vote to accept or reject the Plan.

a. Class 1(a) (Properties retained by the Debtor under the Plan): Allowed Class 1(a) Claims will be (a) paid in full on the later of the Effective Date or the allowance of the Claim, or (b) over a period not exceeding five (5) years after the Petition Date. Allowed Class 1(a) Secured Tax Claims will be allowed in the principal amount of the tax due as of the Petition Date, with interest at the applicable statutory rate, and applicable penalties. In the event that the Debtors elect to make periodic payments rather than pay any or all of the Allowed Class 1(a) Secured Tax Claims in full on the Effective

16

Date, Class 1(a) Secured Tax Claims will be paid: (i) in equal monthly installments; (ii) with interest at an appropriate rate to be determined in accordance with 11 U.S.C. § 511; (iii) with payments beginning within thirty days after the Effective Date, (iv) all in accordance with 11 U.S.C. § 1129(a)(9). Class 1(a) Secured Tax Claims are impaired, and holders of Allowed Class 1(a) Claims will be entitled to vote to accept or reject the Plan. Below is a chart showing the anticipated amounts and payment schedule for the Allowed Class 1(a) Secured Tax Claims relating to the Properties to be retained by the Debtor under the Plan:

| Property | Claimant | Amount | Monthly Payment |
|---|---|---|---|
| Willcox Office<br>759 S. Haskell<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $10,950 | $266 |
| San Jose Chevron<br>1288 S. Hwy 92<br>Bisbee, AZ | Cochise Co.<br>(POC #4) | $19,831 | $482 |
| Sierra Vista Little<br>General<br>1860 S. Hwy 92<br>Sierra Vista, AZ<br>SV Vacant Land - | Cochise Co.<br>(POC #4)<br><br>Cochise Co.<br>(POC #4) | $83,135<br><br><br>$12,792 | $2,021<br><br><br>$311<br>Total = $2,332 |
| Marana Chevron<br>13960 N. Sandario<br>Marana, AZ | Pima Co.<br>(POC #24)<br>Pima Co.<br>(POC #33) | $89,762<br><br>$525 | $2,183<br><br>$13<br>Total = $2,196 |
| Dunlap Plaza<br>900 W. Rex Allen Dr.<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $107,982 | $2,626 |
| Willcox Truck Plaza<br>1190 W. Rex Allen Dr<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $68,501 | $1,666 |
| Green Valley<br>SuperCenter<br>171 W. Continental Rd<br>Green Valley, AZ (and<br>adjacent vacant land) | Pima Co.<br>(POC #27, 28,<br>29, 31, 32)<br>Pima Co.<br>(POC #36) | $83,119<br><br><br>$2,188 | $2,021<br><br><br>$53<br>Total = $2,074 |
| DOC's Food Stop<br>2371 E. Hwy 70<br>Thatcher, AZ | Graham Co.<br>(POC#20) | $8,361 | $203 |
| Ajo Chevron<br>2001 N. Ajo-Gila Bend<br>Hwy<br>Ajo, AZ | Pima Co.<br>(POC #34) | $246 | To be paid on<br>Effective Date |
| Cochise County<br>Personal Property Taxes<br>pursuant to Cochise<br>County Proof of Claim<br>for DOC | Cochise Co.<br>(POC #4) | TOTAL = $2,595.20<br>(cannot distinguish<br>between locations based on<br>Cochise County POC #4) | To be paid on<br>Effective Date |

17

b.     **Class 1(b) (Properties returned to secured creditors under the Plan):** With respect to the Properties that the Debtors intend to surrender in exchange for credit against the applicable secured claims, to the extent Secured Tax Claims exist on the Effective Date, the Returned Collateral will be turned over by the Debtors to the respective secured creditor subject to all Allowed Class 1(b) Secured Tax Claims then existing.  Holders of Allowed Class 1(b) Secured Tax Claims will retain their liens on any Assets of the Debtors that serve as security for repayment of Allowed Class 1(b) Secured Tax Claims.  The respective secured creditors will be responsible for paying all Allowed Class 1(b) Secured Tax Claims in full.  Class 1(b) Secured Tax Claims will be allowed in the principal amount of the tax due as of the Petition Date, with interest at the applicable statutory rate, and applicable penalties.  Class 1(b) Secured Tax Claims are impaired, and holders of Allowed Class 1(b) Claims will be entitled to vote to accept or reject the Plan.  Below is a chart showing the anticipated amounts for the Allowed Class 1(b) Secured Tax Claims relating to the Properties to be turned over by the Debtor under the Plan:

| Property | Claimant | Amount | Secured Creditor |
|---|---|---|---|
| Benson Chevron 680 N. Ocotillo Benson, AZ | Cochise Co. IRS (POC #9) | $18,503 (estimated RE 10/11) $56.86 (estimated PP-11/12) $309,004 (Payroll) | None besides Taxing Authorities |
| Benson Little General 696 N. Ocotillo Benson, AZ | Cochise Co. | $24,980 (estimated RE-10/11/12) $7,368 (estimated PP-10/11/12) | Compass |
| Quail Hollow Inn 699 N. Ocotillo Benson, AZ | Cochise Co. (POC #1) | $226,613 (includes both real and personal property taxes pursuant to Cochise County POC #1) | Compass |
| Sierra Vista Chevron 1796 E. Fry Blvd Sierra Vista, AZ | Cochise Co. (POC #4) | $18,503 | Compass |
| Grand Texaco w/ DQ 1051 W. Beta Rd Sahuarita, AZ (and adjacent vacant land) | Pima Co. (POC #25, 30) Pima Co. (POC #35) | $140,420 $3,067 | CCB |
| Esperanza Texaco 61 W. Esperanza Green Valley, AZ | Pima Co. (POC #26) Pima Co. (POC #37) | $33,742 $2,188 | CCB/Cox It is anticipated that the taxes due and owing on the Esperanza Station will be satisfied by Magnesson upon the transfer of the Esperanza |

18

| | | | Station leasehold improvements and personal property to Magnesson. Magnesson and the Debtor continue to work on an agreement relating to the Esperanza Station. |
|---|---|---|---|
| Pinetop Chevron 971 E. White Mtn Blvd. Pinetop, AZ | Navajo Co. | $28,964 (estimated RE-10/11/12) $8,761 (estimated PP-12) | CCB |
| Payson Chevron 709 E. Hwy 260 Payson, AZ | Gila Co. Havin Trust (purchased tax cert.) (POC #13) | $43,601 | Cox The taxes due and owing on the Payson Chevron will be satisfied by the Debtor in accordance with the payment terms set forth in Class 1(a), as a part of the settlement reached between the Debtors and Cox. |
| Tucson Office 4231 S. Station Master Dr., Tucson, AZ | Pima Co. (POC #23) Pima Co. (POC #38) | $32,206 $2,110 | Cox The taxes due and owing on the Tucson Office will be satisfied by the Debtor in accordance with the payment terms set forth in Class 1(a), as a part of the settlement reached between the Debtors and Cox. |

### 2. <u>Class 2 (Secured Claims)</u>

Allowed Class 2 Secured Claims will be satisfied through a combination of the return of Collateral to the respective secured creditors and a restructured payment of the remaining balance as either a Class 2 Allowed Secured Claim or a Class 3(a) Unsecured Deficiency Claim.

Holders of Allowed Class 2 Secured Claims will retain their liens on the Collateral that serves as security for repayment of Allowed Class 2 Claims as further set forth below, pending payment in full. Class 2 Claims are impaired, and Holders of Allowed Class 2 Claims will be entitled to vote to accept or reject the Plan.

19

In partial or total satisfaction of secured claims, the Debtors will return the following Collateral to the respective secured creditors in exchange for a credit equal to the fair market value of the Collateral as of the Effective Date. The Fair Market Values ("FMV") set forth below are estimates based on various sources of information, including appraisals, brokers' opinions, and management estimates. To the extent that any creditor disagrees with the FMV set forth below and timely files an objection on this basis, the valuation of the Collateral will be addressed in the confirmation proceedings in this Case.

After taking into account the FMV credits set forth below, to the extent that the Holder of an Allowed Class 2 Secured Claim remains fully secured after the return of a portion of its collateral, the balance will be paid in monthly installments according to a twenty-five year amortization schedule, with interest at the rate of 5% per annum, and with a balloon payment on the 60th month following the Effective Date. The monthly payment amount for the first 59 installments (the "Monthly Payment") will be due on the first of each month beginning with the first day of the month following the Effective Date. There shall be no penalty for pre-payment of any or all Class 2 Allowed Secured Claims. To the extent that any secured creditor is not fully secured for the remaining balance after the return of Collateral, any Deficiency Claim will be treated as a Class 3(a) Unsecured Deficiency Claim.

The Class 2 Allowed Secured Claims will be secured by the existing deeds of trust and security interests held by the respective creditors as of the Petition Date, with the exception of CCB which will be granted an additional first position deed of trust on the Ajo Station in exchange for the release of its deed of trust relating to the Esperanza Station, as security for repayment of the Class 2 Allowed Secured Claims.

Any creditor who properly and timely elects treatment pursuant to Section 1111(b) of the Bankruptcy Code (and only if the election is deemed proper and the claim is allowed by the Bankruptcy Court) will receive treatment of its Allowed Claim in accordance with the applicable provisions of the Bankruptcy Code.

Each subclass in Class 2 Allowed Secured Claims shall be considered a separate class for all confirmation purposes, including treatment and voting on the Plan:

a.      Class 2(a) Secured Claim of Compass Bank/Pineda.

*PINEDA ASSERTS:*

*Pineda disputes Debtors' estimation of the amount of its Claim and asserts that the total amount of its Claim, as of the Petition Date, is no less than $6,998,815.54 as set forth in Pineda's proofs of claim. Pineda has filed a motion to determine the amount of the secured portion of its Claim. Pineda reserves the right to make an election to have its entire Allowed Claim treated as fully secured pursuant to 11 U.S.C. § 1111(b).*

**Option 1:**      The Allowed Class 2(a) Secured Claim of Compass Bank in the estimated total amount of $5,994,324 shall be treated as follows:

The Benson Chevron, Benson Little General, Quail Hollow Inn, and Sierra Vista Chevron will be returned to Compass in exchange for a credit in the total amount of $4,458,972, after accounting for the outstanding taxes relating to these Properties.

| Property | Secured Creditor | FMV | Taxes | Net Credit Against Claim |
|----------|------------------|-----|-------|--------------------------|
| Benson Chevron 680 N. Ocotillo Benson, AZ | Compass | $480,000 | $18,503 (RE 10/11) $56.86 (PP-11/12) $309,004 (2010) | $152,436 |
| Benson Little General 696 N. Ocotillo Benson, AZ | Compass | $459,000 | $24,980 (RE-10/11/12) $7,368 (PP-10/11/12) | $426,652 |
| Quail Hollow Inn 699 N. Ocotillo Benson, AZ | Compass | $3,275,000 | $226,613 | $3,048,387 |
| Sierra Vista Chevron 1796 E. Fry Blvd Sierra Vista, AZ | Compass | $850,000 | $18,503 | $831,497 |
| **Total Credit Against Compass Claim:** | | | | **$4,458,972** |

The remaining balance of the Class 2(a) Allowed Secured Claim of Compass Bank will total approximately $1,535,352 and will be secured by the existing deeds of trust held by Compass on the following properties: Willcox Office, San Jose Chevron, Sierra Vista Little General, Marana Chevron, and Dunlap Plaza. The Monthly Payment amount for the balance of the Class 2(a) Allowed Secured Claim of Compass Bank will be $8,975.

*PINEDA ASSERTS:*

*Pineda disputes Debtors' estimates of the value of the above properties, disputes Debtors' estimate of the balance of the Class 2(a) Allowed Secured Claim that would remain after application of the credit for the value of the above properties, and disputes Debtors' estimate of the monthly payment that would be required to service the remaining secured claim balance.*

**Option 2:** As an alternative to the Option 1 treatment, to the extent the Debtors obtain financing or are otherwise able to generate funds through the sale of a portion of the Debtors' Property, in full satisfaction of all Claims of Compass against the Debtors, holders of Allowed Class 2(a) Claims may elect to receive a discounted payoff in a lump sum totaling $3.2 million, payable on the Effective Date (the "<u>Discounted Payoff</u>"). Upon receipt of the Discounted Payoff, all Claims held by Compass, including any Class 3(a) Compass Deficiency Claim as well as any other claims held by Compass, will be deemed satisfied in full. Compass shall file a written notice setting forth its election for Option 2 no later than ten (10) days prior to the Confirmation Hearing.

      b.   <u>Class 2(b) Secured Claims of CCB.</u>

**Option 1:** The Allowed Class 2(b) Secured Claim of Canyon Community Bank ("<u>CCB</u>"), in the estimated total amount of $6,316,364, shall be treated as follows:

*CCB ASSERTS:*

*CCB disputes Debtors' estimated total amount of CCB's Claims, as provided in the Proofs of Claim filed by CCB in the bankruptcy cases.*

21

The Grand Texaco and Pinetop Chevron will be returned to CCB in exchange for a credit in the total amount of $3,518,788, after accounting for the outstanding taxes relating to these Properties.

*CCB ASSERTS:*

*CCB disputes the values Debtors' have assigned to the properties below, as detailed in Section of of the Articles titled "Background & Events Leading to Filing" above. CCB has filed a Motion to Determine Value of Interest at Dkt. 191, to establish the value of the collateral.*

| Property | Secured Creditor | FMV | Taxes | Net Credit Against Claim |
|---|---|---|---|---|
| Grand Texaco w/ DQ 1051 W. Beta Rd Sahuarita, AZ (and adjacent vacant land) | CCB | $2,850,000 | $143,487 | $2,706,513 |
| Pinetop Chevron 971 E. White Mtn Blvd. Pinetop, AZ | CCB | $850,000 | $28,964 (RE-10/11/12) $8,761 (PP-12) | $812,275 |
| **Total Credit Against CCB Claim:** | | | | **$3,518,788** |

The remaining balance of the Class 2(b) Allowed Secured Claim of CCB will total approximately $2,797,576 and will be secured by the existing deeds of trust held by CCB on Green Valley Super Center and adjacent vacant land, as well as the portion of DOC's Rolling Stock on which CCB holds a valid lien. A summary of DOC's Rolling Stock is set forth in Schedule B to the Statements and Schedules (Dkt. #36).  In addition, in exchange for the release of its lien and deed of trust on the Esperanza Station, CCB shall be provided with a lien in the amount of $125,000 and a corresponding deed of trust on the Ajo Station.  The Monthly Payment amount for the balance of the Class 2(b) Allowed Secured Claim of CCB will be $16,354.

*CCB ASSERTS:*

*CCB disputes this value based upon the amount of its claims and the value of the collateral Debtors propose to return to CCB.*

**Option 2:**    As an alternative to the Option 1 treatment, to the extent the Debtors obtain financing or are otherwise able to generate funds through the sale of a portion of the Debtors' Property, in full satisfaction of all Claims of CCB against the Debtors, holders of Allowed Class 2(b) Claims may elect to receive a discounted payoff in a lump sum totaling $4.5 million, payable on the Effective Date (the "Discounted Payoff"). Upon receipt of the Discounted Payoff, all Claims held by CCB, including any Class 3(a) CCB Deficiency Claim as well as any other claims held by CCB, will be deemed satisfied in full. CCB shall file a written notice setting forth its election for Option 2 no later than ten (10) days prior to the Confirmation Hearing.

22

c.    Class 2(c) Secured Claims of Cox.

The Allowed Class 2(c) Secured Claim of Cox shall be treated in accordance with the Parties' separate Settlement filed (or to be filed) with the Court.  A summary of the materials terms of the Settlement is provided below:

| Property | Secured Creditor | FMV | Taxes | Net Credit Against Claim |
|---|---|---|---|---|
| Payson Chevron 709 E. Hwy 260 Payson, AZ | Cox | $700,000 | The taxes due and owing on the Payson Chevron will be satisfied by DOC in accordance with the payment terms set forth in Class 1(a), as a part of the Settlement reached between the Debtors and Cox. | $700,000 |
| Tucson Office 4231 S. Station Master Dr., Tucson, AZ | Cox | $450,000 | The taxes due and owing on the Tucson Office will be satisfied by DOC in accordance with the payment terms set forth in Class 1(a), as a part of the Settlement reached between the Debtors and Cox. | $450,000 |
| **Total Credit Against Cox Claim:** | | | | **$1,150,000** |

Following the transfer of the Payson Chevron and the Tucson Office to Cox, Cox will hold a Class 2(c) Allowed Secured Claim in the amount of $807,055 (the "Remaining Cox Allowed Secured Claim"), which will be secured by the existing first position deed of trust held by Cox on the real property located at 1190 W. Rex Allen Drive, Willcox, Arizona ("Willcox Truck Plaza").

In the event that Cox sells the Payson Chevron prior to the full repayment by DOC of the Payson Chevron Taxes, and Cox is forced to satisfy any outstanding portion of the Payson Chevron Taxes from the proceeds of such sale, then the amount of the Payson Chevron Taxes paid or otherwise satisfied by Cox shall be added to the amount of the Remaining Cox Allowed Secured Claim, and DOC will adjust the monthly payment amount to reflect the increased amount of the Remaining Cox Allowed Secured Claim based on the addition of the outstanding taxes at the time of sale.

In the event that Cox sells the Tucson Office prior to the full repayment by DOC of the Tucson Office Taxes, and Cox is forced to satisfy any outstanding portion of the Tucson Office Taxes from the proceeds of such sale, then the amount of Tucson Office Taxes paid or otherwise satisfied by Cox shall be added to the amount of the Remaining Cox Allowed Secured Claim, and DOC will adjust the monthly payment amount to reflect the increased amount of the Remaining Cox Allowed Secured Claim based on the addition of the outstanding taxes at the time of sale.

The Remaining Cox Allowed Secured Claim will be paid in monthly installments according to a twenty-five year amortization schedule, with interest at the rate of five percent (5%) per annum, and with a balloon payment in month 60. The initial monthly payment of the Remaining Cox Allowed Secured Claim for the first 59 installments shall be $4,717, due on the first day of each month beginning with the first day of the month following the Court's approval of this Settlement. The monthly payment may increase based on the amount of outstanding Payson Chevron Taxes or Tucson Office Taxes at the time of sale by the Coxes. There shall be no penalty for pre-payment of the Class 2(c) Cox Allowed Secured Claim.

In conjunction with the Settlement, Cox will release its deed of trust relating to the leasehold improvements located at 61 W. Esperanza Blvd., Green Valley, Arizona (the "Esperanza Station"). Cox will also release its deeds of trust relating to the following real property listed on Schedule A of DOC's Statement and Schedules (Dkt. #36):

      a. 1051 W. Beta Road, Sahuarita, Arizona
      b. Vacant land located in Sahuarita, Arizona
      c. 171 W. Continental Road, Green Valley, Arizona
      d. Vacant land located in Green Valley, Arizona

In exchange for the release of the Cox deed of trust on the Esperanza Station, DOC agrees to indemnify and otherwise hold Cox harmless for the obligations arising from Cox's Guarantee of the lease obligations relating to the Esperanza Station, within thirty (30) days of written notice from the Coxes demanding indemnification. In addition, to the extent that DOC fails to make payment on the Payson Chevron Taxes or the Tucson Office Taxes as set forth above, or in the event that such payments do not fully satisfy the outstanding pre-petition taxes, interest, and penalties allowed by the Court, then DOC agrees to indemnify the Coxes for such amounts. The indemnification obligations of DOC to Cox will be secured by the existing first position deed of trust held by Cox on the Willcox Truck Plaza.

In the event of a default by DOC under the Plan with regard to the Cox Claim, the default provisions set forth in the existing loan documents between DOC and the Coxes will apply, including but not limited to the ability to initiate foreclosure proceedings against the Willcox Truck Plaza. The Coxes shall give DOC written notice of any alleged default, and a thirty (30) day opportunity to cure, prior to exercising any alleged rights and remedies.

d.     Class 2(d) Secured Claims of Jackson.

The Class 2(d) Allowed Secured Claim of Jackson totals approximately $266,247 and is secured by the existing deed of trust held by Jackson on the DOC's Food Stop in Thatcher, Arizona. Jackson holds a deed of trust relating to DOC's Food Stop. The real property comprising DOC's Food Stop is owned by the principals of the Debtor, and is

24

leased to the Debtor.  Jackson is further secured by the fuel and receipts of the Debtor.  The Class 2(d) Allowed Secured Claim of Jackson arises from the provision of fuel pursuant to the Jackson Supply Agreement, which Jackson asserts is an executory contract.  To the extent that the Court determines that the Jackson Supply Agreement in an executory contract, DOC intends to assume the Jackson Supply Agreement under the Plan and will cure any alleged default through the treatment set forth in this Class 2(d).

The Class 2(d) Allowed Secured Claim of Jackson will be paid in monthly installments according to a twenty-five year amortization schedule, with interest at the rate of 5% per annum, and with a balloon payment on the 60th month following the Effective Date.  The monthly payment amount for the first 59 installments (the "Monthly Payment") will be due on the first of each month beginning with the first day of the month following the Effective Date.  The Monthly Payment amount for the Class 2(d) Allowed Secured Claim of Jackson will be $1,556.  The treatment of Jackson's Class 2(d) Allowed Secured Claim shall be deemed to satisfy any alleged "cure" relating to the assumption of the Jackson Supply Agreement.

### 3. Class 3 (Unsecured Claims).

a. Class 3(a) Deficiency Claims.  Class 3(a) consists of any Deficiency Claims of the secured creditors set forth above.  Based upon the Debtors' estimated values of the Collateral, the Debtors do not believe that any creditor will hold a Deficiency Claim.  In the event that any Class 3(a) Deficiency Claims are Allowed by the Court, holders of Allowed Class 3(a) Claims will be entitled to semi-annual pro rata distributions of the cash flows generated and amounts received by the Debtors, after payment of operating expenses and installment payments to secured creditors, for a period of five years after the Effective Date (the "Unsecured Distribution Amount").  Upon receipt of their respective pro rata portions of the Unsecured Distribution Amount, all Allowed Unsecured Deficiency Claims in Class 3(a) will be deemed paid and discharged in full five years after the Effective Date. Class 3(a) Claims are impaired and holders of Allowed Class 3(a) Claims will be entitled to vote to accept or reject the Plan.

As noted above, the Debtors do not anticipate that there will be any Class 3(a) Deficiency Claims in this Case.  The Deficiency Claims are properly treated in their own class on the basis that such claims are disputed, and are of a different nature and character than the other general unsecured claims in Class 3, constituting "a legitimate business or economic justification" for the separate classification. *See Barakat v. The Life Ins. Co. of Virginia (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996).  Further, separate classification is appropriate when the legal character of the claim is different from that of creditors in other classes.  *See Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1994); *see also Oxford Life Ins. Co. v. Tucson Self-Storage, Inc.* (*In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 897-98 (B.A.P. 9th Cir. 1994); *Montclair Retail*

*Ctr., L.P. v. Bank of West* (*In re Montclair Retail Ctr., L.P.*), 177 B.R. 663, 665 (B.A.P. 9th Cir. 1995).

b. <u>Class 3(b) General Unsecured Claims.</u> Class 3(b) consists of all General Unsecured Claims other than the Deficiency Claims and the Related Parties Unsecured Claims. Holders of Allowed Class 3(b) Claims will be entitled to semi-annual pro rata share of the Unsecured Distribution Amount for a period of five years after the Effective Date. Upon receipt of their respective pro rata portions of the Unsecured Distribution Amount, all Allowed Unsecured Deficiency Claims in Class 3(b) will be deemed paid and discharged in full five years after the Effective Date. Class 3(b) Claims are impaired and holders of Allowed Class 3(b) Claims will be entitled to vote to accept or reject the Plan.

c. <u>Class 3(c) Related Parties Unsecured Claims.</u> Class 3(c) Related Parties Unsecured Claims will be deemed waived and released as against the Debtors on the Effective Date as a component of the contributions by the current Equity Security Interest holders under the Plan, and the Related Parties will not receive any payment on account of Class 3(c) Related Parties Unsecured Claims. The Class 3(c) Related Parties Unsecured Claims total approximately $1,378,500.

**4.** **<u>Class 5 (Membership Interests in QHI)</u>**. The membership interests of the QHI members will be terminated and QHI will be dissolved following the sale or transfer of the Hotel to Pineda pursuant to the Plan. Class 5 Claims are impaired, and holders of Allowed Class 5 Claims are deemed to reject the Plan pursuant to 11 U.S.C. § 1126(g).

**IX.**
**<u>OVERVIEW OF ADDITIONAL PLAN PROVISIONS</u>**

**A.** **<u>Implementation of the Plan & Conditions to Effectiveness.</u>**

The means of execution of the Plan are and will be as follows:

**1.** **<u>Conditions Precedent to Occurrence of Effective Date</u>**. It is a condition of the Effective Date that the Confirmation Order has been entered by the Bankruptcy Court and has become a Final Order. The Confirmation Order will provide that the New Value Contribution defined below is substantial and necessary, and is sufficient to satisfy the corollary to the Absolute Priority Rule so as to allow the Equity Interest holders of DOC to retain their interests in DOC even if Unsecured Creditor Claims are not paid in full under the Plan. The Effective Date is expected to occur within fifteen (15) calendar days of the entry of the Confirmation Order.

2. **Implementation**.

    (a)     **Cash Flow and Member Financing**. Payments under the Plan will be funded through cash flow generated by the continued operations of the Debtors' business, and/or through alternate financing obtained from third parties. The Debtors anticipate that cash flow generated from the continued operation of its restructured business operations will increase and stabilize in the coming months, thereby increasing the cash flow for the remaining payments under the Plan. *See* Exhibit D – Cash Flow Projections. In addition, because initial cash flows are insufficient to fund Effective Date and Plan payments, the Equity Interest holders of DOC will contribute on the Effective Date $150,000 to fund the Plan (the "New Value Contribution") from a variety of source including but not limited to the sale of assets, financing, and/or refinancing. In addition to the cash New Value Contribution, the Equity Interest holders of DOC have also agreed to contribute their respective fee simple interests in the Benson Little General and Benson Chevron in the event that the Plan is confirmed.

    (b)     **Future Management of Debtor**. The Reorganized Debtors will continue to be managed by Ted Dunlap. The Debtor's current management will continue in place after confirmation, with the same pre-petition rate of pay for the two years following the Effective Date. In the event that cash flows are sufficient to increase salaries, any increase to insider salaries will be limited to no more than a 10% increase per year starting in the third year following the Effective Date. The current pay for insiders, as set forth in the Debtors' monthly operating reports, is as follows:

| Name | Reason for Payment | Monthly Salary |
|------|--------------------|----------------|
| TED DUNLAP | SALARY | $7920 |
| CAROL A DUNLAP | SALARY | $5360 |
| WILLIAM ALEXANDRA | SALARY | $4400 |

Mr. Alexandra is the current manager of the Quail Hollow Inn. In the event that the Quail Hollow Inn is sold or otherwise transferred, it is anticipated that Mr. Alexandra will either be terminated or will be moved to another management position.

**B.**     **Resolution of Claims, Demands, and Causes of Action.**

    **1.**     **Preservation of Debtors' Claims, Demands, and Causes of Action**. All claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtors arising before the Effective Date and that have not been resolved or disposed of prior to the Effective Date, are preserved in full for the benefit of the Debtors and the Debtors will own and retain, and may prosecute, enforce, compromise, settle, release, or otherwise dispose of, any and all claims, defenses, counterclaims, setoffs, and recoupments belonging to the Debtors.

27

## 2. Procedure for Determination of Claims.

**(a)** **Objections to Claims.** Except as to any Claim that has been Allowed prior to the Effective Date, the Debtors may object to the allowance of any Claim against the Debtors or seek estimation on any Claim.

**(b)** **Disputed Claims.** No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order. If a Claim is not an Allowed Claim by or on the Effective Date or when payment is otherwise due under the Plan, payment of the Allowed Claim will be made when a Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in the Plan.

**(c)** **Treatment of Contingent Claims.** Until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan. The holder of a contingent Claim will only be entitled to a distribution under the Plan when and if such contingent Claim becomes an Allowed Claim.

## C. Treatment of Executory Contracts.

**1.** **Assignment, Assumption or Rejection of Executory Contracts.** As part of the turnover of the various secured creditors' Collateral on the Effective Date, the secured creditors will have the option to assume the existing executory contracts relating to those locations. CCB, Compass, and/or Cox must provide notice of its intent to assume or reject the executory contracts by filing a notice of its decision with the Bankruptcy Court in this Case ten (10) days before the Confirmation Hearing. If CCB, Compass, or Cox elects to assume the executory contracts, the Debtors will execute an assignment to the respective secured creditor effective as of the Effective date of the Plan. If the secured creditor instead elects not to assume the executory contracts (or fails to timely file a notice with the Bankruptcy Court), the executory contracts will be rejected by the Debtors pursuant to Section 365 of the Bankruptcy Code.

**2.** **Rejection of Executory Contracts.** The Plan contemplates and provides for the rejection, pursuant to Section 365 of the Bankruptcy Code, of any and all Executory Contracts of the Debtors which are in force on the Confirmation Date, except those Executory Contracts which were specifically assumed pursuant to an order of the Court.

**3.** **Assumption of Other Executory Contracts.** Before the Confirmation Hearing, the Debtors may file one or more motions identifying any Executory Contracts

that they intend to assume as of the Effective Date; and such motions and the Bankruptcy Court's orders thereon will be deemed incorporated in the Plan. All Executory Contracts not otherwise assumed will be rejected as of the Confirmation Date. Because the assumption and rejection of leases and executory contracts may depend on the election of various secured creditors in this Case, the Debtors anticipate that a final determination regarding the assumption or rejection of executory contracts will be made prior to the Confirmation Hearing, and after the Option 2 election deadline for secured creditors.

**4.** **Rejection Claims Bar Date**. Every Claim asserted by a Creditor arising from an Executory Contract that is rejected under the Plan must be filed with the Bankruptcy Court no later than the first Business Day that is thirty (30) days after the Effective Date. Every such Claim that is timely filed will be treated under the Plan as a General Unsecured Claim. Every such Claim that is not timely filed by the deadline stated above will be forever barred, unenforceable, and discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

**D.** **Miscellaneous Plan Provisions.**

**1.** **Retention of Jurisdiction**. As described in detail in the Plan, the Plan provides for the retention of jurisdiction by the Bankruptcy Court over various aspects of the Debtors' Bankruptcy Cases from and after the Effective Date.

**2.** **General Injunction**. Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that all parties-in-interest who have held, hold, or may hold Claims are permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against the Debtors or any successor-in-interest of the Debtors, against property of the Debtors, or against property of any successor-in-interest of the Debtors; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or any successor-in-interest of the Debtors, property of the Debtors, or against property of any successor-in-interest of the Debtors with respect to any such Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or any successor-in-interest of the Debtors, against property of the Debtors, or against property of any successor-in-interest of the Debtors with respect to any such Claim; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors or any successor-in-interest of the Debtors, against property of the Debtors, or against property of any successor-in-interest of the Debtors, with respect to any such Claim; (e) conducting any form of discovery from the Debtors with respect to any such Claim, or any successor-in-interest of the Debtors; and/or (f) harassing the Debtors or any successor-in-interest of the Debtors.

29

**3.** **<u>Vesting</u>**.  As of the Effective Date of the Plan, Debtors shall be vested with all of the Assets of the Estate.  All assets transferred to the Debtors shall be free and clear of all liens, claims, and interest of creditors and parties-in-interest, except as specifically provided in the Plan.  Upon the Effective Date, except as provided in the Plan, the Debtors shall be free to borrow without further Bankruptcy Court order, such sums of money upon such terms and conditions as it may, in its sole discretion, determine, including the granting of liens and purchase money security interests.

**4.** **<u>Payment of Statutory Fees and Filing of Quarterly Reports</u>**.  All fees payable pursuant to 28 U.S.C. § 1980, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with applicable bankruptcy law.  All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

**X.**
**FEDERAL TAX CONSEQUENCES**

**A.** **<u>No Federal Tax Consequences.</u>**

Debtor DOC is an Arizona corporation.  Debtor QHI is an Arizona limited liability company (LLC). LLCs are pass-through entities for federal income tax purposes and are not subject to federal income tax; the members are directly taxed individually on the income, taking into account the member's share of the profits and losses. Nevertheless, each holder of a claim is urged to consult with its own tax advisor regarding the federal, state, local and other tax consequences of the Plan. No rules have been requested from the Internal Revenue Service with respect to any of the tax aspects of the Plan.

**XI.**
**VOTING PROCEDURES AND REQUIREMENTS**

**A.** **<u>Parties Entitled to Vote.</u>**

If you hold an Allowed Claim that is "impaired" under the Plan, you are entitled to vote to accept or reject the Plan.  Accordingly, to be entitled to vote, your Claim must be "allowed" as set forth in Section 502 of the Bankruptcy Code or temporarily allowed as set forth in Bankruptcy Rule 3018(a).  Additionally, Section 1126(f) of the Bankruptcy Code permits you to vote to accept or reject the Plan only if your Claim is "impaired."

**B.** **<u>Procedures for Voting.</u>**

**1.** **<u>Submission of Ballots</u>**.  After this Disclosure Statement has been approved by the Bankruptcy Court, all Creditors whose votes are solicited (as explained above) will be sent (a) a ballot, together with instructions for voting (the "<u>Ballot</u>"); (b) a copy of this

30

Disclosure Statement as approved by the Bankruptcy Court; and (c) a copy of the Plan. You should read the Ballot carefully and follow the instructions. Please use only the Ballot sent with this Disclosure Statement. You should complete your Ballot and return it to:

> GALLAGHER & KENNEDY, P.A.
> Attn: John R. Clemency and Lindsi M. Weber
> 2575 East Camelback Road, Suite 1100
> Phoenix, AZ 85016
> Telephone: (602) 530-8000

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., MOUNTAIN STANDARD TIME, ON <u>APRIL 10, 2013</u>. IF YOUR BALLOT IS NOT TIMELY RECEIVED, IT WILL NOT BE COUNTED IN DETERMINING WHETHER THE PLAN HAS BEEN ACCEPTED OR REJECTED.**

A properly addressed, stamped return envelope will be included with your Ballot.

**2. <u>Procedures for Vote Tabulation</u>.** In determining whether the Plan has been accepted or rejected, Ballots will be tabulated in accordance with the Court's Order approving this Disclosure Statement.

**3. <u>Withdrawal of Ballots</u>.** A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

**4. <u>Questions and Lost or Damaged Ballots</u>.** If you have any questions concerning voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Debtors' counsel, John Clemency or Lindsi Weber, at the address and telephone number listed above.

**C. <u>Summary of Voting Requirements</u>.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one (1) impaired Class of Claims. For a Class of Claims to accept the Plan, votes representing at least two-thirds in claim amount and a majority in number of the Claims voted in that Class (not including votes of insiders) must be cast to accept the Plan.

> **IT IS IMPORTANT THAT HOLDERS OF ALLOWED IMPAIRED CLAIMS EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTORS ASSERT THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THE**

31

**DEBTORS RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.**

The specific treatment of each Class under the Plan is described in the Plan and is summarized in this Disclosure Statement.

## XII.
## LIQUIDATION ANALYSIS

A liquidation analysis is attached as Exhibit "C", and reflects a liquidation value of approximately 81% recovery on Class 2 Secured Claims (compared to 100% recovery proposed under the Plan) and a 0% recovery on Class 3 Unsecured Claims (compared to an estimated 100% recovery proposed under the Plan).

## XIII.
## CONFIRMATION OF THE PLAN

**A.      Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, will hold a Confirmation Hearing on the Plan.  The Confirmation Hearing will be held at the United States Bankruptcy Court, 38 S. Scott Avenue, Tucson, Arizona, on **April 17, 2013, at 10:30 a.m.   THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING.**

**B.      Objections to Confirmation.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan, regardless of whether it is entitled to vote.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.   **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY MADE, THE COURT NEED NOT RECEIVE AND CONSIDER IT.**  All objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors' counsel at the address set forth above, on the United States Trustee, and on any party-in-interest who has requested notice in the Debtors' Bankruptcy Cases, by **April 10, 2013**.

**C.      Requirements for Confirmation of the Plan.**

**1.      Confirmation Under Section 1129(a) of the Bankruptcy Code**.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  Such requirements include, among others:

32

(1)     That the Debtors have complied with the applicable provisions of Chapter 11, including the provisions of Sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and interests and contents of a plan of reorganization.

(2)     That the Debtors have proposed the Plan in good faith and not by any means forbidden by law.

(3)     That any payment made or promised by the Debtors to any Person for services, costs, or expenses in connection with the Bankruptcy Case or the Plan has been approved by or is subject to approval by the Bankruptcy Court as reasonable.

(4)     That the Debtors have disclosed the identity and affiliations of Persons proposed to serve as officers after confirmation.

(5)     That one or more of the impaired Classes of Claims has voted to accept the Plan.

(6)     That the Plan is in the best interests of holders of Claims and Equity Interests; that is, each holder of an Allowed Claim or Allowed Equity Interest either has accepted the Plan or will receive on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder of such Claim or Equity Interest would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

(7)     That the Plan is feasible; that is, confirmation is not likely to be followed by the need for liquidation or further reorganization of the Debtors unless that is provided for in the Plan.  The Debtors' Plan so provides; thus, feasibility is not an issue.

**2.      Debtors Believe the Plan Satisfies Bankruptcy Code Requirements.**

**(a)      Best Interests Test and Liquidation Analysis**.   Under the best interests test, the Plan is confirmable if, with respect to each impaired Class of Claims or Equity Interests, each holder of an Allowed Claim or Allowed Equity Interest in such Class either:  (i) has accepted the Plan; or (ii) will receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

33

As set forth above, the Debtors believe the distributions to Creditors under the Plan will meet or exceed the recoveries that Creditors would receive in a Chapter 7 liquidation of the Debtors and their Estates. The Debtors believe that the Plan provides an equal or better return to Creditors than they can otherwise receive under Chapter 7, and therefore the best interests of creditors test is met.

      **(b)**    <u>**Feasibility of the Plan**</u>.   Section 1129(a)(11) of the Bankruptcy Code includes what is commonly described as the "feasibility" standard. In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible - that is, that the need for further reorganization or a subsequent liquidation of the Debtors is not likely to result following confirmation of the Plan. As set forth in this Disclosure Statement and in the Plan, the Debtors believe the Plan is feasible. Attached to this Disclosure Statement as <u>Exhibit "D"</u> are cash flow projections prepared by Debtors which reflects the ability of the Debtors to make the payments called for under the Plan.

      **(c)**    <u>**Acceptance by an Impaired Class**</u>.   Because the Plan impairs some Classes of Claims, Section 1129(a)(10) of the Bankruptcy Code requires that, for the Plan to be confirmed, at least one impaired Class must accept the Plan by the requisite vote without counting the votes of any "insiders" (as that term is defined in Section 101(31) of the Bankruptcy Code) contained in that Class. The Debtors believe that at least one impaired Class will vote to accept the Plan.

      **(d)**    <u>**Confirmation Under Section 1129(b) of the Bankruptcy Code**</u>. Although Section 1129(a)(8) of the Bankruptcy Code requires that the Plan be accepted by each Class that is impaired by the Plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of the Debtor if all requirements of Section 1129(a) of the Bankruptcy Code are met except for Section 1129(a)(8) and if, with respect to each Class of Claims or Equity Interests that (a) is impaired under the Plan, and (b) has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." This provision commonly is referred to as a "cramdown." The Debtors have requested cramdown confirmation of the Plan with respect to any such non-accepting Class of Creditors. **The Debtors believe that, with respect to such Class or Classes, the Plan meets the requirements of Section 1129(b) of the Bankruptcy Code.**

          **(1)**    <u>**Unfair Discrimination**</u>. A plan of reorganization "does not discriminate unfairly" if: (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to those of the non-accepting class; and (ii) no class receives payments in excess of that which it is legally entitled to

34

receive on account of its Claims or Equity Interests. The Debtors assert that under the Plan: (i) all classes of impaired Claims are being treated in a manner that is consistent with the treatment of other similar classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in the Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Equity Interests.

(2) **Fair and Equitable Test**. The Bankruptcy Code establishes different "fair and equitable" tests for Secured Creditors, Unsecured Creditors, and holders of Equity Interests, as follows:

(i) **Secured Creditors**. With respect to a secured claim, "fair and equitable" means that a plan provides that either (A) the holder of the secured claim in an impaired class retains the liens securing such claim, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the amount of such allowed claim, and that the holder of such claim receives on account of such claim deferred cash payments totaling at least the amount of such allowed claim, of a value, as of the effective date, of at least the value of such holder's interest in the estate's interest in such property; (B) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claim, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clauses (A) and (C); or (C) the realization by such holder of the "indubitable equivalent" of such claim.

(ii) **Unsecured Creditors**. With respect to an unsecured claim, "fair and equitable" means that a plan provides that either (A) each impaired unsecured creditor receives or retains property of a value, as of the effective date, equal to the amount of its allowed claim; or (B) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii) **Equity Interest Holders**. With respect to holders of equity interests, "fair and equitable" means that a plan provides that either (A) each holder will receive or retain under the plan property of a value, as of the effective date, equal to the greater of: (1) the fixed liquidation preference or redemption price, if any, of such interest; or (2) the value of such interest; or (B) the holders of equity

35

interests that are junior to the non-accepting class will not receive any property under the plan.

The Debtors believe the Plan complies with the Claims priority established by the Bankruptcy Code and thus the "fair and equitable" test of the Bankruptcy Code (including the absolute priority rule) is met with respect to the Secured Creditors and the Equity Interest holders under the Plan after the New Value Contribution is made by the Equity Interest holders.

## XIV.
## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, several different events could occur: (1) the Debtors or a third party could propose another plan providing for different treatment of certain Creditors; (2) Secured Creditors, if any, could move for relief from the automatic stay to allow them to foreclose their liens against their collateral, which may be granted by the Court if an alternative plan is not confirmed in a reasonable period of time; (3) the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Bankruptcy Case or convert such to a case under Chapter 7 if an alternative plan is not confirmed in a reasonable period of time; or (4) the Bankruptcy Court could approve a sale of the Debtors' remaining assets to the highest and best bidder an auction sale under Section 363 of the Bankruptcy Code.

## RECOMMENDATION AND CONCLUSION

The Debtors believe that the Plan provides the best available alternative for maximizing the recoveries that Creditors will receive from the Debtors' Assets. Therefore, the Debtors recommend that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

Date: February 14, 2013                    DUNLAP OIL COMPANY, INC.

                                           */s/ Theodore Dunlap*
                                           Theodore Dunlap
                                           President, Dunlap Oil Company, Inc.

                                           QUAIL HOLLOW INN, LLC

                                           */s/ Theodore Dunlap*
                                           Theodore Dunlap
                                           On behalf of Carol Dunlap, Manager of
                                           Quail Hollow Inn, LLC

PREPARED AND SUBMITTED BY:

GALLAGHER & KENNEDY, P.A.

By: */s/ Lindsi M. Weber*
    John R. Clemency
    Lindsi M. Weber
    2575 East Camelback Road
    Phoenix, Arizona 85016-9225
    *Attorneys for Debtor*

36