DAVID WM. ENGELMAN, SBA #004193
BRADLEY D. PACK, SBA #023973
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
_____
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@eblawyers.com
Email: bdp@eblawyers.com
_____

Attorneys for Pineda Grantor Trust II

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>DUNLAP OIL COMPANY, INC.,<br>QUAIL HOLLOW INN, LLC,<br><br>Debtors.<br><br>Filing applies to both Debtors | Chapter 11<br><br>Case No.: 4:12-bk-23252-JMM<br>Case No.: 4:12-bk-23256-JMM<br><br>(Jointly Administered)<br><br>**OBJECTION TO CONFIRMATION OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION DATED FEBRUARY 14, 2013**<br><br>Hearing Date: April 17, 2013<br>Hearing Time: 10:30 a.m. |

Pineda Grantor Trust II ("Pineda") hereby files its objection to confirmation of Debtors' *First Amended Joint Plan of Reorganization Dated February 14, 2013* (the "Plan").

The Plan proposes a partial dirt for partial debt transfer to Pineda, whereby Debtors will deed certain properties to Pineda in exchange for a credit against Pineda's secured claim equal to the "fair market value" of the transferred properties. The remaining balance of the secured claim will be paid on the basis of a 25 year amortization schedule with 5% interest, and will mature 5 years from confirmation. Debtors' principals will retain their equity interests in the Debtor in exchange for a $150,000 "new value contribution."

The Plan fails to satisfy the requirements for confirmation under 11 U.S.C. § 1129(a) and (b) and cannot be confirmed because, among other things:

- **The Plan Is Not Filed In Good Faith:** As Dunlap Oil's operating history both prior to and after filing bankruptcy demonstrates, it has been operating its business

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

at a considerable financial loss. Dunlap Oil has failed to demonstrate that this continuing loss to the estate would improve even with the scaled-down operation proposed under the Plan. Additionally, the value of Dunlap Oil's real property is deteriorating. Thus, creditors would be better served by an orderly liquidation of Debtors' property than by confirmation of the Plan. As the Plan will only result in further diminution of the estate's assets at the expense of the creditors, confirmation would undermine the fundamental policies of the Bankruptcy Code.

- **The Plan Is Not Feasible.** Debtors' financial projections are not grounded in reality. Moreover, Debtors seriously underestimate the amount of their debt service on secured claims. There is simply no likelihood that Debtors can perform under their Plan.

- **The Plan Is Not Fair and Equitable.** Debtors' partial dirt for partial debt proposal does not satisfy the exacting standard of indubitable equivalence required to confirm such plans. Debtors propose an improper (albeit undefined) "fair market value" standard, and there is no evidence to support their inflated valuations of the properties. Additionally, the proposed interest rate of 5% is insufficient in light of the substantial risk of default.

- **The Plan Violates the Absolute Priority Rule.** There is no support for Debtors' conclusory statement that the proposed $150,000 contribution is sufficient to satisfy the "new value corollary" to the absolute priority rule.

This Objection is supported by the following Memorandum of Points and Authorities and the papers and pleadings on file, all of which are incorporated herein by this reference.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.  FACTUAL AND PROCEDURAL BACKGROUND**

#### **A.  Parties and Jurisdiction.**

1. On October 24, 2012 (the "Filing Date"), Debtors filed their voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Debtors' bankruptcy cases are being jointly administered. Debtors are operating their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L).

#### **B.  The Indebtedness to Pineda.**

3. Prior to the Filing Date, Compass Bank made a series of loans to Dunlap Oil, including the following. All of Compass's rights in and to the following loans were assigned and transferred to Pineda on or about November 7, 2012:

a. On or about August 30, 2000, Compass made a loan to Dunlap Oil in the original principal amount of $2,400,000.00 (the "First Term Loan"), as evidenced by the promissory note of even date (the "First Term Note").

b. On or about October 17, 2000, Compass made a loan to Dunlap Oil in the original principal amount of $1,000,000.00 (the "Second Term Loan"), as evidenced by the promissory note of even date (the "Second Term Note").

c. On or about October 17, 2000, Compass established a revolving line of credit facility for Dunlap Oil in the original principal amount of up to $1,000,000.00"), as evidenced by the promissory note of even date (the "Revolver Note").

d. On or about September 8, 2004, Compass made a loan to Dunlap Oil in the original principal amount of $800,000.00 (the "Third Term Loan"), as evidenced by the promissory note of even date (the "Third Note").

4. The First Term Note, Second Term Note, Revolver Note, and Term Note are collectively referred to herein as the "Notes." Pineda is the owner and the holder of the Notes. Copies of the Notes and the assignments thereof are attached to Pineda's *Motion for Relief from Automatic Stay* filed on January 16, 2013 (the "Stay Relief Motion").

5. Each of the Notes has matured by its terms. Despite the maturity of the Notes, Debtors have failed to pay the outstanding balances thereof.

6. Following Dunlap Oil's default, the Notes were modified through a series of modification and forbearance agreements to, among other things: (a) increase the principal amount of the Revolver to $3,500,000; (b) provide additional collateral for the Notes; (c) provide that the interest rates on each of the Notes would never be less than 9.0% per annum; and (d) provide that notwithstanding Dunlap Oil's failure to pay the Notes on their respective maturity dates, Compass Bank would forbear from taking any action to enforce the Notes provided Debtors remained in compliance with certain payment terms and with other conditions of the forbearance agreements (the "Forbearance Obligation"). The Forbearance Obligation terminated on November 25, 2009.

7.  Debtors have not made any payments to Pineda or its predecessor, Compass Bank, in the last three years.  As of the Filing Date, the total outstanding indebtedness under the Notes was **$6,998,815.54,** inclusive of interest at the contract rate accrued through the Filing Date.  A detailed itemization of the balance is set forth in the Stay Relief Motion.

### C. The Notes Are Secured By Deeds of Trust on the Hotel, Gas Stations and Other Properties.

8.  Quail Hollow is the owner of a hotel located at 699 N. Ocotillo in Benson, Arizona.  The Hotel is an 83-room hotel that is currently operated as a Best Western.

9.  The Hotel was previously owned by the Kenneth T. Dunlap and Carol A. Dunlap Revocable Trust (the "Dunlap Trust").  The Dunlap Trust transferred the Hotel to Quail Hollow by Special Warranty Deed recorded on June 20, 2012.

10. Pursuant to the Deeds of Trust dated August 5, 2008 and November 5, 2008 and recorded in the official records of Cochise County, Arizona, the Dunlap Trust granted Compass a first-position lien and a second-position lien on the Hotel as security for the Notes.  Copies of the Deeds of Trust are attached to the Stay Relief Motion.

11. In addition to the Hotel, the Notes are secured by Deeds of Trust and a UCC-1 lien on certain real and personal property owned by Dunlap Oil, including the following: (1) Gas station/convenience store located at 13968 North Sandario Road, Marana; (2) Gas station/c-store located at 1796 East Frye Boulevard, Sierra Vista; (3) Gas station/c-store located at 1860 S. State Highway 92, Sierra Vista; (4) Gas station/c-store located at 1288 S. State Highway 92, Sierra Vista; (5) Gas station/c-store located at 696 N. Ocotillo Road, Benson; (6) Commercial warehouse/office located at 759 South Haskell Avenue, Willcox; (7) Retail strip center located on the southwest corner of Rex Allen Drive and Arizona Avenue, Willcox; and (8) all of Dunlap Oil's accounts and contract rights, equipment, inventory and general intangibles (replacement liens on post-petition property were granted to Pineda pursuant to the Order entered on October 29, 2012).

12. Prior to transferring the Notes to Pineda, Compass Bank obtained appraisals of all of the real property collateral as of August 1, 2012.[1] Copies of said appraisals were provided to counsel for Debtors on December 14, 2012. Said appraisals make the assumption that all property taxes have been paid. In fact, as disclosed in Debtors' Disclosure Statement, there is approximately $775,000 of senior real and personal property tax liens encumbering the properties. When the tax liens are taken into consideration, the value of Pineda's interest in the real property collateral for the Notes is **$5,230,485**, according to the August 2012 appraisals, is itemized as follows:

| PROPERTY | APPRAISED AMOUNT | TAX LIENS | VALUE OF INTEREST |
|---|---|---|---|
| 759 S. Haskell Ave., Willcox | $350,000 | $91,674 | $258,326 |
| 1288 S. Highway 92, Bisbee | $700,000 | $25,104 | $674,896 |
| 696 N. Ocotillo Road, Benson | $140,000 | $32,348.00 | $107,652 |
| Quail Hollow Motel, 699 N. Ocotillo Road, Benson | $1,900,000 | $300,674 | $1,599,326 |
| 13968 N. Sandario Road, Marana | $925,000 | $74,715 | $850,285 |
| 1796 E. Fry Blvd., Sierra Vista | $470,000 | $41,656 | $428,344 |
| 1860 S. Highway 92, Sierra Vista | $870,000 | $78,798 | $791,202 |
| Shopping Center - 902 - 918 W Rex Allen | $650,000 | $129,546 | $520,454 |
| **Total Values** | **$6,005,000** | **$774,515** | **$5,230,485** |

### D. Debtor's Cash Flow.

13. According to Dunlap Oil's monthly operating report for November 2012 (Dkt. 115), it posted a net <u>loss</u> of $1,688,216 from January to November 2012 – despite having not made any debt service payments to Pineda or paying its real property taxes. Its cash flow

---

[1] Pineda has ordered updated appraisals on all of the properties and expects that they will be completed prior to the confirmation hearing. All of the values discussed herein are for illustrative purposes only, and Pineda reserves the right to present evidence that the value of its collateral is greater or less than the values set forth herein. The actual value of Pineda's collateral will be determined at the evidentiary hearing on Pineda's *Motion to Determine Value of Interest in Collateral Pursuant to 11 USC § 506*.

does not appear to have improved since filing bankruptcy, as it had a net loss of $428,213 from its Filing Date through January 31, 2013. (Dkt. 213 at pp.10-11).

14. There is no likelihood that Dunlap Oil will be able to rehabilitate its financial condition by scaling down its operations. In its Disclosure Statement, Debtors project that Dunlap Oil's gross profit for 2013 – *after* it has divested itself of half of its revenue generating properties – will be $1,594,270. However, according to Dunlap Oil's January 2013 monthly operating report, its *gross* profit for January 2013 (total revenues less cost of goods sold, labor costs and taxes, but excluding overhead) was $48,525 – for an annualized total of $582,300. Thus, Debtor is currently generating less than 40% of the revenue it projects it will generate after it has substantially scaled down its business operations.

**E. The Plan and Disclosure Statement.**

15. The Plan provides for a transfer of certain properties to Pineda in exchange for a credit against Pineda's secured claim in the amount of the "fair market value" of such property, less any senior tax liens. Specifically, Debtors propose to transfer the following properties (collectively, the "Transferred Properties") in exchange for the following credits, which Debtors estimate to be the "fair market value" less the amount of the senior tax liens:

- Benson Chevron:[2]        $152,436
- Ocotillo Gas Station:     $426,652
- Hotel:                    $2,974,326
- Fry Blvd. Gas Station:    $808,344

16. The Plan proposes to pay the remaining balance of Pineda's secured claim in monthly payments based upon a 25 year amortization, with interest at 5%, and with the obligation to mature in 5 years.

///

///

---

[2] Debtors claim to own this property free and clear of any voluntary liens. It is not part of Pineda's collateral.

17. Unsecured creditors will be paid from "the cash flows generated and amounts received by the Debtors, after payment of operating expenses and installment payments to secured creditors"[3] for a period of 5 years from the Effective Date.

18. The Disclosure Statement states that the amount owed to Pineda is estimated at $5,994,324 – which actually understates the amount of debt by over $1 million. Thus, deducting Debtors' estimate of the fair market value of the Transferred Properties, Debtors estimate that the principal amount of the payment obligation to Pineda on account of its remaining secured claim is $1,632,566.

19. Using the actual amount of Pineda's claim and the current appraised values of the properties set forth above, the principal amount of the payment obligation to Pineda on account of the claims secured by Retained Properties would be $4,863,493 – more than $3 million greater than the amount estimated by Debtors.

20. The Plan states that to the extent any secured creditor's claim is not fully secured, the "deficiency balance" shall be classified as an unsecured claim – albeit in a separate class from all other general unsecured claims.

21. Debtors attach 5 year cash flow projections as an exhibit to their Disclosure Statement. The projections predict positive cash flows between $54,000 and $207,000 for each of those five years.

22. Under the Plan, the current equity holders in the Debtors would retain their equity interests in Dunlap Oil in exchange for a $150,000 "new value contribution" and the waiver of their unsecured claims against the Debtors.

## II. THE COURT SHOULD DENY CONFIRMATION OF THE PLAN

11 U.S.C. § 1129(a) provides that "[t]he Court shall confirm a plan only if all of the following requirements are met." Thus, if any of the enumerated conditions are unsatisfied,

---

[3] It is unclear precisely what Debtors mean by "cash flows generated and amount received by the Debtors" or what they are classifying as "operating expenses," as all of those terms are undefined.

confirmation must be denied. The Debtor bears the burden of establishing each of the enumerated conditions. *In re Shoen*, 193 B.R. 302, 313 (Bankr. D. Ariz. 1996).

The only exception to the requirement that Debtor satisfy *all* of the conditions enumerated in § 1129(a) is that it is not necessary for the Debtor to obtain the acceptance of each class of impaired creditors *if* the Plan "does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting impaired class. 11 U.S.C. § 1129(b)(1). "The burden of demonstrating that the plan is 'fair and equitable' in order to obtain confirmation falls on the plan proponent." *In re Friedman*, 466 B.R. 471, 480 (B.A.P. 9th Cir. 2012).

In this case, confirmation must be denied because Debtors cannot satisfy their burden of proof as to the following requirements for Plan confirmation.

### A. The Plan Is Proposed In Bad Faith and In Violation of the Code.

Under 11 U.S.C. § 1129(a)(1)-(3), a Chapter 11 plan may be confirmed only if the plan and plan proponent comply with the Bankruptcy Code and the plan is proposed in good faith. Debtors' Plan fails that test.

As set forth above, Dunlap Oil has operated at a substantial loss both prior to and after filing bankruptcy. There is no evidence that the Debtor's financial condition will improve even after it has scaled down its operations by divesting itself of less profitable properties. On the other hand, there is evidence that Debtor's properties are declining in value. In the event the Plan is confirmed, it likely will just be a matter of time before Dunlap Oil defaults on its obligations under the Plan. The creditors' interests would thus be better served if the Debtors' assets were liquidated now, in an orderly fashion, rather than requiring creditors to wait for an inevitable plan default and leave them to assert their remedies after the value of Debtors' assets has been further diminished. Debtors are not acting in good faith by proposing a plan that will leave their current management in place while the value of their business and their assets continue to erode, at the expense of their creditors. Such a plan is contrary to the policy of maximization of the return to creditors that is fundamental to the

Bankruptcy Code. And because creditors would be better served by a liquidation rather than by confirmation, the Plan also fails the best interest of creditors test of § 1129(a)(7).

### B. The Plan Is Not Feasible.

Bankruptcy Code §1129(a)(11) requires the Court to find, as a condition of confirmation, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In order to satisfy this "feasibility" requirement, a Chapter 11 Plan "must offer a reasonable prospect of success and be workable." *In re Holmes*, 301 B.R. 911, 915 (Bankr. M.D. Ga. 2003). Thus, "[t]he debtor cannot confirm a plan that is a visionary scheme which promises more than the debtor can deliver." *In re Windmill Durango Office, LLC*, 481 B.R. 51, 67 (B.A.P. 9th Cir. 2012).

As set forth above, Debtors' operating history both prior to and after the Filing Date demonstrates that it has no ability to pay both its ordinary operating costs and to fund its obligations under the Plan. The actual annualized *gross* profit for Dunlap Oil (the only entity that will survive confirmation) is less than 40% of the gross profit the Debtors project for 2013 – and that is before the Debtor divests itself of nine of its revenue-generating properties.

Debtors also underestimate the amount of their required debt service. For example, Debtors assume that after they are credited for the value of their "dirt for debt" transfers, the remaining amount of Pineda's secured claim will be $1,632,566. Assuming a 25 year amortization and a 5% interest rate, the annual debt service would be $114,525.84. But if the Court were to use the above values of the Transferred Properties to figure the amount of Debtors' credit, then Pineda's remaining claim would be $4,863,493. The annual debt service would be $341,178. With an obligation of that size, even assuming all of the other figures in Debtors' cash flow projections are accurate, the Debtors will not have sufficient revenue to fund their Plan. And of course, that does not take into consideration the likelihood that the value of the Transferred Properties has declined, that the values will need to be discounted to "fair value," and that the proposed 5% interest rate is too low. Thus, the Plan is not feasible.

{0003085.0000/00421900.DOCX / }  9

Case 4:12-bk-23252-BMW    Doc 256    Filed 04/08/13    Entered 04/08/13 15:47:25    Desc
Main Document    Page 9 of 17

## C.  "Deficiency Claims" May Not Be Separately Classified.

"Separate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors." *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 897 (B.A.P. 9th Cir. 1994) (citations omitted). In their Plan, however, Debtors classify their secured creditors' "deficiency" claims separately from other general unsecured claims. Debtors have not identified any business or economic justification for such separate classification. Thus, the Plan violates the Bankruptcy Code.

## D.  The Plan Is Not Fair and Equitable With Respect to Pineda.

With respect to a class of secured creditors, the "fair and equitable" requirement of § 1129(b) requires, at a minimum, that the plan provide: (i) that the secured creditors retain their lien on their collateral and receive deferred cash payments equal to the present value of their secured claim; (ii) that the collateral be sold free and clear of the creditor's lien, subject to Bankruptcy Code §363(k), with the lien to attach to the proceeds of the sale; or (iii) that the secured creditor receive the "indubitable" equivalent of its claim. 11 U.S.C. § 1129(b)(2)(A). The Plan fails these requirements in numerous respects.

### i.  No Authority Permits a Partial Dirt for Partial Debt Plan.

The Plan in this case proposes an unconfirmable hybrid of subparts (i) and (iii). Debtor will transfer some property to Pineda in exchange for a "fair market value" credit against the secured debt, presumably to provide Pineda with the "indubitable equivalent" of its claim. Debtor acknowledges, however, that the value of the property to be transferred to Pineda is not sufficient to pay off the full amount of Pineda's secured claim. Debtor thus proposes to make deferred payments on the remaining balance of Pineda's secured claim.

There is no authority that would permit confirmation of such a "partial dirt" for "partial debt" plan, particularly where it is clear that the Debtors are cherry picking the properties they will retain and attempting to deed back to creditors the least desirable properties they own. The requirements of § 1129(b)(2)(A) are written in the disjunctive. A plan must satisfy the

requirements of subparts (i), (ii), <u>or</u> (iii) to be fair and equitable with respect to a secured class. The statute does not permit Debtor to combine one type of treatment with another.

In addition to violating the plain language of § 1129, the Debtors' Plan undermines the principles underlying those cases upholding dirt for debt plans. Dirt for debt cases fall under two categories: (1) those where a debtor proposes to deed back *all* of an *undersecured* creditor's collateral in full satisfaction of the secured portion of its claim; and (2) those where a debtor proposes to deed back *some* of an *oversecured* creditor's collateral in full satisfaction of its claim. *In re Arnold & Baker Farms,* 85 F.3d 1415, 1423 (9th Cir. 1996).

With respect to undersecured creditors, "the secured portion of an undersecured creditor's total claim is *by definition* equal to the value of the collateral securing it." *Id.* Thus, an undersecured creditor "necessarily receives the indubitable equivalent of its secured claim when it receives the collateral securing that claim." *Arnold & Baker*, 85 F.3d at 1423. On the other hand, because the value of an oversecured creditor's collateral exceeds its claim, it is not necessary to deed back all of the collateral to satisfy the claim. "[T]he amount of collateral deemed to be the indubitable equivalent of [the] secured claim depends entirely on the court's valuation of the collateral." *Id.* An undersecured creditor will be left with an unsecured claim after the transfer, while a secured creditor will be left with no claim at all.

In either case, the transfer of the creditor's collateral must satisfy the full amount of the creditor's *secured* claim. Because the Plan in this Case proposes to transfer *some* of Pineda's collateral in satisfaction of *some portion* of its secured claim, it does <u>not</u> provide Pineda with the indubitable equivalent of its secured claim. The Plan also fails to provide for payments with a present value equal to the full amount of Pineda's secured claim. Thus, the Plan does not satisfy either subparts (i) or (iii) of § 1129(b)(2). Accordingly, it cannot be confirmed.

        ii.    <u>Debtor Cannot Force Pineda to Accept Property That Does Not Even Serve As Collateral for Its Claim</u>.

Because the amount of a secured claim depends upon the value of the creditor's collateral, a dirt for debt transfer provides the indubitable equivalent of the secured claim only

if the "dirt" that the debtor proposes to transfer constitutes all or a part of the creditor's collateral. *See, e.g. Arnold & Baker*, 85 F.3d at 1423; *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1350 (5th Cir. 1989). Under the Debtor's Plan, the property to be transferred to Pineda includes the "Benson Chevron" – a property which does *not* secure Pineda's claim. Pineda cannot be compelled to accept title to this property in satisfaction of any part of its claim.

### iii. The Plan Proposes an Improper Valuation Standard.

The Debtors' partial dirt for partial debt Plan also proposes an improper "fair market value" standard for determining the amount of the credit against Pineda's secured claim. As the Ninth Circuit BAP held in *Arnold & Baker,* the standard to be applied in dirt for debt cases is "fair value." "Valuation through the 'fair value' method essentially applies a market valuation and then discounts that value to present value in order to reflect the amount of time the property is scheduled to be held by the creditor in anticipation of sale." *In re Arnold & Baker Farms*, 177 B.R. 648, 657 (B.A.P. 9th Cir. 1994). In this case, the Plan does not actually define the term "fair market value." However, to the extent that Debtors intend a definition that fails to discount the Transferred Properties to present value for the anticipated holding period, the Plan cannot be confirmed.

### iv. Debtor Cannot Meet Its Burden of Proof with Respect to Value.

Finally, Debtor cannot meet the extraordinarily high burden of proof necessary to confirm its partial dirt for partial debt Plan under the indubitable equivalence standard. "Indubitable" means "too evident to be doubted." *Arnold & Baker Farms*, 177 B.R. at 661. However, real estate valuation "is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold." *Id.* Thus, "where the creditor is earmarked to receive *part* of its collateral, it will be a rare case in which the creditor will have received the indubitable equivalent of its claim. ***Any such plan will be subject to extremely close scrutiny*** to insure that the creditor will actually receive the indubitable equivalent of its secured claim." *Id.* at 660.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

In *Arnold & Baker,* the debtor presented evidence that the "fair value" of its property was $7,300 per acre. The creditor presented evidence that it was worth just $1,381 per acre. The bankruptcy court accepted the debtor's valuation. On appeal, the BAP agreed that this finding was not clearly erroneous. *Id.* at 658. Nonetheless, because the value of the property was "far from certain," as evidenced by the disparity in the parties' respective valuation evidence, the BAP still held that the transfer of the property to the creditor could not satisfy the indubitable equivalence standard. *Id.* at 662. It therefore reversed the bankruptcy court's order confirming the plan. *Id.* at 663. The Ninth Circuit affirmed the BAP. 85 F.3d at 1424.

In this case, the values Debtors ascribe to the Transferred Properties are taken from appraisals that are over 3 years old. Debtors have yet to produce a current appraisal. The appraisals obtained by Compass in August 2012 reflect that the Transferred Properties are worth millions less than what Debtors contend. They have likely declined in value even further. Under these circumstances, Debtors simply cannot meet their burden of proving that Pineda will receive the indubitable equivalent of its claim.

     v.    Debtor's Proposed Interest Rate Is Impermissibly Low.

With respect to the payments on the portion of the secured claim that would remain after Debtors' dirt for debt transfers are completed, the Plan fails to provide an appropriate rate of interest. In determining the interest rate necessary to provide secured creditors the present value of their claim, the court must start with the national prime rate and adjust upward to account for the risk of a default under the plan. *Till v. SCS Credit Corp.,* 541 U.S. 465, 483 (2004). "The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* at 479. In this case, given Debtors' long history of operating at a loss, ongoing failure to pay property taxes, and the lack of any reliable evidence as to Debtors' prospects of performing, the risk of default is extremely high. It thus requires an adjustment to the prime rate substantially in excess of 5% per annum.

     vi.    A 25-Year Amortization Is Not Fair or Equitable.

Finally, "technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'" *In re D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989). "A Chapter 11 plan proposing a long term payment must be literally fair and equitable." *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993). Among the factors a court should consider in determining whether a plan is fair and equitable are "whether the primary risk of reorganization remains with the equity interests of the reorganized debtor" and "whether the length of time until proposed repayment is reasonable." *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992).

In this case, the loans held by Pineda matured years before Debtors filed for bankruptcy. Debtors failed to make any payments at all for over 3 years, and have made no adequate protection payments since the Filing Date. They have also neglected their obligation to pay real property taxes on any of the properties that collateralize the loans. Under these circumstances, Debtors' proposal to make payments on Pineda's secured claim based upon a 25 year amortization, with a balloon payment to be made 5 years from the effective date, is not fair and equitable. It places essentially all of the risk of reorganization on Pineda, while enabling Debtors and their management to reap all of the rewards. That is especially true in light of the paucity of evidence that the Plan is actually feasible.

Because the Debtor Plan fails both the technical and literal requirements of the fair and equitable test, it cannot be confirmed.

### D. The Debtor Plan Violates The Absolute Priority Rule.

The Debtor Plan also cannot be confirmed because it violates the absolute priority rule of 11 U.S.C. §1129(b)(2)(B). In order to satisfy the "new value" exception to this rule, the plan proponent must prove that the new value to be contributed is: 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received." *In re Bonner Mall P'ship*, 2 F.3d 899, 908 (9th Cir. 1993). And even if the proposed contribution satisfies these standards, a plan that provides for equity holders to retain their equity interest in the reorganized debtor "is

doomed" if it fails to "extend[] an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan." *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999).

Here, Debtors have failed to produce any evidence necessary to prove that their Plan satisfies the new value exception to the absolute priority rule. Moreover, the Plan has not been subjected to the "market test" required by *LaSalle*. Thus, it may not be confirmed.

### E. The Debtors Have Failed To Meet Their Burden Of Proving That Substantive Consolidation Is Appropriate Under the Facts Of This Case.

Substantive consolidation is not expressly authorized by the Bankruptcy Code. *In re Bonham*, 229 F.3d 750, 763-64 (9th Cir. 2000). It may be appropriate if the proponent of the plan proves that "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit;" or that "the affairs of the debtor are so entangled that consolidation will benefit all creditors." 229 F.3d at 766. Here, Debtors have failed to produce any evidence toward the satisfaction of this burden. It would be prejudicial to Dunlap Oil's creditors if its income and assets could be used to pay the separate and independent debts of Quail Hollow. Thus, substantive consolidation is not appropriate.

### F. The Plan's Provisions Concerning Assumption of Executory Contracts Is Not Workable.

Section 10.1 of the Plan provides that as part of the proposed dirt for debt transfers, "the secured creditors will have the option to assume the existing executory contracts relating to those locations," and that the election to do so must be made 10 days prior to the confirmation hearing. Secured creditors are not in a position to assume executory contracts; only trustees and debtors-in-possession may do so. Presumably, Debtors mean that *they* will assume the contracts and *assign* them to the creditors under § 365(f). If that is the case, Debtors must provide some workable procedure for giving notice of their election to assume the contracts, specifying exactly which contracts they are assuming and who they will be assigned to, and permitting the secured creditors receiving the Transferred Properties sufficient opportunity to review the contracts and conduct any due diligence necessary to

determine whether they wish to receive an assignment. As the Plan purports to require creditors to make an election to assume contracts they have no standing to assume, and leaves them to guess which contracts the Debtors are even referring to, the Plan is not confirmable.

## III. CONCLUSION

For the foregoing reasons, the Plan fails to satisfy the requirements of 11 U.S.C. § 1129(a) and (b). The Court should enter an order denying confirmation of the Plan.

**DATED** this 8th day of April 2013.

        **ENGELMAN BERGER, P.C.**

By */s/ Bradley D. Pack, SBA #023973*
    David Wm. Engelman
    Bradley D. Pack
    3636 North Central Avenue, Suite 700
    Phoenix, Arizona 85012
    Attorneys for Pineda Grantor Trust II

**ORIGINAL** of the foregoing filed via the CM/ECF
Electronic Notification System and transmittal of a
Notice of Electronic Filing provided to all parties
that have filed a notice of appearance in the Bankruptcy Case.

**COPY** of the foregoing served via method
indicated this 8th day of April 2013 to:

John R. Clemency
Lindsi M. Weber
Gallagher & Kennedy PA
2575 E. Camelback Rd.
Phoenix, AZ 85016
**Via Email: john.clemency@gknet.com**
**Via Email: lindsi.weber@gknet.com**
Attorneys for Debtor

Dean M. Dinner
Nussbaum Gillis & Dinner, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
**Via Email: ddinner@ngdlaw.com**
Attorneys for Unsecured Creditors Committee
of Dunlap Oil Company

| | |
|---|---|
| 1 | Larry Watson |
| | US Trustee's Office |
| 2 | 230 N. 1st Avenue, Suite 204 |
| | Phoenix, AZ  85003 |
| 3 | **Via Email:  Larry.watson@usdoj.gov** |
| 4 | Pat P. Lopez III |
| | Jeffrey G. Baxter |
| 5 | Rusing Lopez & Lizardi |
| | 6363 N. Swan Rd., Ste. 151 |
| 6 | Tucson, AZ 85718 |
| | **Via Email:  plopez@rllaz.com** |
| 7 | **Via Email:  jbaxter@rllaz.com** |
| | Attorneys for Canyon Community Bank NA |

         */s/ Kimberly A. Cox*