John R. Clemency (Bar No. 009646)
Lindsi M. Weber (Bar No. 025820)
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
Email:         john.clemency@gknet.com
                    lindsi.weber@gknet.com
*Attorneys for Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| DUNLAP OIL COMPANY, INC., | Case No. 4:12-bk-23252-BMW |
| QUAIL HOLLOW INN, LLC, | Case No. 4:12-bk-23256-BMW |
| Debtors. | (Jointly Administered) |

Filing applies to:

DUNLAP OIL COMPANY, INC. ☐

QUAIL HOLLOW INN, LLC ☐

BOTH ☒

## DEBTORS' OPENING BRIEF IN SUPPORT OF CONFIRMATION OF JOINT PLAN OF REORGANIZATION

### Evidentiary Hearing Dates:

June 12 and July 11, 2013

# TABLE OF CONTENTS

**Page**

I.    **INTRODUCTION AND SUMMARY OF THE PLAN** .......................................1

     A.    Overview of the Plan ..........................................................1

     B.    Voting ........................................................................2

     C.    Objections ...................................................................2

     D.    Resolutions and Plan Support ...............................................3

II.    **LEGAL STANDARDS** .............................................................3

     A.    Feasibility ..................................................................4

     B.    Partial return of collateral ................................................4

     C.    Good faith ...................................................................5

     D.    Classification ...............................................................6

     E.    New Value Contribution ......................................................8

III.    **CONFIRMATION ANALYSIS AND EVIDENCE** ..........................................9

     A.    The Plan is feasible ........................................................9

         1.    The projections are reasonable and supported by historical results ..9

         2.    The expert testimony concludes that the Debtors' Plan is feasible 10

         3.    In the end, profitable operations are retained ....................12

         4.    The alleged environmental issues have been resolved ...............13

         5.    The Debtors' management is qualified and committed to successfully reorganize the Debtors' business operations and financial obligations ............................................14

         6.    Effective Date payments ...........................................14

         7.    Claim amounts and Plan payments ...................................16

     B.    The Plan was filed in good faith ...........................................26

     C.    The classification and treatment of claims under the Plan is fair and reasonable ..................................................................26

         1.    Partial return and retention using stipulated values provides secured creditors with fair and equitable treatment for their claims ...........26

         2.    Classification .....................................................27

     D.    The 5% interest rate proposed under the Plan is fair and reasonable ........27

     E.    The New Value Contribution is substantial, necessary, and satisfies the Absolute Priority Rule ....................................................28

IV.    **CONCLUSION** ..................................................................29

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

Dunlap Oil Company, Inc. ("DOC")[1] and Quail Hollow Inn, LLC ("QHI") (collectively the "Debtors"), debtors in the above-captioned jointly administered cases (the "Case"), pursuant to the Court's instructions at the conclusion of the two-day evidentiary hearing on confirmation of the Debtors' *First Amended Joint Plan of Reorganization dated February 14, 2013* (Dkt. #220; as modified or amended, the "Plan"), hereby file this *Opening Brief in Support of Confirmation of the Debtors' Joint Plan of Reorganization* (the "Opening Brief"). The Opening Brief addresses the few remaining objections to confirmation, as well as the issues raised by the Court at the conclusion of the evidentiary proceedings.

This Opening Brief is supported by: (i) the testimony and evidence submitted at the evidentiary hearings conducted on June 12 and July 11, 2013 (the "Trial"); (ii) the exhibits admitted by the Court during Trial;[2] and (iii) germane matters of record from the administrative docket in the above-captioned Case.[3]

# I. INTRODUCTION AND SUMMARY OF THE PLAN.

## A. Overview of the Plan.

1. The Plan provides for the reorganization of DOC and QHI (Willcox and Benson, Arizona mainstays since the 1950s) through a combination of return and retention of collateral to secured creditors, with an expected dividend to unsecured creditors who would get nothing in the event of a liquidation of the Debtors.

2. Under the Plan, secured debt is trimmed from approximately $17 million to approximately $11 million through give backs and valuing collateral at stipulated amounts based on recent appraisals.

3. The Plan has been on file for over six months, with a Court approved disclosure statement early in the Case. Since the initial filing of the Plan, the Debtors have filed

---

[1] Unless otherwise indicated, capitalized terms used in this Opening Brief shall have the same meanings set forth in the Plan.

[2] References to exhibits offered by the Debtors will be cited alphabetically, e.g. "Tr. Ex. A"; and references to exhibits offered by CCB and Pineda will be cited numerically, e.g. "Tr. Ex. 1".

[3] References to the administrative docket will be by docket number (e.g., "Dkt. #__"). References to the claims docket will be by docket number (e.g., "Claims Dkt. #__").

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

modifications largely addressing objections from interested parties and clarifying claim treatments. *See* Dkt. #249, 265, 299, 322. The Court denied Pineda's request to have the Plan modifications deemed material. *See* Dkt. #328.

**B. Voting.**

4. The Plan received substantial support from secured and unsecured creditors, as well as taxing authorities. *See Notice of Filing Ballot Report* (Dkt. #262). The Cox Parties, significant secured creditors with a claim of roughly $2 million, accepted the partial return and retention of collateral scheme under the Plan early in the Case, and the proposed stipulated Plan treatment for the Cox Claim was approved by the Court. *See* Order Approving Cox Stipulation (Dkt. #247).

5. The Debtors' primary fuel supplier, Jackson Oil Company, initially rejected the Plan, but later agreed to stipulated treatment of its claim and assumption of the Fuel Supply Agreement between the parties. *See* Dkt. #322.

6. In Class 3(b) General Unsecured Claims, Debtors received over $41,000 in accepting votes and no rejecting votes. Dkt. #262. Approximately $400,000 in County secured tax claims relating to retained and returned properties voted in favor of the Plan. *Id.*

7. Pineda and CCB both voted against the Plan. Pineda's total asserted claim on its ballot was $6,998,815. CCB's initial Claim has since been adjusted, and the current amount of the asserted CCB Claim is $6,317,629.47.

**C. Objections.**

8. There were five (5) objections to confirmation of the Plan:

- *Objection of the United States to Confirmation of First Amended Plan of Reorganization Dated February 14, 2013* (Dkt. #254; the "IRS Objection");

- *Objection to Confirmation of Debtors' First Amended Joint Plan of Reorganization Dated February 14, 2013* (Dkt. #256; the "Pineda Objection");

- *Jackson Oil's Objection to Confirmation of the Debtors' First Amended Joint Plan of Reorganization Dated February 14, 2013* (Dkt. #257; the "Jackson Objection");

- *Objection to First Amended Joint Plan of Reorganization Dated February 14, 2013* (Dkt. #259; the "Magnussen Objection"); and

- *Canyon Community Bank's Objection to Confirmation of Debtors' First Amended Joint Plan of Reorganization Dated February 14, 2013* (Dkt. #260; the "CCB Objection")

2

(collectively, the "Objections").

9. The IRS and ADOR did not vote on the Plan, but did submit prior objections that were resolved through agreed amendments in the First Amended Disclosure Statement and Plan, as well as the later resolution reached with the IRS. *See* Dkt. #322.

10. Magnussen initially objected to the Plan, and the Debtors resolved the objection at the first day of the evidentiary confirmation proceedings and the objection was withdrawn. *See* Dkt. #351 at p. 4 of 6.

11. For the most part, the Pineda and CCB Objections raise nearly identical complaints regarding the Plan centering largely on feasibility. Pursuant to stipulations reached with various parties, a significant portion of the Objections have been resolved. Also, the treatment of Cox under the Plan has been accepted, which eliminates any issue over satisfaction of Bankruptcy Code §1129(a)(10) for the Plan. The sole remaining objections are from Pineda and CCB.

**D. Resolutions and Plan Support.**

12. As set forth in part in the parties' Joint Pretrial Statement (Dkt. # 300; the "JPTS"), the Debtors were able to reach significant agreements regarding various factual and legal issues between the parties. Since the filing of the JPTS, the Debtors continued to work to resolve any remaining objections and were able to successfully resolve the concerns of ADOR, IRS, and Jackson. The materials terms of the parties' agreements were set forth in the *Notice of Resolution of Confirmation Objections of IRS and Jackson* (Dkt. #322) and were further set forth on the record at the June 12, 2013 confirmation hearing.

13. In addition, the Debtors stipulated to the values provided by Pineda and CCB pursuant to the most recent updated appraisals to establish valuation for purposes of Plan confirmation. *See* JPTS at 7, 9.

**II. LEGAL STANDARDS.**

14. The Plan satisfies each of the requirements for confirmation under the Bankruptcy Code. In particular, the Plan has been proposed in good faith, serves the best interests of creditors, and is feasible. Accordingly, as demonstrated by the evidence before the

3

Court, the Plan should be confirmed.

**A.      Feasibility.**

15.      "A plan meets th[e] feasibility standard if the plan offers a reasonable prospect of success and is workable. The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility." *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994) (citations omitted).

16.      The Plan in this Case is feasible as demonstrated by the ample evidence presented by the Debtors in support of confirmation.

**B.      Partial return of collateral.**

17.      The Ninth Circuit has recognized that a debtor may return collateral to a secured creditor in satisfaction of its claim. *In re Arnold and Baker Farms,* 177 B.R. at 660 (citing 124 Cong.Rec. H11104 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) (abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence)).  In addition, the United States Supreme Court has recognized that it is entirely permissible under the Code for a debtor to return or surrender collateral to a secured creditor in satisfaction of its claims. *See Associates Commercial Corp. v. Rash,* 520 U.S. 953, 962, 117 S. Ct. 1879, 1885, 138 L. Ed. 2d 148 (1997) ("…in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor.")

18.      The *Sandy Ridge* decision from the Fifth Circuit, relied upon by the Ninth Circuit and the Ninth Circuit BAP in the *Arnold and Baker* case, supports the conclusion that regardless of the value of the collateral, a plan of reorganization that provides for the return of a secured creditor's collateral is permitted under the Code. *See Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346, 1350 (5th Cir. 1989) ("In the present case, LNB will receive the actual property underlying its secured claim and, therefore, it is clear that it will receive the indubitable equivalent of its secured claim.").

19.      The proposed return of collateral to secured creditors in exchange for a fair market value credit (based on values stipulated to by the parties) is allowed and expressly

4

1  provided for under the Code.[4]

2       20.     Accordingly, the proposed return of collateral to secured creditors is proper,

3  satisfies the requirements of Bankruptcy Code § 1129(b)(2)(A)(iii), and the Plan should be

4  confirmed.

5       **C.     Good faith.**

6       21.     As set forth by the Ninth Circuit, in determining whether a plan is proposed in

7  good faith, the Court should apply the following standard:

8

9  > A plan is proposed in good faith where it achieves a result consistent with the
> objectives and purposes of the Code. *Ryan v. Loui* (*In re Corey* ), 892 F.2d 829,
> 835 (9th Cir.1989); *see also, Madison Hotel,* 749 F.2d at 425 ("[F]or purposes of

10  > determining good faith under section 1129(a)(3) ... the important point of inquiry
> is the plan itself and whether such plan will fairly achieve a result consistent with

11  > the objectives and purposes of the Bankruptcy Code."). The requisite good faith

12  > determination is based on the totality of the circumstances. *Stolrow v. Stolrow's,
> Inc.* (*In re Stolrow's, Inc.),* 84 B.R. 167, 172 (9th Cir.BAP 1988).

13

14  *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir. 2002).

15       22.     Here, the Plan achieves objectives consistent with the Bankruptcy Code, will

16  maximize recoveries and effect a rehabilitation of the Debtors, preserves a company that holds

17  longstanding ties to the rural communities of Arizona, and will save approximately one hundred

18  employees' livelihoods in those same communities.  There is ample evidence of good faith in

19  this Case.

20       23.     Pineda and CCB further argue that the Option 1: Give Back Option is prohibited

21

22  ───────────────

[4] It is ironic that Pineda and CCB would complain about the return of their collateral when that is

23  precisely the relief they are each seeking through various stay relief requests.  To date, and per
the agreement of the parties, numerous assets have already been returned to Pineda and CCB
with the cooperation of the Debtors.  *See* Dkt. #345, 356.

24  The primary issue facing plans that involve partial give backs of collateral is how to value fairly
the returned collateral.  Here, the valuation issue has been obviated through a stipulation where

25  the Debtors have agreed to accept Pineda's and CCB's proffered values for their collateral.

26  Thus, the Plan provides fair and equitable treatment of the Pineda and CCB secured claims with
respect to the returned collateral based on the stipulated values.  The values agreed to by the

27  parties are supported by recent appraisals that include personal property value in the valuations.
The unchallenged payment terms for retained collateral also meet the fair and equitable standard

28  with respect to the treatment of the secured claims of CCB and Pineda.

5

on the basis that the Plan is proposed in "bad faith." The Court in *Sandy Ridge* rejected a nearly identical argument proffered by the secured creditor in that case, reasoning that:

> Section 1123(a)(5) states that a plan shall
>
> > "provide adequate means for the plan's execution, such as—
> >
> > ....
> >
> > "(D) sale of all or any part of the property of the estate, either subject to or free of any lien, *or* the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;...." (Emphasis added.)
>
> Section 1123(b)(4) states that a plan may
>
> > "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests...."
>
> It is clear from these statutory provisions that although Chapter 11 is titled "Reorganization," a plan may result in the liquidation of the debtor. *In re Coastal Equities, Inc.,* 33 B.R. 898, 904 (Bankr.S.D. Cal.1983). *See* H.Rep. 95–595 at 407, *reprinted in 1978* U.S.Code Cong. & Admin. News 5963 at 6363. Furthermore, even though section 1123(b)(4) refers to "sale of all ... property," it appears that a plan may include a "give-back" such as that proposed in the current case. Section 1123(a)(5) allows the "distribution of all or any part of the property of the estate" to creditors. 5 *Collier on Bankruptcy* at 1123–20 states that section 1123(b)(4) merely *supplements* section 1123(a)(5)(D).

*Sandy Ridge,* at 1352 (emphasis supplied).

24. Much the same here, the return of the Pineda and CCB Collateral is allowed under the Bankruptcy Code, and the Debtors have demonstrated ample good faith in their efforts to maximize the value of the assets of the estate for all creditors. Accordingly, the Debtors and the Plan meet the good faith requirements of Bankruptcy Code §1129(a)(3), and the Plan should be confirmed.

**D. Classification.**

25. CCB and Pineda further object on the basis that the potential unsecured deficiency claims are classified separately from the other unsecured claims in this Case. The assertion that the separate classification of the Deficiency Claims is improper runs contrary to applicable Ninth Circuit authority. As set forth in the recent case of *In re Loop 76,* the Ninth Circuit BAP determined that the existence of a third party guaranty was a sufficient basis to

6

classify a potential deficiency claim separately from other unsecured claims:

> We are asked to determine whether a third-party source for recovery on a creditor's unsecured claim, such as a guarantor, is a factor the bankruptcy court may consider when determining whether claims are substantially similar under 11 U.S.C. § 1122(a). We conclude that it is, and we AFFIRM
> …
> Accordingly, we reject Wells Fargo's argument that a third-party guarantor does not render its deficiency claim dissimilar from other unsecured claims. Its argument is based on case law inconsistent with *In re Johnston's* holding that whether the claim is substantially similar does not rest entirely on how it relates "to the assets of the debtor."
> ….
> We conclude that *In re Johnston* allows the bankruptcy court to consider the existence of a third-party source for payment, including a guarantor, when determining whether unsecured claims are substantially similar under § 1122(a). Accordingly, we see no error by the bankruptcy court.
>
> > n.11 Based on our decision, we need not address the issue of whether Loop 76 provided a business or economic justification for separately classifying similar claims. We also need not consider whether Loop 76 separately classified similar claims in order to gerrymander an affirmative vote for the Plan.

*In re Loop 76, LLC,* 465 B.R. 525, 528, 541 (B.A.P. 9th Cir. 2012).

26.     Much the same here, the existence of third party guaranties supports the separate classification of the potential Deficiency Claims.[5]

27.     In addition, Pineda refused to accept payments from the Debtors, and yet seeks to collect default interest during that time period and moving forward.  Accordingly, the disputed status of the Pineda claim also supports the separate classification of any alleged unsecured deficiency claim under Ninth Circuit law. *See Barakat v. The Life Ins. Co. of Virginia (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996) (separate classification of unsecured claims is appropriate when there is "a legitimate business or economic justification."); *see also In re Loop 76, LLC,* 465 B.R. 525 (B.A.P. 9th Cir. 2012); *Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1994) (separate classification is appropriate when the legal character of the claim is different from that of creditors in other classes); *Oxford Life Ins. Co. v. Tucson*

---

[5] Complaints about classification normally involve plans that need to "gerrymander" an accepting impaired class of claims to satisfy Bankruptcy Code §1129(a)(10). Here, there is no "gerrymandering" at work since the Plan has been accepted by a number of classes of claims (including the Class 2(c) claims of Cox and the Class 1(a) and (b) claims of the Counties).

*Self-Storage, Inc.* (*In re Tucson Self-Storage, Inc.*), 166 B.R. 892, 897-98 (B.A.P. 9th Cir. 1994); *Montclair Retail Ctr., L.P. v. Bank of West* (*In re Montclair Retail Ctr., L.P.*), 177 B.R. 663, 665 (B.A.P. 9th Cir. 1995).

28. The evidence shows that the classification of Claims under the Plan is reasonable and supported by valid business and legal justifications.

**E.    New Value Contribution.**

29. Pineda and CCB also argue that the Plan violates the Absolute Priority Rule because the retention of equity interest by the current Equity Interest holders does not fall within the new value exception to the Absolute Priority Rule.    The New Value exception applies when the value provided is: (1) new; (2) substantial; (3) up-front infusion money or money's worth; (4) necessary for successful reorganization; and (5) reasonably equivalent to the value of interest received.  *See In re Tucson Self-Storage, Inc.,* 166 B.R. 892, 899 (B.A.P. 9th Cir. 1994).

30. Here, just like in prior Arizona bankruptcy cases, "because the reorganized debtor will be balance sheet insolvent, there will be no value to its equity interests. Compared to this zero value for the equity in the reorganized Debtor, the new value contributions substantially exceed that value." *In re Red Mountain Mach. Co.,* 448 B.R. 1, 19 (Bankr. D. Ariz. 2011) *aff'd*, 471 B.R. 242 (D. Ariz. 2012).

31. Also, like in other recent Arizona bankruptcy cases approving the sufficiency of a new value contribution by current owners, "there is no evidence anyone would have contributed any more, [and] the Debtor actively solicited third party investors…." *In re Red Mountain Mach. Co.,* 451 B.R. 897, 908 (Bankr. D. Ariz. 2011).

32. The contributions made by the current Equity Interest holders under the Plan fall squarely within the Ninth Circuit standard.  The contributions of the Equity Interest holders to the Plan are enforceable and the evidence at Trial demonstrated that the current Equity Interest holders are ready, willing, and able to contribute the New Value Contribution promptly upon confirmation of the Plan.[6]

---

[6] The ability of the Equity Interest Holders to perform the New Value Contribution is not in question:  The Debtors provided testimony and a cashier's check in the amount of $150,000 at

33.     Finally, the current Equity Interest holders have committed to assist with funding shortfalls post-confirmation.  Accordingly, the New Value Contribution proposed under the Plan satisfies the new value corollary to the absolute priority rule and the Plan should be confirmed.

## III.     CONFIRMATION ANALYSIS AND EVIDENCE.

### A.     <u>The Plan is feasible.</u>

34.     Based on historic performance, reasonable projections supported by testimony, and an expert opinion rendered by a qualified outside expert, the Debtors have demonstrated that the Plan offers a reasonable prospect of success and is workable.

#### 1.     The projections are reasonable and supported by historical results.

35.     As set forth at length in the *Declaration of Theodore Dunlap in Support of Plan Confirmation* (Dkt. #316; Tr. Ex. I), the Debtors' projections (attached as Exh. A to the Dunlap Declaration) are based on historical performance and are conservative projections based on scaled down operations.  *Id.* at ¶¶6-18.

36.     The Debtors' expert on Plan feasibility, Steve Odenkirk, testified that he reviewed and tested the projections for reasonableness and compared the projected figures to historical performance.  *Declaration of Steven Odenkirk in Support of Plan Confirmation* (Dkt. #309; Tr. Ex. H at ¶¶9-19 and Exh. D).

37.     In many cases, the Debtors' reasonable projections are even more conservative than the projections made by the appraisers hired by Pineda and CCB. *Compare* Tr. Ex. I at Exh. A p. 4 of 8 (reflecting Debtors' estimated gross profit at San Jose Chevron of $132,000) *with* Tr. Ex. N at p. 67 of 133 (appraiser's estimated gross profit at San Jose Chevron of $194,000); *compare* Tr. Ex. I at Exh. A p. 4 of 8 (reflecting Debtors' estimated gross profit at Marana of $236,000) *with* Tr. Ex. L at p. 62 of 123 (appraiser's estimated gross profit at Marana of $262,000); *compare* Tr. Ex. I at Exh. A p. 4 of 8 (reflecting Debtors' estimated gross profit at Green Valley SuperCenter of $424,000) *with* Tr. Ex. 38 at p. 36 (appraiser's estimated gross profit at Green Valley SuperCenter of $629,000).  Thus, the appraisal experts hired by the

the hearing on July 11, 2013.

1  objecting secured creditors confirm that the Plan is feasible.

2      38.    If the Debtors perform according to the projections of the Pineda and CCB

3  appraisers rather than according to the much more conservative projections, payments under the

4  Plan will be made with ease.  *Id.*

5      39.    In addition, the Debtors have the support of their critical fuel supplier, Jackson

6  Oil Company, and expect to return to pre-petition credit terms with Jackson upon confirmation.

7  Tr. Ex. I at ¶15 and Ex. D.

8      40.    The Debtors' controller, Jim Martin, further testified that at least $50,000 in

9  further cost and expense reductions could be made if necessary.  *See* Transcript of Proceedings

10  dated July 11, 2013, Testimony of Jim Martin.

11     41.    Finally, the Equity Interest holders have committed to fund any shortfalls up to

12  the amount of $10,000 annually to assist with Plan feasibility if needed.

13     42.    With overwhelming support from key suppliers and secured creditors, along with

14  access to credit terms for future fuel purchases, reasonable projections supported by historical

15  performance, and an infusion of New Value from the equity holders, the Debtors have

16  demonstrated with ample evidence that the Plan is feasible.

17          **2.    The expert testimony concludes that the Debtors' Plan is feasible.**

18     43.    The uncontroverted testimony of the only third party expert in this Case, Steve

19  Odenkirk, concluded that the Plan is feasible and that the projections are squarely grounded on

20  historic performance of the retained assets.  Tr. Ex. H at ¶¶9-19.

21     44.    Mr. Odenkirk described in detail how increases in fuel supply will translate into

22  greater sales and higher profits on the retained locations. Tr. Ex. H at ¶¶12-19.

23     45.    Mr. Odenkirk's opinions are based on an extensive background in banking,

24  (including a recent stint as a chief credit officer of a Tucson bank), as a mortgage broker, and as

25  a workout consultant. Tr. Ex. H at Exh. E. In fact, Mark Farr of CCB testified that he had

26  recommended Mr. Odenkirk to other CCB customers in recent months. Transcript of

27  Proceedings dated July 11, 2013, Testimony of A. Mark Farr.

28     46.    Rather than submit testimony from an expert, CCB and Pineda offered the

testimony of Mr. Farr in an attempt to defeat confirmation. Given the amount spent by CCB on the case, this Court should wonder why the Bank did not get itself an independent financial advisor to test feasibility – perhaps the Bank could not find an independent person to contradict Mr. Odenkirk's views and the plain reality that the Plan is feasible.

47. Mr. Farr's half-hearted, biased, and erroneous declaration did not disprove feasibility. *See* Dkt. #363; Tr. Ex. 54. His claim of $700,000 of missing labor costs was revealed to be incorrect during cross-examination and by the testimony of Jim Martin. *See* Transcript of Proceedings dated July 11, 2013, Testimony of Jim Martin; *compare* Tr. Ex. 54 (Farr Declaration) at Exh. 3 (listing approximately $1.9 million in total labor expenses) *with* Tr. Ex. H at Exh. D (Plan projections) at p. 2 of 8 (listing approximately $1.9 million in total labor expenses, with labor expenses contained in the admin/overhead line, labor line, and payroll taxes/ins. line, as further explained by Jim Martin).

48. CCB and Pineda's red herring assertions regarding depreciation were likewise disabused through the testimony of Jim Martin. Maintenance, repairs, and capital improvements are all included in the projections and are based on reasonable historical performance. Tr. Ex. I at Exh. A.

49. In addition, with respect to the branded stations, Mr. Martin testified that historically the company has obtained funding from Chevron and Texaco for purposes of "refreshing" the stations when certain promotional programs are offered. There is no current need for maintenance or other refurbishment outside the ordinary course and as provided for in the projections, and the absence of complaints from the franchisors indicates that the stations are being adequately maintained.

50. Finally, Mr. Martin testified that more than $1 million in upgrades has been completed on QHI in recent years, and that QHI is in compliance with Best Western franchise requirements.[7]

---

[7] Pineda's own appraiser rated the condition of QHI as "in good condition." Tr. Ex. Q at p. 13 of 122.

### 3. In the end, profitable operations are retained.

51.     Without the financial drag caused by the unprofitable properties, the Debtors will be able to emerge from this Case as stronger, viable, reorganized entities.

52.     The reduction in scope of operations and closure of locations makes the focus of CCB and Pineda on recent operating losses suffered mostly by the returned properties irrelevant to feasibility. The focus of CCB and Pineda on past losses is a comparison of apples to oranges that does not disprove Plan feasibility.

53.     In addition, the Debtors have received multiple letters of interest and inquiries regarding a potential sale of QHI in the range of $2.5 to $2.7 million, which would eliminate $300,000 in tax claims and the net $1.5 million against the Pineda Secured Claim, significantly reducing the payments required under the Plan. Tr. Ex. 22, 23. As confirmed by Mr. Martin's testimony, the sale of QHI would strengthen the feasibility of the Plan.

54.     A sale of QHI in the range of $2.5 to $2.7 million could also generate an additional $300,000 in additional proceeds for further secured debt pay down or more funds for payment to creditors. *Id.*

55.     Based on the projections, a sale of QHI would eliminate revenue in the amount of $131,000 in Year 1, which is more than made up for in the savings on the payments to taxing authorities on more than $225,000 in secured tax claims (eliminating annual payments to Cochise County in the amount of $66,000), and the additional $1.5 million in Pineda debt that would be retired (reducing annual payments to Pineda from $313,464 to $208,236). *See* Tr. Ex. I at Exh. A.

56.     Based on the evidence, there is no objective support for the Pineda and CCB cries of infeasibility.

57.     Pineda's focus on the cost basis of fuel and merchandise inventory does not add to its lien for purposes of trying to crater the Plan, and Pineda's personal property lien is encompassed in the values that the parties stipulated to. *See, e.g.,* Tr. Ex. Q at p. 39 of 122 (listing various categories of personal property included in FF&E such as "all of the room and common area furnishings, pool furnishings, wall hangings and artwork, office equipment and

12

1  supplies, lines, bedding, sundry items, housekeeping carts and supplies, maintenance tools and

2  supplies and other related items and equipment needed to operate the hotel.")[8]

3      58.    In addition, Jackson Oil holds a purchase money senior lien in excess of

4  $200,000 on all fuel and supplies provided to the Debtors, which consumes and takes priority

5  over any claimed blanket interest of Pineda.  JPTS Dkt. #300 at p. 11 of 45; *see also* Dkt. #322.

6      59.    Even assuming, for the sake of argument only, that Pineda's secured interest is

7  determined to include an additional $250,000 in personal property, the annual Plan payments

8  would increase by approximately $17,500 – well within the tolerances and excess cash flows set

9  forth in the projections.  Tr. Ex. I at Exh. A.

10          **4.    The alleged environmental issues have been resolved.**

11      60.    The environmental "wolf cry" by CCB also was proven to be what it is: another

12  speculative attempt to derail the Plan.

13      61.    As set forth in Tr. Ex. R and S, the ADEQ has approved the closure plan

14  submitted by the Debtors, and work is scheduled to commence in compliance with ADEQ's

15  instructions.

16      62.    The dire speculation set forth in the *Declaration of Rod Reyes in Opposition to*

17  *Plan Confirmation* (Dkt. #362) is dispelled by the testimony of Mr. Reyes on cross-examination,

18  and a review of Tr. Ex. R and S.

19      63.    The estimated cost of the ADEQ-approved closure plan is $6,500, which

20  includes a closure of the tank in place and soil sampling consistent with ADEQ requirements.

21  Tr. Ex. S.

22      64.    Mr. Reyes admitted that there are no less than four recent tank tests, including

23  one by the same testing firm that Reyes relies upon, showing no leaks and confirming that the

24  tank is tight.  Dkt. #362, Tr. Ex. 55 (Reyes Declaration) at Exh. B; *see also* Tr. Ex. B.

25      65.    Mr. Reyes further admitted on cross examination that there is no proof that a

26

---

27  [8] Likewise, the CCB and Pineda appraisals include the value of FF&E personal property in the
   values provided.  *See* fn. 11.  Thus, the real and personal property interests of Pineda and CCB
28  are being paid under the Plan.

spill has occurred at this site. *See* Transcript of Proceedings dated July 11, 2013, Testimony of Rod Reyes.

66.     Accordingly, speculation and misplaced assertions regarding alleged environmental issues do not provide any basis to deny confirmation of the Plan.

### 5.     The Debtors' management is qualified and committed to successfully reorganize the Debtors' business operations and financial obligations.

67.     As demonstrated by a review of the Debtors' Plan and Projections, the Debtors' management and professionals have worked hard to propose a Plan that maximizes the value of the assets of the estate for the benefit of creditors and interested parties.

68.     Ted Dunlap, the Debtors' President and manager, has performed every job involved in running DOC since he was a kid. Tr. Ex. I at Exh. E ¶¶34-39.

69.     Ted Dunlap has held together the companies in a tenuous situation, has brokered deals with major creditors (including Cox, Jackson, and the IRS), and he deserves a chance to succeed with a streamlined, reorganized company.

70.     The continued successful operation of the Debtors also will preserve approximately one hundred jobs in small communities throughout Eastern Arizona.

71.     Finally, as Judge Case was fond of saying: feasibility "is where the rubber meets the road." Even though this is not a real close case, the Debtors have shown more than enough to get the chance to prove feasibility the most effective way: through post confirmation performance and plan payments to creditors.

### 6.     Effective Date payments.

72.     Based on the Proofs of Claim, approved applications for administrative expense, and the Debtors' books and record, the following constitute the Debtors' estimate of currently anticipated Effective Date payments:

| Creditor | Basis | Proposed Treatment |
|---|---|---|
| Jackson Oil Company | Cure payments for assumption of executory contract | Agreed treatment under modified Plan is payments over time with balloon in month 30. No Effective Date payment required |

14

| Gallagher & Kennedy | Professional Fees and Expenses | Agreed to accept payments over twelve months if needed. No Effective Date payment required |
|---|---|---|
| Sally Darcy | Professional Fees and Expenses – see Dkt. #333 (Order Approving Fee App) | $4,381.57 to be paid within ninety days of Effective Date |
| Steven Odenkirk | Expert Witness Fees and Expenses | $8,592.75 to be paid within ninety days of Effective Date[9] |
| Nussbaum Gillis & Dinner | Professional Fees and Expenses – see Dkt. #366 (Order Approving Fee App) | $15,924.80 to be paid on Effective Date or as otherwise agreed by the Parties |
| Trejo Oil | Administrative reclamation claim – see Dkt. #95 | $58,122.78 to be paid on Effective Date or as otherwise agreed by the Parties |
| ADOR | Administrative claim withdrawn – see Claims Dkt. #19 | None |
| IRS | Administrative claim filed and amended – see Claims Dkt. #54 | $5,242.48 to be paid on Effective Date |
| Cochise County | Personal Property Taxes listed in Claims Dkt. #4 (paid for convenience) | $2,595.20 to be paid on Effective Date |
| Pima County | Property Taxes listed in Claims Dkt. #34 (paid for convenience) | $246 to be paid on Effective Date |

Total Effective Date Payments Required Unless Otherwise Agreed: **$82,131.26**

73.     Pineda vaguely asserts that it may be entitled to an undetermined amount of a super priority claim for alleged loss in value of the personal property of the Debtors during the pendency of this Case.  However, there are numerous issues with Pineda's assertions.

74.     First, Pineda has offered no evidence to demonstrate that there is any actual decline in the value of any personal property in which Pineda may hold a perfected interest.[10] Pineda has already received some portion of the Debtors' personal property back through stipulated stay relief and appointment of a receiver, and therefore has received the indubitable

---

[9] Pending approval of a final fee application and order authorizing payment of professional fees incurred as Debtors' Court-approved expert witness for confirmation.

[10] Jim Martin testified in his deposition that a significant portion of the reduction in inventory figures was the result of a year-end physical audit that is performed annually to reconcile actual inventory levels, and further testified that inventory is tracked at cost.  Tr. Ex. 45 at 11-16.

equivalent of its secured claim with respect to such property.

75.     Second, Pineda has never held a perfected interest (or first position) in the Debtors' cash and receivables, and therefore any claim to alleged diminution in value of those assets is misplaced.

76.     Third, the Pineda and CCB appraisals on which the parties have agreed for the stipulated values of the respective creditors' secured claims specifically and expressly include the Debtors' personal property.[11]

77.     Finally, there is serious question as to whether Pineda holds any perfected interest in the Debtors' personal property based on insufficient collateral descriptions and deficiencies with its security agreement and UCC filings.

78.     Regardless of the numerous deficiencies and disputes concerning the final amount of the Pineda claim, there is no need or requirement for the Debtors to litigate the Pineda claim at this time because whether Pineda has a lien on personal property (and to what extent) is not determinative of whether this Plan works.   The amount of the Pineda claim can be determined (if necessary) post-confirmation in the context of claims litigation, and does not affect feasibility of the Debtors' Plan. *See, supra.*

### 7.     Claim amounts and Plan payments.

79.     As set forth at the Initial Confirmation Hearing conducted on April 17, 2013, because the Option 1 Cash Out was not completed secured creditors will be paid under Option 2 with a partial return of collateral (a good portion of which has already been accomplished through stay relief and voluntary return of collateral to Pineda and CCB with the Debtors' cooperation) and reasonable payment terms for the stipulated amounts of the retained assets:

> MS. WEBER: Your Honor, it is the Debtor's view of the plan that if the option 2 performance cannot take place, that it falls back to the option 1, to the give back. The partial give back, the credit fair market value and a term out of the remaining debt.

4/17/13 Transcript of Proceedings at 26:7-11; *see also* Tr. Ex. I at Exh. A (projections).

---

[11] *See* Tr. Ex. Q at 39 of 122 (including FF&E in determining FMV); Tr. Ex. L at p. 78, 93 of 123 (same); Tr. Ex. M at p. 97, 101 of 131 (same); Tr. Ex. N at p. 92, 96 of 133 (same); Tr. Ex. 38 at  p. 49-50 (same).

16

80.    Multiple creditors confirmed this understanding at the Initial Confirmation Hearing. *Id.* Accordingly, the Debtors have utilized the various parties' Proofs of Claim,[12] stipulations reached with creditors, plan modifications, and proposed treatments for secured and priority claims to calculate plan payments based on the partial return and retention of collateral as follows:[13]

### i.    Pineda:

81.    The Debtors will return to Pineda the Benson Little General and Sierra Vista Chevron, with stipulated values and secured tax claims according to the books and records of the Debtors[14] as follows:

| Property | Secured Creditor | Stipulated Value | Secured Taxes | Net Credit |
|---|---|---|---|---|
| Benson Little General 696 N. Ocotillo Benson, AZ | Compass/ Pineda | $140,000 | $24,980 (est. RE-10/11/12) $7,368 (est. PP-10/11/12) | $107,652 |
| Sierra Vista Chevron 1796 E. Fry Blvd Sierra Vista, AZ | Compass/ Pineda | $185,000 | $18,503 | $166,497 |
| **TOTAL** | | **$325,000** | **$50,851** | **$274,149** |

---

[12] The Debtors have utilized the Proofs of Claim filed by the taxing authorities (and as amended) to determine Plan payments for pre-petition secured tax claims.  CCB and Pineda have disregarded the amounts set forth in the taxing authorities' proofs of claim, instead apparently relying upon hearsay and unsupported statements in various appraisals to estimate the proposed pre-petition and post-petition tax amounts.

No taxing authority has asserted an administrative claim based on post-petition taxes other than the IRS, in the amount of $5,242.48, which will be paid on the Effective Date.  Claims Dkt. #54.  The ADOR withdrew its administrative proof of claim on July 5, 2013.  *See* Dkt. #357.

The secured real and personal property taxes that have come due post-petition are for the second half of 2012, which payment was due on May 1, 2013.  The amounts for second half 2012 taxes are included in the taxing authorities' Proofs of Claim, and therefore are properly treated under the Plan.  *See, e.g.,* Tr. Ex. G.

With respect to payment of post-petition secured taxes on the retained real and personal property, the Debtors' projections include these amounts in the line item designated "Taxes" in the projections, totaling more than $213,000 in Year 1.

[13] Because unsecured claims - including Pineda and CCB deficiency claims, general unsecured claims, and any rejection damages claims (which the Debtors expect to be minimal) - will be paid a pro rata amount of excess cash flows, it is not necessary to take into account the unsecured portions of Pineda and CCB's claims when determining Plan feasibility.

[14] Pineda appears to stipulate to at least the amount of taxes set forth in Section III(B) of the JPTS.

82. With respect to the properties retained by the Debtors under the Plan, the Debtors and Pineda have stipulated to the following values (with secured tax claims referenced according to the books and records of the Debtors and proofs of claim on file):

| Property | Secured Creditor | Stipulated Value | Secured Taxes | Net Secured Claim Amount for Pineda |
|---|---|---|---|---|
| Willcox Office 759 S. Haskell Willcox, AZ | Compass/ Pineda | $350,000 | $10,950 | $339,050 |
| San Jose Chevron 1288 S. Hwy 92 Bisbee, AZ | Compass/ Pineda | $600,000 | $19,831 | $580,169 |
| Sierra Vista Little General 1860 S. Hwy 92 Sierra Vista, AZ SV Vacant Land | Compass/ Pineda | $820,000 | $83,135 $12,792 | $724,073 |
| Marana Chevron 13960 N. Sandario Marana, AZ | Compass/ Pineda | $700,000 | $89,762 $525 | $609,713 |
| Dunlap Plaza 900 W. Rex Allen Dr. Willcox, AZ | Compass/ Pineda | $650,000 | $107,982 | $542,018 |
| Quail Hollow Inn 699 N. Ocotillo Benson, AZ | Compass/ Pineda | $1,900,000 | $226,613 (includes both real and personal property taxes pursuant to Cochise County POC #1) | $1,673,387 |
| **TOTALS:** | | **$5,020,000** | **$551,590** | **$4,468,410** |

83. After deducting the secured taxes, Pineda is left with an Allowed Secured Claim in the amount of $4,468,410. The Pineda Allowed Class 2(a) Secured Claim will be paid pursuant to the terms set forth in Section 7.2 of the Plan, on a 25-year amortization schedule with interest at the rate of 5% per annum, resulting in a monthly payment of **$26,122**.

84. The remainder of the Pineda claim will be treated as a Class 3(a) Unsecured Deficiency Claim. Allowed Class 3(a) Claims will be entitled to semi-annual pro rata distributions of the cash flows generated and amounts received by the Debtors, after payment of operating expenses and installment payments to secured creditors, for a period of five years after the Effective Date (the "Unsecured Distribution Amount"). Upon receipt of their respective pro rata portions of the Unsecured Distribution Amount, all Allowed Unsecured Deficiency Claims in Class 3(a) will be deemed paid and discharged in full five years after the Effective Date.

18

85.     The Debtors and Pineda disagree regarding the scope and value of the Pineda lien on inventory and personal property of the Debtors.  The Debtors assert that the value of the personal property in which Pineda claims a lien has already been included in the values stipulated to by the parties.

**ii.      CCB:**

86.     The Debtors will return to CCB the Grand Texaco and Pinetop Chevron, with stipulated values and secured tax claims according to the books and records of the Debtors[15] as follows:

| Property | Secured Creditor | Stipulated Value | Secured Taxes | Net Credit |
|---|---|---|---|---|
| Grand Texaco | CCB | $1,600,000 | $143,487 | $1,456,513 |
| Pinetop Chevron | CCB | $530,000 | $28,964 (est. RE-10/11/12) $8,761 (est. PP-12) | $492,275 |
| **TOTAL** | | **$2,130,000** | **$181,212** | **$1,948,788** |

87.     With respect to the property retained by the Debtors under the Plan, CCB and the Debtors have stipulated to the following value (with secured tax claims referenced according to the books and records of the Debtors and proofs of claim on file):[16]

| Property | Secured Creditor | Value | Secured Taxes | Net Secured Claim Amount for CCB |
|---|---|---|---|---|
| Green Valley SuperCenter | CCB | $2,500,000 | $83,119 $2,188 | $2,414,693 |
| **TOTAL** | | **$2,500,000** | **$85,307** | **$2,414,693** |

After deducting the secured taxes, CCB is left with an Allowed Secured Claim in the amount of $2,414,693.  The CCB Allowed Class 2(b) Secured Claim will be paid pursuant to the terms set forth in Section 7.2 of the Plan, on a 25-year amortization schedule with interest at the rate of 5% per annum, resulting in a monthly payment of **$14,116**.

88.     In addition, CCB and the Debtors have stipulated to the value of the Debtors' Rolling Stock in the amount of $416,800, resulting in a monthly payment of **$2,437.**

89.     The remainder of the CCB claim will be treated as a Class 3(a) Unsecured

---

[15]  CCB appears to stipulate to at least the amount of taxes set forth in Section III(A) of the JPTS.
[16]  *Id.*

19

Deficiency Claim. Allowed Class 3(a) Claims will be entitled to semi-annual pro rata distributions of the cash flows generated and amounts received by the Debtors, after payment of operating expenses and installment payments to secured creditors, for a period of five years after the Effective Date (the "Unsecured Distribution Amount"). Upon receipt of their respective pro rata portions of the Unsecured Distribution Amount, all Allowed Unsecured Deficiency Claims in Class 3(a) will be deemed paid and discharged in full five years after the Effective Date.

### iii. Cox:

90. The Allowed Class 2(c) Secured Claim of Cox will be treated in accordance with the Parties' Settlement previously approved by the Court. Dkt. #202, 247. The Cox Allowed Secured Claim breakdown and treatment is as follows:

| Property | Secured Creditor | FMV | Taxes | Net Credit Against Claim |
|---|---|---|---|---|
| Payson Chevron 709 E. Hwy 260 Payson, AZ | Cox | $700,000 | The taxes due and owing on the Payson Chevron will be satisfied by DOC in accordance with the payment terms set forth in Class 1(a), as a part of the Settlement reached between the Debtors and Cox. | $700,000 |
| Tucson Office 4231 S. Station Master Dr., Tucson, AZ | Cox | $450,000 | The taxes due and owing on the Tucson Office will be satisfied by DOC in accordance with the payment terms set forth in Class 1(a), as a part of the Settlement reached between the Debtors and Cox. | $450,000 |
| TOTAL | | $1,150,000 | To be paid by Debtor | $1,150,000 |

91. Following the transfer of the Payson Chevron and the Tucson Office to Cox, Cox will hold an Class 2(c) Allowed Secured Claim in the amount of $807,055 (the "Remaining Cox Allowed Secured Claim"), which will be secured by the existing first position deed of trust held by Cox on the real property located at 1190 W. Rex Allen Drive, Willcox, Arizona ("Willcox Truck Plaza").

92. The Remaining Cox Allowed Class 2(c) Secured Claim will be paid in monthly installments according to a twenty-five year amortization schedule, with interest at the rate of

20

five percent (5%) per annum, and with a balloon payment in month 60. The initial monthly payment of the Remaining Cox Allowed Secured Claim for the first 59 installments will be **$4,717**.

### iv.     Jackson:

93.     The Class 2(d) Allowed Secured Claim of Jackson totals approximately $218,605.99 and is secured by the existing deed of trust held by Jackson on the DOC's Food Stop in Thatcher, Arizona. The lien on the Thatcher property will be retained by Jackson. Jackson is further secured by the fuel and receipts of the Debtor. The Class 2(d) Allowed Secured Claim of Jackson arises from the provision of fuel pursuant to the Jackson Supply Agreement.

94.     The Class 2(d) Allowed Secured Claim of Jackson will be paid in monthly installments according to a twenty-five year amortization schedule, with interest at the rate of 5% per annum, and with a balloon payment on the 30th month following the Effective Date. The Monthly Payment amount for the Class 2(d) Allowed Secured Claim of Jackson will be **$1,278**.

95.     The Trust has consented and agreed to the payment of the balloon payment in the 30th month, and consented to the balance of the settlement and resolution of the Jackson Objection as set forth on the record at the June 12, 2013 evidentiary confirmation hearing.

96.     The Jackson Secured Claim includes any refresh incentive obligations for transferred stores and reasonable attorneys' fees.

97.     The treatment of Jackson's Class 2(d) Allowed Secured Claim shall be deemed to satisfy any alleged "cure" relating to the assumption of the Jackson Supply Agreement, which is permissible pursuant to applicable bankruptcy law and authority, and particularly in these circumstances where Jackson is admittedly oversecured and therefore is adequately assured of payment. *See, e.g., In re PRK Enterprises*, 235 B.R. 597,601 (Bankr. E.D. Tex. 1999).

### v.     IRS:

98.     At the option of the Internal Revenue Service ("IRS"), the IRS may elect to receive a transfer of the Benson Chevron to the IRS in full satisfaction of its Allowed Secured Claims in this Case.

99.     In the alternative, the IRS will retain its lien on the Benson Chevron, and in the

event that the Benson Chevron is sold prior to payment in full of the IRS Allowed Secured Claim, the remainder of the IRS Allowed Secured Claim existing at the time of sale will be paid from the proceeds of the sale.

100.    The Debtors have agreed to amend the Plan, through the Confirmation Order, to include the following provisions to resolve the IRS Objection:

a.    To the extent that the IRS' secured claim in the amount of $295,454.77 is determined to be fully secured, the Debtor will provide for payment of the secured portion of the claim with interest;

b.    The applicable rate of interest for the IRS priority tax claims and secured tax claims (if any) is clarified and such claim will accrue interest at the rate of 3% compounded daily;

c.    The IRS Secured Claim is secured by all of Debtor's personal property located in Arizona and all of Debtor's real property located in Cochise County, Arizona, which includes real property in Willcox, Bisbee, Sierra Vista and Benson.

d.    The default provisions set forth in Article V, § 5.3 of the Plan shall apply to both the IRS unsecured claim and secured claim; and

e.    Payments due under the Plan will be mailed to the Internal Revenue Service; Attn: Linda Kittrell; 4041 N. Central Avenue, Mail Stop 5014PHX, Phoenix, Arizona 85012.

101.    The IRS Allowed Claims will be paid as follows:

| Claim Type | Amount | Treatment | Monthly Payment |
|---|---|---|---|
| Secured | $295,454.77 | Retains lien and paid according to Class 2(a) Secured Claims – on a 25 year amortization schedule with interest at the rate of 5% per annum, with a balloon payment in year five or upon the sale of Benson Chevron. | $1,727.20 |
| Priority | $269,555.59 | Paid pursuant to Section 5.3 of the Plan | $4,843.56 |
| Administrative | $5,242.48 Debtors are entitled to a refund from their 2011 taxes in the amount of $11,300 which should be applied against any amounts alleged to be owing to the IRS. | Paid on or about Effective Date | N/A |
| TOTAL | $570,252.84 | | $6,570.76 |

22

102.     With respect to its secured claims, the IRS will retain its lien and will be paid according to Class 2(a) Secured Claims – on a 25-year amortization schedule with interest at the rate of 5% per annum, with a balloon payment in year five or upon the sale of Benson Chevron. The proposed payment schedule for the secured portion of the IRS claim is allowable under applicable law and authority. *See, e.g.,* 11 U.S.C. § 1129(a)(9); *In re Jerath Hospitality, LLC*, 484 B.R. 245, 247 (Bankr. S.D. Ga. 2012) ("There is nothing in the plain reading of the statute that would indicate that monthly payments, followed by a balloon payment, is not an appropriate payment method under the Code. If Congress wanted to say 'equal payments,' it could have done so. If Congress had wanted to say 'no balloon payments,' it could have done so") (quoting *In re F.G. Metals, Inc.,* 390 B.R. 467 (Bankr.M.D.Fla.2008)).

103.     With respect to its Priority Claims, the IRS will be paid in accordance with Section 5.3 of the Plan - (i) in equal monthly installments; (ii) with interest at 3% in accordance with 11 U.S.C. § 511; and (iii) with payments beginning within thirty days after the Effective Date.

104.     The monthly payment for the IRS totals **$6,570.76,** with a balloon payment in the 60th month following the Effective Date (in the event that the Benson Chevron is not sold prior to that date).

### vi.      County Taxes:

105.     Class 1(a) Secured Tax Claims will be paid: (i) in equal monthly installments; (ii) with interest at 16%; and (iii) with payments beginning within thirty days after the Effective Date.

106.     Holders of Allowed Class 1 Claims will retain their liens on any Assets of the Debtors that serve as security for repayment of Allowed Class 1 Claims, and the taxes relating to the following properties will be paid by the Debtors under the Plan as follows:

| Property | Claimant | Amount | Monthly Payment |
|---|---|---|---|
| Willcox Office<br>759 S. Haskell<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $10,950 | **$266** |
| San Jose Chevron<br>1288 S. Hwy 92<br>Bisbee, AZ | Cochise Co.<br>(POC #4) | $19,831 | **$482** |
| Sierra Vista Little General<br>1860 S. Hwy 92 | Cochise Co.<br>(POC #4) | $83,135 | **$2,021** |

23

| | | | |
|---|---|---|---|
| Sierra Vista, AZ<br>SV Vacant Land - | Cochise Co.<br>(POC #4) | $12,792 | **$311**<br>**Total = $2,332** |
| Dunlap Plaza<br>900 W. Rex Allen Dr.<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $107,982 | **$2,626** |
| Willcox Truck Plaza<br>1190 W. Rex Allen Dr<br>Willcox, AZ | Cochise Co.<br>(POC #4) | $68,501 | **$1,666** |
| Quail Hollow Inn<br>699 N. Ocotillo<br>Benson, AZ | Cochise Co.<br>(QHI POC #1) | $226,613<br>(includes both real and personal property taxes pursuant to Cochise County POC #1) | **$5,511** |
| Benson Chevron<br>680 N. Ocotillo<br>Benson, AZ | Cochise Co. | $18,560<br>(est. RE and PP 10/11) | **$451** |
| Cochise County Personal Property Taxes pursuant to Cochise County Proof of Claim for DOC | Cochise Co.<br>(POC #4) | TOTAL = $2,595.20<br>(cannot distinguish between locations based on Cochise County POC #4) | To be paid on Effective Date |
| **TOTAL** | **Cochise Co.** | **$550,959** | **$13,335** |
| | | | |
| Ajo Chevron<br>2001 N. Ajo-Gila Bend Hwy<br>Ajo, AZ | Pima Co.<br>(POC #34) | $246 | To be paid on Effective Date |
| Tucson Office<br>4231 S. Station Master Dr., Tucson, AZ<br>(taxes paid according to Settlement with Cox) | Pima Co.<br>(POC #23)<br>Pima Co.<br>(POC #38) | $32,206<br><br>$2,110 | **$783**<br><br>**$51**<br><br>**Total = $834** |
| Green Valley SuperCenter<br>171 W. Continental Rd<br>Green Valley, AZ (and adjacent vacant land) | Pima Co.<br>(POC #27, 28, 29, 31, 32)<br>Pima Co.<br>(POC #36) | $83,119<br><br>$2,188 | **$2,021**<br><br>**$53**<br>**Total = $2,074** |
| Marana Chevron<br>13960 N. Sandario<br>Marana, AZ | Pima Co.<br>(POC #24)<br>Pima Co.<br>(POC #33) | $89,762<br><br>$525 | **$2,183**<br><br>**$13**<br>**Total = $2,196** |
| **TOTAL** | **Pima Co.** | **$210,156** | **$5,104** |
| | | | |
| Payson Chevron<br>709 E. Hwy 260<br>Payson, AZ<br>(taxes paid according to | Gila Co.<br>Havin Trust<br>(purchased tax | $43,601 | **$1,060** |

24

| | | | |
|---|---|---|---|
| Settlement with Cox) | cert.)<br>(POC #13) | | |
| **TOTAL** | **Gila Co.** | **$43,601** | **$1,060** |
| | | | |
| DOC's Food Stop<br>2371 W. Hwy 70<br>Thatcher, AZ | Graham Co.<br>(POC#20) | $8,361 | $203 |
| **TOTAL** | **Graham Co.** | **$8,361** | **$203** |
| | | | |

vii.          **ADOR:**

107. The ADOR Secured and Priority Allowed Claims will be paid (i) in equal monthly installments; (ii) with interest at 3%; and (iii) with payments beginning within thirty days after the Effective Date as follows:

| Claim Type | Source | Amount | Monthly Payment |
|---|---|---|---|
| Secured | POC #18 | $79,526.46 | **$1,429** |
| Priority | POC #18 | $115,289.62 | **$2,072** |
| Priority | POC #2 (QHI) | $22,558.52 | **$405** |
| Administrative | POC #19 | Withdrawn | N/A |
| Administrative | POC #7 (QHI) | Withdrawn | N/A |
| **TOTAL** | | **$217,374.60** | **$3,906** |

108. The Monthly Payment for the ADOR Secured and Priority Claims will be **$3,906**.

viii.          **Rejection Claims:**

109. Based on the proposed rejection of executory contracts and leases, the Debtors anticipate rejection damages claims from the following parties:

        a.    Chevron/Jackson – contingent rejection damages relating to returned stations, estimated in an amount of $26,000.

        b.    Grand Dairy Queen – no rejection damages anticipated other than minimal franchise fees estimated in the amount of $4,500.

        c.    Magnussen – lease rejection relating to Esperanza station, amount unknown and no claim filed to date.

110. The majority of the Debtors' remaining executory contracts are terminable upon thirty days' notice, significantly limiting any rejection damages for any ancillary operating contracts related to returned or closed locations. *See* Dkt. #321.

111. Finally, rejection damages will be included in the Class 3 Unsecured Claims.

25

Allowed Class 3 Claims will be entitled to semi-annual pro rata distributions of the cash flows generated and amounts received by the Debtors, after payment of operating expenses and installment payments to secured creditors, for a period of five years after the Effective Date (the "Unsecured Distribution Amount"). Upon receipt of their respective pro rata portions of the Unsecured Distribution Amount, all Allowed Unsecured Claims in Class 3 will be deemed paid and discharged in full five years after the Effective Date.

112. Because unsecured claims - including any rejection damages claims - will be paid a pro rata amount of excess cash flows, it is not necessary to take into account the rejection damages claims when determining Plan feasibility.

**B.** **The Plan was filed in good faith.**

113. The Plan achieves objectives consistent with the Bankruptcy Code, will maximize recoveries and effect a rehabilitation of the Debtors, preserves a company that holds longstanding ties to the rural communities of Eastern Arizona, and will save approximately one hundred employees' livelihoods in those same communities. There is ample evidence of good faith in this Case.

114. The evidence demonstrates that the Plan will provide a far greater recovery for creditors than liquidation. *Compare* Tr. Ex. 19 at Exh. C (liquidation analysis) *with* Tr. Ex. I at Exh. A (projections).

115. The Plan further allows for the rehabilitation and reorganization of the Debtors, a benefit to creditors, vendors, suppliers, employees, and equity holders. Tr. Ex. H, I.

116. There is no evidence that the Debtors have proposed the Plan in anything but good faith, and accordingly, the Plan should be confirmed.

**C.** **The classification and treatment of claims under the Plan is fair and reasonable.**

**1.** **Partial return and retention using stipulated values provides secured creditors with fair and equitable treatment for their claims.**

117. In an effort to streamline the confirmation proceedings, the Debtors agreed to stipulated values with Pineda and CCB for both returned and retained properties, with the

stipulated values based on recent appraisals.

118.    The proposed return of collateral to secured creditors in exchange for a fair market value credit (based on values stipulated to by the parties) is allowed and expressly provided for under the Code.

119.    There is no prohibition to a partial return of collateral under the Code, and the only remaining issue in give back cases is the amount of the credit for the returned assets. However, with stipulated values agreed to by the parties, that issue is resolved.

120.    At the very least, CCB and Pineda are getting a portion of what they want and what they bargained for.

121.    Accordingly, the proposed return of collateral to secured creditors is proper, satisfies the requirements of the Bankruptcy Code, and the Plan should be confirmed.

## 2.    Classification.

122.    The evidence shows that the classification of Claims under the Plan is reasonable and supported by valid business and legal justifications.

123.    Both Pineda and CCB hold guaranties from various entities and individuals, constituting a valid basis for separate classification. Tr. Ex. 7 at p, 24; Tr. Ex. 8 at p. 7;  Tr. Ex. 9 at p. 8; Tr. Ex. 10 at p. 9; Tr. Ex. 34 at p. 2.

124.    The Debtors dispute the amount of the claim asserted by Pineda based on the refusal of Compass to accept payments tendered by the Debtors in the late 2009 timeframe, and Compass/Pineda effectively waived any defaults after refusing payment by failing to take any action until shortly before the Petition Date.

125.    Finally, based on the ballot results, there is no need for separate classification of the various creditors in order to obtain an accepting impaired class of votes. *See* Dkt. #262.

## D.    The 5% interest rate proposed under the Plan is fair and reasonable.

126.    The only testimony offered on the appropriateness of the proposed rate of interest under the Plan was that of Mr. Odenkirk.  Tr. Ex. H at ¶¶20-26.

127.    According to the Supreme Court's reasoning and analysis set forth in *Till*, the 5% interest rate on secured claims is reasonable and supportable.  *Id.*

27

128.     The expert testimony and evidence provided by Mr. Odenkirk was unrefuted by CCB and Pineda.

129.     Based on current market rates, applicable risk factors, and overall default risk, the Plan's 5% rate of interest is appropriate under the facts and circumstances of this Case.

### E.     The New Value Contribution is substantial, necessary, and satisfies the Absolute Priority Rule.

130.     The evidence proves that the proposed contribution by the current Equity Interest Holders - including but not limited to the New Value Contribution - is a substantial, up-front infusion of cash, needed for reorganization, and reasonably equivalent to interest retained.

131.     The Equity Interest holders of DOC and QHI will contribute on the Effective Date $150,000 to fund the Plan (the "New Value Contribution").   In addition to the cash New Value Contribution, the Equity Interest holders of DOC have also agreed to contribute to DOC their respective fee simple interests in the Benson Little General and Benson Chevron in the event that the Plan is confirmed.

132.     Pineda has already taken possession of the Benson Little General pursuant to stipulated stay relief and appointment of a receiver.[17]   The Debtors have reopened the Benson Chevron after modifying the Plan to address Pineda's objection to the return of the Benson Chevron.   By contributing to DOC the fee simple interest to the real property underlying the Benson Little General and Benson Chevron, the Equity Interest Holders are greatly enhancing the value of the estate for the benefit of its creditors.

133.     In exchange for the New Value Contribution (which has already been substantiated through the tender of a cashier's check in the amount of $150,000 and an affirmance of the intention to transfer the two fee simple interests upon Confirmation), the current Equity Interest Holders will retain their respective equity interest in the Debtors.

134.     The evidence further demonstrates that the New Value Contribution is needed for Effective Date and Year 1 Plan payments and, along with the credit terms supplied by

---

[17] Accordingly, to the extent the Plan is confirmed and the fee simple interest in the Benson Little General is transferred, the transfer of the fee simple interest would more than compensate Pineda for any alleged interest in the Debtors' personal property.

28

1  Jackson Oil Company, will greatly assist the Debtors in obtaining additional fuel and

2  merchandise inventory for sale.

3      135.    The New Value Contribution is substantial and equitable, given the negative

4  equity in the Debtors that Pineda and CCB trumpeted at every opportunity.  Tr. Ex. 16 (showing

5  an alleged $1.6 million in negative equity, making a $150,000 infusion very substantial under the

6  circumstances).  Because the Debtors are insolvent, the New Value Contribution is indisputably

7  greater than the interests being retained.

8      136.    Finally, the owners have provided a commitment to assist with any additional

9  shortfalls under the Plan, providing further value if needed.

10  **IV.    CONCLUSION.**

11      The Debtors, with the leadership and guidance of Ted Dunlap, have worked hard to

12  present a confirmable Plan of Reorganization that satisfies the applicable provisions of the

13  Bankruptcy Code, maximizes the value of estate assets for the benefit of all parties, and positions

14  the Debtors to emerge from Chapter 11 as stronger, streamlined, viable entities.  For the reasons

15  set forth at the Trial, and supported by the record in this Case, the Plan should be confirmed.

16

17      RESPECTFULLY SUBMITTED this 26th day of July, 2013.

18                  GALLAGHER & KENNEDY, P.A.

19                  By: */s/ Lindsi M. Weber*
20                      John R. Clemency
                        Lindsi M. Weber
21                      2575 E. Camelback Road
                        Phoenix, Arizona 85016
22                      *Attorneys for Debtors*

23  COPIES of the foregoing were served
    this 26th day of July, 2013 via
24  first-class, U.S. Mail, Email, and/or Facsimile
25  to the parties on the attached service list.

26  By: */s/ Rachel Milazzo, CP*

27

28

29