DAVID WM. ENGELMAN, SBA #004193
BRADLEY D. PACK, SBA #023973
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012

Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@eblawyers.com
Email: bdp@eblawyers.com

Attorneys for Pineda Grantor Trust II

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>DUNLAP OIL COMPANY, INC.,<br>QUAIL HOLLOW INN, LLC,<br><br>Debtors.<br><br>Filing applies to: Both | Chapter 11<br><br>Case No.: 4:12-bk-23252-JMM<br>Case No.: 4:12-bk-23256-JMM<br><br>(Jointly Administered) |

**PINEDA GRANTOR TRUST II'S POST-TRIAL MEMORANDUM CONCERNING OBJECTION TO CONFIRMATION OF PLAN AND STAY RELIEF MOTIONS**

**Evidentiary Hearing Dates:**

June 12, 2013 and July 11, 2013

## TABLE OF CONTENTS

Summary of Argument ........................................................................................................ 1

Argument ............................................................................................................................ 3

I. THE PLAN IS NOT FAIR AND EQUITABLE. ....................................................................... 3

A. The Plan Does Not Provide for Payment of the Full Amount of Pineda's Secured Claim. . 3

1. The Debtors' Argument that the Agreed Real Property Values Encompass the Value of Personal Property Misrepresents the Parties' Stipulation. .................................................... 5

2. The Debtors' Dispute as to the Validity of Pineda's Lien Is Meritless and Irrelevant in the Context of a Confirmation and Stay Relief Hearing. .......................................................... 6

B. The Plan Fails To Provide An Appropriate Rate of Interest. .............................................. 8

C. The Plan Violates the Absolute Priority Rule. .................................................................. 12

II. THE DEBTORS HAVE FAILED TO CARRY THEIR BURDEN OF PROOF ON THE CONFIRMATION REQUIREMENTS OF § 1129(a). ............................................................ 13

A. The Debtors' Plan Is Infeasible. ........................................................................................ 13

1. The Debtors Cannot Meet Their Debt Service Obligations Even Assuming That Their Projections are Correct. ....................................................................................................... 14

2. The Debtors' Projections Are Not Credible. ...................................................................... 14

3. The Debtors Presented No Evidence of Their Ability to Make the Balloon Payments. .... 17

4. The Debtors' Management Did Not Commit to Funding Shortfalls and Has No Ability To Do So. ................................................................................................................................. 18

5. The Debtors Cannot Argue They Will Sell the Hotel for $2.7 Million When They Stipulated to a Value of $1.9 Million. .................................................................................. 18

B. The Debtors Have No Ability to Pay Their Administrative Claims. ................................. 19

1. Post-Petition Taxes are Entitled to Administrative Priority. ............................................. 19

2. Pineda Is Entitled to an Administrative Claim for Failed Adequate Protection. ................ 20

C. The Plan Is Not Proposed In Good Faith. ......................................................................... 22

III. PINEDA IS ENTITLED TO STAY RELIEF. ..................................................................... 23

Conclusion .......................................................................................................................... 23

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## SUMMARY OF ARGUMENT

The Debtors have failed to meet their burden of proof with respect to the confirmation requirements of both Bankruptcy Code § 1129(a) and the "fair and equitable" requirements for cramdown under § 1129(b). Confirmation of the Debtors' First Amended Chapter 11 Plan (the "Plan") must therefore be denied. And because there is no dispute that Debtors lack equity in the collateral securing the claim of Pineda Grantor Trust II ("Pineda"), the Debtors have failed to provide any adequate protection of Pineda's interest, and the Debtors have not proven that a successful reorganization is reasonably in prospect, Pineda is entitled to stay relief to enable it to foreclose upon its collateral.

Pineda timely filed a proof of claim for <u>$6,998,815.54</u>, a portion of which is unsecured. It has rejected the Plan. To confirm the Plan over Pineda's rejecting vote, Debtors must prove, among other things, that the Plan is fair and equitable. The Plan fails this test with respect to its treatment of both the secured and unsecured parts of Pineda's claim.

To be fair and equitable toward Pineda's secured claim, the Plan must provide for payment of the full amount of Pineda's allowed secured claim, with interest at a rate sufficient to compensate for the risk of non-payment. Under 11 U.S.C. § 506(b), Pineda's secured claim includes the value of both the real property <u>and</u> the personal property securing its claim, as well as accumulated cash collateral. Based upon the parties' stipulation as to the real property values and the undisputed evidence as to the personal property value, Pineda's secured claim is no less than <u>$5,784,116.00</u>. Because the Plan proposes to pay Pineda only $4.46 million on its secured claim, it cannot be confirmed.

The Debtors' proposed 5% rate of interest also fails the fair and equitable test. Because there is no efficient market for a loan to the Debtors, the Court must apply the "prime-plus" formula prescribed in *Till* to determine the cramdown rate. Under *Till,* the court must start with "the national prime rate" and adjust upward for risk. Here, the Debtors' own expert testified that the appropriate risk adjustment is 4.0%. Adding that to the prime rate of 3.25% yields a cramdown rate of 7.25%. The Debtors' use of the 5 year treasury yield as the

starting point is contrary to both *Till* and Ninth Circuit law. *In re Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1506 (9th Cir. 1987) (cramdown rate may not be calculated "on the basis of interest rates paid on treasury obligations").

Finally, the Plan is not fair and equitable with respect to unsecured creditors because the Plan violates the absolute priority rule. The Debtors' proposed New Value Contribution of $150,000, which represents just 3.29% of unsecured claims, is insufficient as a matter of law to satisfy the new value corollary. It also fails because it will be funded by a loan. *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 899 (B.A.P. 9th Cir. 1994) (infusion of cash funded by loan does not satisfy new value exception).

In addition to its failure to satisfy the cramdown requirements, the Plan also fails the general confirmation requirements of § 1129(a) in numerous respects. First, the Plan is not feasible. Even if the Court were to accept the Debtors' income projections as true, the Debtors will run out of money within one year, once the Court applies the proper interest rate to the correct secured claim, as illustrated in **Exhibits "A," "B"** and **"C"** attached hereto. This problem is compounded by the unreliability of the Debtors' projections, which are untied to either the Debtors' historical performance or industry averages. Additionally, because the Plan proposes a balloon payment on secured claims, which will amount to at least $6,437,985 on Pineda's and CCB's claims alone, the Plan may not be confirmed absent credible evidence of the Debtors' ability to fund the balloon. *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 738 (Bankr. D. Ariz. 2010). The Debtors have presented no such evidence.

The Debtors also lack the ability to pay their administrative claims. Even with the proposed $150,000 New Value Contribution, Debtors do not have the funds to pay administrative claims for post-petition taxes and failed adequate protection, let alone the fees of committee's counsel or their own attorneys' fees.

Finally, the Debtors have failed to prove that the Plan was filed in good faith. This case has been marked by substantial and continuing loss to the estate. That includes losses of nearly $9 million over the last 5 ½ years, and over $1 million in the first five months of 2013.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

The Debtors' proposal to retain current management all but assures that such losses will continue. As the Plan will only result in further diminution of the estate's assets at the expense of creditors, confirmation would undermine the policies of the Bankruptcy Code.

The Debtors' disregard of its creditors' rights throughout this case further evidences their lack of good faith. Their actions include: (a) a last-minute "amendment" to the Plan to keep the hotel they promised to deed back to Pineda; (b) their argument that the Court should assume they will sell their hotel for $2.7 million when they stipulated to a value of $1.9 million; (c) their abrupt abandonment of the gas stations for which Pineda and CCB were granted stay relief; and (d) their failure to pay post-petition property taxes on their creditors' collateral or to make a single payment on their secured debt for over four years.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

## ARGUMENT

## I. THE PLAN IS NOT FAIR AND EQUITABLE.

If an impaired class of creditors has rejected a Chapter 11 plan, the plan may be confirmed only if it "does not discriminate unfairly, and is fair and equitable" with respect to each such class. 11 U.S.C. § 1129(b)(1). Pineda holds both a $5,784,116.00 secured claim and a $940,551 unsecured claim. Because the Debtors have failed to meet their burden of proving that the Plan is fair and equitable with respect to both of Pineda's claims, confirmation must be denied.

### A. The Plan Does Not Provide for Payment of the Full Amount of Pineda's Secured Claim.

When a plan proposes retention of a creditor's collateral, the plan is fair and equitable only if it provides that the creditor retain its lien and receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i). The Plan fails this requirement because the Debtors propose to pay Pineda only the value of its real property collateral, and not its personal property collateral.

Under 11 U.S.C. §506(a), "a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral." *Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 961 (1997). "For the purpose of making the comparison of the debt owed to the secured creditor and the value of collateral, ***<u>all of the collateral</u> pledged by affiliated debtors who have commenced Chapter 11 cases is considered*** in determining whether a creditor has a fully secured claim." *In re SW Hotel Venture, LLC*, 460 B.R. 4, 26 (Bankr. D. Mass. 2011) (emphasis added), *aff'd in part, rev'd in part on other grounds*, 479 B.R. 210 (B.A.P. 1st Cir. 2012).

A secured claim also includes the value of all accumulated cash collateral. "The law in this Circuit is clear that when a creditor is secured by income producing property, when its lien extends to the rents or other income generated by the property, and when the value of the real property alone is less than the amount of the claim, then the amount of the secured claim determined pursuant to § 506(a) includes both the value of the real property and the amount of the accumulated cash collateral." *In re Arden Props., Inc.*, 248 B.R. 164, 168 (Bankr. D. Ariz. 2000) (citing *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir.1997))

Pineda timely filed a proof of claim for **$6,998,815.54**,[1] which is secured by real property and a blanket lien on Debtors' inventory, accounts, general intangibles, equipment, and all proceeds and products of the foregoing, whenever acquired and wherever located. Under the Court's cash collateral orders (Dkt. 33, 59, 97; QHI Dkt. 34), Pineda was granted "a replacement lien on all property acquired by the Debtors after the Petition Date of the same type and kind as the property on which such creditor held a lien as of the Petition Date."

The parties stipulated in the *Joint Pre-Trial Statement* that the value of the "real property and improvements" securing Pineda's claim, after deducting the amount of senior

---

1 *See* Claim No. 47 in Dunlap Oil's case and Claim No. 3 in Quail Hollow's case. In their closing brief, the Debtors erroneously assert that Pineda refused to accept payments and that it is estopped from seeking to collect "default interest." The Debtors have not tendered any payments to Pineda. The pre-bankruptcy interest included in Pineda's claim was calculated at the standard 9% rate Dunlap Oil agreed to and reaffirmed. (Tr. Ex. 8 at p.2, ¶2.2(b); Tr. Ex. 9 at p.3, ¶3.2(d)).

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

property tax liens, is $4,468,410.[2] (Dkt. 300, pp.8-9, ¶24). The Debtors' controller Jim Martin testified that as of May 31, 2013, the value of the Debtors' inventory, cash, and accounts receivable was $1,315,705, as itemized in **Exhibit "A"** hereto.[3] Thus, the total amount of Pineda's allowed secured claim is no less than $5,784,115. The Debtors' argument that Pineda's lien is limited to the stipulated value of the real property is baseless.

1. The Debtors' Argument that the Agreed Real Property Values Encompass the Value of Personal Property Misrepresents the Parties' Stipulation.

The Debtors' statement that "Pineda's personal property lien is encompassed in the values that the parties stipulated to" is patently false. The parties' agreement, set forth in the Joint Pre-Trial Statement, states:

> The Notes are secured by Deeds of Trust **on the real properties and improvements** listed below (collectively, the "Pineda Properties"). Debtors and Pineda agree that, for the sole and exclusive purpose of determining the amount of Pineda's secured claim under 11 U.S.C. § 506(a) in connection with the June 12 Hearing, the values of the Pineda Properties are as set forth below.

(Dkt. 300, pp.8-9, ¶24) (emphasis added).

"Real properties and improvements" means just that – real estate. To suggest that this stipulation includes personal property is simply absurd. In fact, the Joint Pre-Trial Statement expressly acknowledges the parties' disagreement as to the value of the personal property that must be added to the real property value in order to determine the total amount of Pineda's secured claim. It states: "***The Debtors and Pineda disagree regarding the scope and value of the Pineda lien on inventory and personal property*** of the Debtors. The Debtors assert that the value of the inventory in the retained properties as of the Effective Date is the relevant

---

[2] Pineda initially disputed the Debtors' calculation of the amount of the senior property tax liens. For purposes of the stay relief and plan confirmation hearing, however, Pineda will accept the Debtors' calculation, as set forth on page 24 of the *Joint Pre-Trial Statement*.

[3] The Debtors argue in their closing brief that Pineda recovered the value of some of this property when it obtained stay relief and a receiver was appointed for two of the gas stations securing its claim. However, Pineda's receiver did not recover any cash, did not collect on any accounts receivable, and most of the inventory had already been cleared from the stations he took over. Moreover, Pineda's receiver simply stands in the shoes of Dunlap Oil. Thus, none of the collateral was actually turned over to Pineda; management was simply transferred to a neutral third-party.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

figure for the Court to determine in reaching a final amount for the total Pineda Class 2(a) Secured Claim." (*Id.* at p.25, ¶111). Pineda also asserted that the total amount of its secured claim must include the value of all inventory at all locations *in addition to* the value of the real property. (*Id.* at ¶¶84-87). There is simply no truth to Debtors' argument that Pineda stipulated its secured claim would be limited to the $4.7 million agreed value of the "real property and improvements."

Debtors urge the Court to consider the real property appraisals as support for their argument. However, the Court may not consider anything other than the express terms of the parties' stipulation to determine what the Debtors and Pineda agreed to. *U.S. v. Nunez*, 223 F.3d 956, 958 (9th Cir. 2000) (court may not look to extrinsic evidence to interpret "unambiguous written instrument"). Nonetheless, the appraisals do not support the Debtors' argument. Although the gas stations appraisals do value "FF&E," that term includes only furniture, fixtures, and equipment. *See, e.g.*, Tr. Ex. K at p.44 (defining FF&E as "cooler doors … [p]roduct displays, shelving, racks, cash registers … sinks, tables/chairs, range/hood, and miscellaneous shelving/racks"). Nothing in the appraisals purport to value the Debtors' inventory, cash, or accounts receivable.

Thus, the record establishes that the Debtors' inventory, cash, and receivables must be valued independently of the real property, and added to the real property value to determine the total amount of Pineda's secured claim.

2. <u>The Debtors' Dispute as to the Validity of Pineda's Lien Is Meritless and Irrelevant in the Context of a Confirmation and Stay Relief Hearing</u>.

The Debtors now dispute the validity of Pineda's lien on personal property. Of course, their mere assertion of a dispute does not render the lien invalid. To the contrary, Pineda's secured claim is automatically allowed by virtue of its timely filing of a proof of claim asserting a blanket security interest in all of the Debtors' personal property. 11 U.S.C. § 502(a); *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). To

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

date, the Debtors have neither filed an objection to Pineda's claim nor filed an adversary proceeding to determine the validity, extent, or priority of Pineda's lien.

The Debtors' assertion that Pineda does not hold a valid lien in certain personal property is meritless. The Debtors fail to articulate the basis of their dispute in the closing brief, apart from the conclusory statement that there is a "serious question" about the validity of Pineda's lien. Previously, however, they raised two arguments: (1) the collateral description in the *Commercial Security Agreement* is defective; and (2) Pineda did not timely file a UCC continuation statement within five years of its initial financing statement.

Both arguments are addressed in detail in Pineda's *Response To Debtors' Argument Re: Pineda's Lien On Personal Property* (Dkt. 358). In summary, the Commercial Security Agreement (Tr. Ex. 5) unambiguously provides for a lien on all accounts and contract rights, equipment, inventory, general intangibles, and all proceeds of the foregoing, whenever acquired and wherever located. The Debtors' argument that the phrase "including, but not limited to, any inventory described on Schedule A" limits the collateral to only the inventory (or equipment, general intangibles, etc.) listed on Schedule A is contrary to Arizona law, the plain meaning of the words, and common sense. Pineda's lien was timely perfected. At the time the security agreement was executed, the current amended version of UCC Article 9 had not yet become effective in Arizona. Under the former, governing statute, the deadline for filing a continuation statement was *six years*. There is no dispute that a continuation statement was filed within that time period.

Debtors also argue that Pineda is not entitled to add the value of the Debtors' fuel inventory to its secured claim, because Jackson Oil has a senior purchase money security interest in the fuel. However, Jackson Oil is already fully secured by its deed of trust lien on the Thatcher property. Dunlap Oil's bankruptcy schedules list the value of the real property at $750,000 and the amount of Jackson's secured claim as $266,247.16. (Tr. Ex. 17 at p.22). Those amounts are not disputed.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Under the doctrine of marshaling, when two creditors hold common collateral (here, Dunlap's fuel inventory), but one also has a lien on other property in which the other creditor has no interest (here, the Thatcher property), the creditor with the additional collateral must look to that collateral first to satisfy its debt. The doctrine "rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. U.S.*, 375 U.S. 233, 236 (1963) (citations omitted). In bankruptcy, marshaling requires the court to value the collateral of a junior lienholder without regard to the senior lienholder's interest where the senior is fully secured by other property. *In re Marble Cliff Crossing Apartments, LLC*, 484 B.R. 175, 181 (Bankr. S.D. Ohio 2012); *In re Mihalko*, 87 B.R. 357, 363 (Bankr. E.D. Pa. 1988); *In re Ctr. Wholesale, Inc.*, 788 F.2d 541, 544 (9th Cir. 1986) (holding there is "no authority for the proposition that a trustee or debtor in possession may require a senior lienor to satisfy its claim out of a junior lienor's collateral."). Because Jackson Oil's claim is already fully secured by its lien on the Thatcher property, Pineda's lien on fuel must be valued without regard to Jackson's purported senior PMSI on the fuel.

Pineda's secured claim is no less than $5,784,115. Because the Plan proposes to pay only $4,468,410, it cannot be confirmed.

**B. The Plan Fails To Provide An Appropriate Rate of Interest.**

The Plan also fails the provision of § 1129(b)(2)(A)(i) that requires deferred payments on secured claims to equal the "value, as of the effective date of the plan," of at least the value of the creditor's collateral. That provision requires interest on secured claims at a rate that takes into consideration "the terms, quality of the security and any risk to be borne by the affected creditor." *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 748 (Bankr. D. Ariz. 2010). If a Chapter 11 plan proposes payment of an interest rate that fails to account for such factors, "confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not 'fair and equitable' and will not satisfy § 1129(b)(2)(A)(i)(II)." *Id.*

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court reviewed various approaches used by courts to determine the appropriate cramdown rate, and ultimately held that courts must use the "formula approach." The approach involves a two-step process. It "begins ***by looking to the national prime rate***." *Id.* at 479 (emphasis added). The court must then adjust the prime rate upward to account for various risk factors, including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.*

*Till* was a Chapter 13 case involving a vehicle loan. In a footnote, the Court acknowledged that while "there is no free market of willing cramdown lenders" for Chapter 13 debtors, the same is not necessarily true in the Chapter 11 context. *Id.* at 477 n.14. "Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.*

Nonetheless, the formula approach was widely applied in Chapter 11 cases even before *Till* was published. *See, e.g., In re Linda Vista Cinemas,* 442 B.R. at 750 ("For at least the last 20 years, the Ninth Circuit Court of Appeals has instructed bankruptcy courts to assess, and whenever possible use a 'formula approach'"). Following *Till,* bankruptcy courts have strayed from this approach *only if* there is in fact an "efficient market" for a loan to the debtor. Absent an efficient market, "then a bankruptcy court should fall back on the formula approach." *Id.*; *see also In re VDG Chicken, LLC,* 2011 WL 3299089 (B.A.P. 9th Cir. 2011) ("a bankruptcy court should apply the market rate of interest where there exists an efficient market. And, when no efficient market exists for a Chapter 11 debtor, then the Bankruptcy Court should employ the formula approach endorsed by the *Till* plurality").

In this case, it is undisputed that there is no efficient market for a loan to the Debtors. Steve Odenkirk, the Debtors' feasibility and interest rate expert, testified that:

> [D]ue to the current bankruptcy status of the Debtors ***there is no efficient market for its debt.*** Even secured and cash flow supported debt like the post BK loans proposed here cannot typically be brought to the open market for new financing. As such, referring to key elements within the *Till* ruling, ***a market-based rate is not the true measure of appropriateness***.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Tr. Ex. H at ¶21 (emphasis added).

Accordingly, Mr. Odenkirk purported to follow *Till* in opining on a cramdown rate for the Debtors. In doing so, he determined that a risk adjustment factor of 4.0% was appropriate based upon the "significant" risk of default, as well as the risk that the value of the creditors' collateral would be insufficient to allow the creditors to foreclose and sell the collateral for an amount at or above the outstanding loan balance. *Id.* at ¶¶23-24. This is undisputed.

Mr. Odenkirk's ultimate conclusion that a 5% cramdown rate is fair and equitable, however, is flawed as a matter of law. That conclusion is based upon the incorrect premise that the Court should add the 4% risk adjustment to the 1.01% yield for a five-year treasury bill. Mr. Odenkirk apparently chose that index because, in his opinion, it represents "the current risk-free rate for investment/borrowing" and because the treatment of secured claims under the Debtors' plan is akin to "five year fixed rate notes." *Id.* at ¶22. Mr. Odenkirk's use of the yield on a five year treasury bill, as opposed to the prime rate of interest, has no support in *Till* or any other binding legal authority. No expert testimony is necessary to refute it.

*Till* instructs bankruptcy courts to start with "the national prime rate," not because it is "risk-free," but because it "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." 541 U.S. at 479 (emphasis added). The Court noted that using the prime rate as the base rate of interest "start[s] from a concededly *low* estimate." *Id.* (emphasis in original).

Beginning with the five year treasury note rate, however, is closer to starting with *zero.* The cost of borrowing to the U.S. government is not equivalent to the amount banks charge commercial borrowers to compensate for opportunity costs, inflation and the risk of default. Thus, the Ninth Circuit has expressly held that "a bankruptcy court may not calculate" the interest rate necessary to provide creditors the present value of their claim "on the basis of interest rates paid on treasury obligations." *In re Camino Real Landscape Maint.*

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

*Contractors, Inc.*, 818 F.2d 1503, 1506 (9th Cir. 1987).[4] The court explained that "The treasury rate is the government's cost of borrowing, which is relatively quite low because to the lender the government's obligation is a short-term, low risk investment. ***The obligation of a private borrower is quite different; its creditworthiness is not the same as the federal government's.*** It cannot borrow money on the favorable terms available to the government." *Id.* at 1506 (emphasis added).

Consistently, bankruptcy courts both inside and outside of the Ninth Circuit have used the national prime rate as the starting point for calculating the appropriate cramdown rate in the Chapter 11 context. *In re Linda Vista Cinemas*, 442 B.R. at 729; *In re 20 Bayard Views, LLC*, 445 B.R. 83, 112 (Bankr. E.D.N.Y. 2011); *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 438 (Bankr. W.D. Mo. 2009); *In re Griswold Bldg., LLC*, 420 B.R. 666, 694 (Bankr. E.D. Mich. 2009); *In re Prussia Associates*, 322 B.R. 572, 591 (Bankr. E.D. Pa. 2005) (starting with prime rate).

While there are some cases that have used treasury notes as the base rate for determining cramdown interest, they generally involve long-term notes with rates ***greater than*** the prime rate. In one recent case, the debtor proposed to amortize its secured debt over a 35-year period. *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574 (Bankr. D.D.C. 2011). The court held that the long amortization schedule presented "greater inflationary risk than the prime rate accounts for." *Id.* Thus, it started its analysis with the yield for a 30 year treasury bill, which was 4.24% (approximately 1.0% percent higher than the prime rate). *Id.* Even that starting rate was too low, however, because "a 30–year treasury yield does not include the average adjustment made by lenders in arriving at a prime rate for the costs of administering the loan." *Id.*

4 *Camino Real* involved the interest rate required by 11 U.S.C. § 1129(a)(9)(C) for a priority tax claim. *Id.* at 1505. However, that statute uses exactly the same language ("value, as of the effective date of the plan") as § 1129(b)(2)(A) uses for describing the required treatment of secured claims.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Other courts utilizing treasury note rates have done so only when there is an efficient market for loans to the debtor, and market rates are tied to treasury notes. *See, e.g., In re Am. HomePatient, Inc.*, 420 F.3d 559, 562 (6th Cir. 2005) (using rate equal to six year treasury note yield plus 3.5% based upon testimony that rate was "the standard market rate for such a loan"); *In re Brice Rd. Developments, L.L.C.*, 392 B.R. 274, 281 (B.A.P. 6th Cir. 2008) (affirming interest equal to ten year treasury note yield plus 1% based on testimony as to "the prevailing interest rate for such loans").

In this case, it is undisputed that there is no efficient market for a loan to the Debtors. The Debtors' own expert testified as such in his declaration. Thus, the 5 year treasury note yield used by Mr. Odenkirk (which is substantially below prime) is not the appropriate starting point for determining the cramdown rate of interest.[5] Rather, as *Till* dictates, the appropriate starting rate is the national prime rate of interest.

The current prime rate is 3.25%. Adding the undisputed 4.0% risk adjustment figure yields a cramdown rate of 7.25%. That is the only interest rate supported by the evidence.

**C. The Plan Violates the Absolute Priority Rule.**

The Plan also fails to satisfy the fair and equitable cramdown requirement with respect to Pineda's unsecured claim because it violates the absolute priority rule of §1129(b)(2)(B). In order to satisfy the "new value" exception to this rule, the plan proponent must prove that the new value to be contributed is: 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received. *In re Bonner Mall P'ship*, 2 F.3d 899, 908 (9th Cir. 1993).

---

[5] Even if treasury note yields were an appropriate substitute for the prime rate, the yield for a 5 year note would not be appropriate in this case. Mr. Odenkirk testified that he chose a 5 year note because Pineda's and CCB's claims mature in 5 years under the Plan. This neglects the fact that payments are based on a 25 year amortization. It would therefore be more appropriate to use the average of the yields for 20 year and 30 year notes. The Court may take judicial notice that as of July 11, 2013, the yields for these notes were 3.33% and 3.64%, respectively, for an average of 3.485% – a rate *in excess* of the national prime rate. *See* **Exhibit "F"** attached hereto.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

The Debtors' argument that the New Value Contribution exceeds their net worth would entirely vitiate the exception. In determining whether a proposed contribution is substantial, the court must compare the amount of the contribution against the amount of unsecured claims. *In re Brotby*, 303 B.R. 177, 197 (B.A.P. 9th Cir. 2003). Where the proposed contribution amounts to less than 5% of the amount of unsecured debt, the contribution will not satisfy the new value exception. *Id.* (order confirming plan where proposed new value contribution was equal to 3.7% to 4.4% of unsecured debt was abuse of discretion); *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) ("proposed new capital infusion of $100,000 could not be considered 'substantial' since it constituted, at most, 3.8% of the approximately $2.6 million of total unsecured debt").

Additionally, "the infusion of cash by way of a *loan* generally will not satisfy the new value exception to the absolute priority rule." *In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826, 834 (Bankr. E.D. Pa. 1995); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 899 (B.A.P. 9th Cir. 1994) (same).

In this case, the Debtors' proposed $150,000 new value contribution represents just **3.29%** of the Debtors' unsecured debt. *See* **Exhibit "D"** hereto. Funding for the $150,000 will not come from the Debtors' equity holders, but rather from a loan from Ted Dunlap's brother-in-law. This is insufficient to satisfy the new value exception as a matter of law.

## II. THE DEBTORS HAVE FAILED TO CARRY THEIR BURDEN OF PROOF ON THE CONFIRMATION REQUIREMENTS OF § 1129(a).

### A. The Debtors' Plan Is Infeasible.

Section 1129(a)(11) requires the Debtors to prove that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization." "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

The Debtors have failed to carry their burden of proof on feasibility. Even assuming that the Debtors' income and expense projections are 100% accurate, they will lose money starting in the first year of their Plan, once the Court takes into account the proper secured claim amounts and interest rate. But the Debtors' projections are also deeply flawed and unattainable. Confirmation must therefore be denied.

1. The Debtors Cannot Meet Their Debt Service Obligations Even Assuming That Their Projections are Correct.

As set forth above, the Debtors' projections of "net cash flow" after debt service (Tr. Ex. H at Ex. D, p.3) are flawed in two key respects: (1) they fail to consider the full amount of Pineda's allowed secured claim; and (2) they fail to provide for interest on secured claims at the proper rate of 7.25%. The effect of these errors on the amount of debt service required by the Plan is demonstrated in **Exhibit "B"** hereto. The upper portion of the exhibit is taken from the debt service chart set forth in the Debtors' cash flow projections. (Tr. Ex. H at Ex. D, p.3). The lower portion makes appropriate adjustments for the actual amount of Pineda's secured claim and for interest at 7.25%. The difference in debt service is over $232,000.

The effect on projected net cash flow is demonstrated in **Exhibit "C."** Again, the top half of the exhibit is taken from the debt service chart set forth in the Debtors' cash flow projections. The lower portion reflects the adjustments for the proper secured claim amounts and interest rate. These corrected projections reflect that the Debtors will have a cash flow of *negative* $54,867 after one year and *negative* $159,288 after two years. The Debtors would suffer losses between $35,000 and $120,500 for years three to five. Thus, even assuming that the Debtors' income and expense projections are correct, the same projections demonstrate that the trend of substantial and continuing loss would continue post-confirmation.

2. The Debtors' Projections Are Not Credible.

The infeasibility of the Plan is further compounded by the evidence that the Debtors' cash flow projections reflect an unrealistically high level of revenue and low amount of operational expenses. Bankruptcy courts have long held that historical performance is an

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

appropriate measure of the attainability of its cash flow projections. "A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible." *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006); *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010) (same).

The discrepancy between the Debtors' financial projections and their historical performance is indeed glaring. The Debtors project they will earn net profits, after debt service, of up to $197,000 per year during the Plan term. However, they have not once earned a profit during the past 5 ½ years. To the contrary, Dunlap Oil posted a total net loss of nearly $9 million from January 2008 through May 2013, broken down annually as follows:

| Year | Profit / (Loss) | Evidence |
|---|---|---|
| 2008 | ($2,712,461) | Tr. Ex. 28, p.3 |
| 2009 | ($421,014) | Tr. Ex. 28, p.3 |
| 2010 | ($1,394,799) | Tr. Ex. 27, p.3 |
| 2011 | ($1,615,884) | Tr. Ex. 30, p.6 |
| 2012 | ($1,772,535) | Tr. Ex. 47, p.11 |
| 2013 YTD | ($1,065,094) | Tr. Ex. 57, p.11 |
| **TOTAL** | **($8,981,787)** | |

The Debtors' argument that assessing their projections in light of past performance is akin to comparing apples to oranges, because their Plan proposes to scale down operations and shed unprofitable locations, has no support in case law or logic. If the Debtors' financial problems could truly be solved by downsizing, they have had plenty of time to accomplish that. In fact, the Debtors *did* previously attempt to downsize, by eliminating their pipeline and reducing wholesale operations. (Tr. Ex. 42, at 47:11-25; Tr. Ex. 43, at 57:11-24). That did not stem the Debtors' losses. And if the specific locations the Debtors propose to "give back" to secured creditors under their Plan was the driving force behind their unprofitability, the Debtors have never explained why they did not simply terminate operations at those locations years ago. They could at least have done so at the outset of this bankruptcy case, and perhaps attenuated the post-petition loss of $1,299,308 (Tr. Ex. 57, p.11).

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

The Debtors' decision to continue operations that have caused large financial losses only evidences its management's lack of competence. Because the Plan proposes to keep existing management in place, there is no reason to believe that Debtors will have any more success than they have experienced in the past.

The testimony of Steve Odenkirk, the Debtors' feasibility expert, does not prove that the Debtors' cash flow projections are attainable. His role was essentially limited to reviewing projections he was provided by Debtors' management *less than 24 hours* before he completed his expert declaration and checking the accuracy of their math. (Tr. Ex. 53 at 127:18-21). He did not compare the Debtors' income and expense projections against industry standards. He did not make any independent analysis of whether Dunlap Oil could attain its projected profit margin for fuel sales. Indeed, he acknowledged that the projected profit margins for fuel sales were in some cases twice as high as the national average. (*Compare* Tr. Ex. L, p.60 showing average profit margin of 16.9 cents per gallon *to* Tr. Ex. H at Ex. B, pp.3-4 projecting profit margins between 25 cents to 35 cents per gallon). He also acknowledged that while Dunlap Oil's ability to increase fuel sales was dependent upon *decreasing* the sales price for fuel to remain competitive, Dunlap Oil would still be selling gas at prices well in excess of its competitors. (*See* Tr. Ex. H at Ex. C).

Mr. Odenkirk's testimony was even more flawed in its analysis of Debtors' operational expenses. As Canyon Community Bank pointed out in its cross-examination, and as Mark Farr's testimony demonstrates even more clearly, Debtors' expense projections exclude whole categories of expenses that Debtors have historically paid. Debtors have never explained how they can achieve such a massive reduction in expenses. When the Debtors' projections are adjusted to account for all of their historical expenses, the Debtors would have a net loss of over $311,000 in the first year of their Plan, *before* accounting for the Debtors' flawed claim amount and interest rate assumptions. (Tr. Ex. 54 at Ex. 4).

Nonetheless, the Debtors argue that their cash flow projections are "conservative." They argue that the appraisals prepared by Pineda and CCB project even higher gross profit

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

for the retained gas stations than the Debtors project. But this fails to take into account the differences between the Debtors' definition of "gross profit" and that of the appraisals. The Debtors calculated gross profit by deducting from projected revenue the costs of purchasing fuel and merchandise, and the costs of items such as labor, supplies, and utilities. (Tr. Ex. I at Ex. A, p.4). The appraisals calculate gross profit by deducting only the costs of fuel and merchandise. (Tr. Ex. L at p.62; Tr. Ex. M at p.71; Tr. Ex. N at p.67). To truly compare the "apples to apples," one would need to deduct the projected costs of labor, supplies, and utilities from the revenue projected in the appraisals. As reflected in **Exhibit "E,"** once these adjustments are made, the Debtors' projected gross profit is over $222,000 greater than the amount projected in the appraisals. Thus, the appraisals further demonstrate that the Debtors' cash flow projections reflect unattainable results that are untied to reality.

3. The Debtors Presented No Evidence of Their Ability to Make the Balloon Payments.

"If a final payment, in the form of a 'balloon' payment, is proposed to come from new financing to be acquired by the Debtor … then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 738 (Bankr. D. Ariz. 2010). The same is true when the debtor proposes to fund a balloon payment through the sale of estate property. The debtor must present credible evidence that a sale is likely to occur. *Id.*; *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (plan proposing to pay secured creditor from proceeds of real property sale could not be confirmed where there was no evidence that sale would be completed within proposed two-year period); *In re Walker*, 165 B.R. 994, 1005 (E.D. Va. 1994) (same).

In this case, even using the Debtors' understated estimates of Pineda's and CCB's secured claims, they are proposing to pay $7,267,975 in secured debt on the basis of a 25 year amortization, and to make a balloon payment of the balance in five years. Assuming the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Debtors do not default on monthly payments, that balloon will be $6,437,985. The Debtors presented no evidence of their ability to fund the balloon.

4. The Debtors' Management Did Not Commit to Funding Shortfalls and Has No Ability To Do So.

In their closing brief, the Debtors contend that its equity holders have committed to fund up to $10,000 per year in shortfalls. However, the Plan imposes no such obligation, and the Debtors presented no evidence that the equity holders agreed to such a commitment. There is also no evidence that they have the ability to honor such a commitment, and it would be disingenuous for the Debtors to suggest that they do. The Debtors' equity holders are liable to Pineda and Canyon Community Bank for over $13 million on their personal guaranties, which they have no ability to pay.

Even if they did have the obligation or ability to fund shortfalls, $10,000 per year is woefully insufficient for debtors with projected operational expenses of $40.7 million and over $940,000 in annual debt service. (*See* Tr. Ex. H at Ex. D). Thus, the purported commitment of the Debtors' shareholders to fund shortfalls is both illusory and insignificant.

5. The Debtors Cannot Argue They Will Sell the Hotel for $2.7 Million When They Stipulated to a Value of $1.9 Million.

Under the original formulation of the Plan, the Debtors proposed to deed the Quail Hollow Inn back to Pineda upon confirmation. Based upon an appraisal prepared on April 10, 2013 (Tr. Ex. Q), Debtors stipulated to value the hotel at $1.9 million. The Debtors then amended their Plan one week before the confirmation hearing to provide that they will retain the hotel. (Dkt. 299).

Now, based upon purchase offers that the Debtors did not disclose until after the appraisal was completed, the Debtors contend they have the ability to sell the hotel for $2.5 to $2.7 million. They cannot have it both ways. It would be patently unfair and inequitable for the Court to hold Pineda to its stipulated value of $1.9 million for the hotel (a stipulation it entered upon the understanding that it would receive title to the hotel), and also accept the

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Debtors' argument that the hotel's true value is $2.7 million. If the Court were to accept such an argument, it should also increase Pineda's secured claim by $800,000.

On the other hand, there is also no evidence that the Debtors actually *could* sell the hotel for anything in the range of $2.7 million. Ted Dunlap testified that the potential purchaser who made the offer for $2.7 million is no longer interested. (Tr. Ex. at 30:5-33:20). The April 1 offer to buy the hotel for $2.2 million has gone nowhere, as the offeror has failed to provide any evidence of his ability to obtain financing. (Tr. Ex. at 24:9-26:8). The Debtors have offered no evidence that they will consummate a sale of the hotel at any time in the near future. Speculation as to the mere possibility of a sale at a price far in excess of what the Debtors stipulated the hotel is worth is not proof that the Debtors' Plan is feasible.

**B. The Debtors Have No Ability to Pay Their Administrative Claims.**

A plan must provide for payment of administrative claims in full on the effective date. 11 U.S.C. § 1129(a)(9)(A). The Plan does not satisfy this requirement because the Debtors lack the ability to pay all administrative claims. This further underscores the infeasibility of the Plan.

The administrative claims total at least **$694,415.38**, not including the claims of the Debtors' own bankruptcy counsel. When those fees are added, the total administrative claims against the estate will be substantially higher. The administrative fees include the following:

| Administrative Claim | Amount | Basis for Claim |
|---|---|---|
| Post-petition taxes | $372,000.00 | § 503(b)(1)(B)(i) – see discussion below |
| Failed Adequate Protection | $229,969.00 | § 507(b) – see discussion below |
| Sally Darcy (special counsel for Quail Hollow) | $4,381.57 | Order Approving Fees at Dkt. 333 |
| Unsecured Creditors' Committee counsel | $15,924.80 | Order Approving Fees at Dkt. 366 |
| Steve Odenkirk | $8,592.75 | Debtor estimate. *See* Dkt. __ at p.15 |
| Trejo Oil Reclamation Claim | $58,122.78 | § 503(b)(9). *See* Dkt. 95 |
| IRS | $5,424.48 | § 503(b)(1). *See* Claim Reg. 54 |
| **TOTAL** | **$694,415.38** | |

1. Post-Petition Taxes are Entitled to Administrative Priority.

Administrative priority is given to "any tax incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

a tax of a kind specified in section 507(a)(8) of this title [taxes assessed pre-petition]." 11 U.S.C. § 503(b)(1)(B). A tax is incurred "when it accrues and becomes a fixed liability." *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 1001 (6th Cir. 2001).

Under Arizona law, property taxes accrue on January 1 of each year. A.R.S. §§ 42-17153(C). According to Jim Martin's testimony, the Debtors' property tax liability is approximately $372,000 per year. As Debtors filed their bankruptcy petitions in October 2012, their liability for 2013 taxes of $372,000 (which accrued on January 1, 2013) was incurred post-petition and is entitled to administrative priority.[6]

2. Pineda Is Entitled to an Administrative Claim for Failed Adequate Protection.

Section 507(b) of the Bankruptcy Code "provides that when adequate protection has been given to a secured creditor and later proves to be inadequate, the creditor becomes entitled to a superpriority administrative expense claim to the extent that the proffered adequate protection was insufficient." *In re Wilson-Seafresh, Inc.*, 263 B.R. 624, 630 (Bankr. N.D. Fla. 2001).

In *Wilson-Seafresh*, the secured creditor held a lien on the Debtor's accounts receivable and inventory, the value of which was approximately $837,000 as of the bankruptcy filing date. As adequate protection for the debtor's use of cash collateral, the court granted the creditor a replacement lien on the debtor's post-petition assets. The debtor's reorganization failed, and its property was liquidated. The proceeds recovered by the secured

---

6 The first half of 2013 taxes are due on October 1, 2013. However, property taxes are afforded administrative expense status if the debtor's liability for the taxes is *incurred* post-petition, regardless of when the taxes actually become payable. The Debtors have not presented evidence of their ability to pay post-petition taxes. As Jim Martin testified on cross-examination, although property taxes are included in the Debtors' expense projections, the projections reflect projected income and expenses after one full year of post-confirmation operation. The Debtors will not have enough income after less than *two months* of post-confirmation operations to pay the 2013 taxes when they come due. They also will have incurred *additional* property tax obligations during that one year period. Without additional cash reserves, the Debtors will be perpetually delinquent in paying taxes.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

creditor totaled about $409,000, leaving a shortfall in adequate protection of nearly $428,000. The court held that under these circumstances, "it is clear that CB & T is entitled to a superpriority claim under § 507(b)." *Id.* at 630. And because the debtor's remaining assets were insufficient to pay the creditors § 507(b) claim, it ordered all interim fees paid to the debtor's professionals to be disgorged and paid over to the creditor. *Id.* at 631.

The facts in this case are similar to those in *Wilson-Seafresh.* Pineda holds a blanket lien on the Debtors' personal property. Under the terms of the cash collateral orders and the parties' stipulation, Pineda was granted adequate protection in the form of a replacement lien on all of the Debtors' post-petition property. The orders authorizing the Debtors' use of cash collateral expressly states that the replacement lien was intended to "adequately protect [Pineda] from any diminution in value of its security interest in property of the Debtors' estates as a result of the entry of this Order and the Debtors' use of cash collateral post-petition." (Dkt. 33, p.4; QHI Dkt. 34, p.4). The Debtors also agreed to provide monthly reports concerning the value of their inventory and to maintain a level of inventory consistent with pre-petition inventory levels.

The Debtors did not keep that agreement. The value of the Debtors' personal property has declined dramatically since the filing of the bankruptcy case. As set forth in the Debtor's monthly operating reports, and verified by the testimony of Jim Martin at trial, the total value of the Debtors' cash, inventory, and accounts receivable as of the Filing Date was $1,545,674.[7] The value as of May 31, 2013 was $1,315,705. Pineda is therefore entitled to an administrative claim equal to the difference of **$229,969.** *See* Exhibit "A" hereto.

---

[7] The Debtors cite a portion of Jim Martin's deposition transcript, in which he testified that the Debtors performed a year-end physical count of their inventory in December 2012. Based upon that hand-count, he determined that the estimate for the value of non-fuel inventory listed in the Debtors' bankruptcy schedules was about $100,000 too high. (Tr. Ex. 45 at 11-16). The figures listed in **Exhibit "A,"** however, are not derived from the Debtors' bankruptcy schedules. They are derived from the Debtors' May 2013 monthly operating report, which was prepared and filed almost 6 months after the Debtors reconciled their books based upon the year-end physical count.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

### C. The Plan Is Not Proposed In Good Faith.

Under 11 U.S.C. § 1129(a)(1)-(3), a Chapter 11 plan may be confirmed only if the plan and plan proponent comply with the Bankruptcy Code and the plan is proposed in good faith. "Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code. It also requires a fundamental fairness in dealing with one's creditors." *In re Stolrow's Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988). The Plan fails that test.

Dunlap Oil has operated at a substantial loss both prior to and after filing bankruptcy. There is no evidence that the Debtors' financial condition will improve even after it has scaled down its operations by divesting money-losing properties. On the other hand, there is evidence that Debtors' properties are declining in value. In the event the Plan is confirmed, it likely will just be a matter of time before the Debtors default on their obligations under the Plan. The creditors' interests would thus be better served if the Debtors' assets were liquidated now, in an orderly fashion, rather than requiring creditors to wait for an inevitable plan default and leave them to assert their remedies after the value of Debtors' assets has been further diminished. The Debtors are not acting in good faith by proposing a plan that will leave their current management in place while the value of their business and their assets continue to erode, at the expense of their creditors. Such a plan is contrary to the policy of maximization of the return to creditors that is fundamental to the Bankruptcy Code.

The Debtors' bad faith is further evidenced by their actions during the pendency of the bankruptcy case, which include:

- The Debtors' "amendment" of their Plan one week before the final confirmation hearing to retain the Quail Hollow Inn hotel, which they had previously agreed in their initial plan filed six months earlier to deed back to Pineda in exchange for a "fair market value credit." Pineda stipulated to a value of the hotel based upon the "give back" provisions of the original plan. The Debtors now seek to hold Pineda to that value, while simultaneously arguing that they will sell it for $800,000 more than the stipulated value.

- Despite initially opposing Pineda's and CCB's stay relief motions with respect to the gas stations the Debtors proposed to give back, the Debtors abruptly decided to abandon those properties. On June 24, 2013, the Debtors' counsel gave notice that Dunlap Oil intended to cease operating those locations four days later, on June 28, without undertaking any measures to protect the properties from theft or vandalism pending a receiver's appointment and takeover of possession. The Debtors'

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

precipitous abandonment of the properties has seriously damaged their value. *See* Dkt. 347, 349.

- Pineda consented to the use of cash collateral at the outset of this case on the basis of the Debtors' promise to maintain a volume of inventory consistent with pre-petition levels. The Debtors broke that promise, allowing inventory to decline in value by over $465,000, and now oppose granting Pineda relief for their breach.
- The Debtors have not a made a single payment on their secured debt since the filing of this bankruptcy case, and did not pay a dime to Pineda's predecessor for 3 years prior to the filing of the bankruptcy.
- The Debtors failed to pay property taxes on their creditors' collateral for years, resulting in the imposition of substantial senior tax liens. The Debtors have not paid any property taxes since filing the bankruptcy petition.

Far from demonstrating fundamental fairness, these actions show a continuing disregard for the rights of creditors, which precludes a finding of good faith. Accordingly, the Plan should not be confirmed.

## III. PINEDA IS ENTITLED TO STAY RELIEF.

In addition to denying confirmation, the Court should also grant Pineda stay relief with respect to all of its collateral. Pineda's interest in its collateral is not adequately protected. It is undisputed that there is no equity or equity cushion in the collateral. The Debtors have made no adequate protection payments, have allowed the senior tax debt on the real property to continue accumulating, and the value of the personal property collateral has plummeted.

Additionally, to demonstrate that a reorganization is reasonably in prospect after the 120 day exclusivity period has expired, the Debtors "must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is assured." *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994). The Debtors have failed to meet their burden of proving that the Plan is confirmable, much less that confirmation is assured. Pineda is therefore entitled to stay relief.

## CONCLUSION

The Debtors have failed to satisfy their burden of proving that their Plan satisfies the confirmation and cramdown requirements of 11 U.S.C. § 1129(a) and (b). They also have failed to prove that Pineda is adequately protected, or that a successful reorganization is

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

reasonably in prospect. Accordingly, Pineda respectfully requests that the Court enter an order: (1) denying confirmation of the Plan; (2) terminating the automatic stay, and all other bankruptcy stays and injunctions, with respect to the enforcement of Pineda's liens and security interests in all property securing its claims against the Debtors; and (3) granting such other and further relief as the Court deems just and appropriate under the circumstances.

**DATED** this 6th day of August 2013.

ENGELMAN BERGER, P.C.

By /s/ Bradley D. Pack #023973
David Wm. Engelman
Bradley D. Pack
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Attorneys for Pineda Grantor Trust II

**COPY** of the foregoing served via email this 6th day of August 2013 to:

John R. Clemency
Lindsi M. Weber
Gallagher & Kennedy PA
2575 E. Camelback Rd.
Phoenix, AZ 85016
john.clemency@gknet.com
lindsi.weber@gknet.com
Attorneys for Debtors

Dean M. Dinner
Nussbaum Gillis & Dinner, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
ddinner@ngdlaw.com
Attorneys for Unsecured Creditors Committee of Dunlap Oil Company

Jeffrey G. Baxter
Pat P. Lopez III
Rusing Lopez & Lizardi PLLC
6363 N. Swan Rd., #151
Tucson, AZ 85718
jbaxter@rllaz.com
plopez@rllaz.com
Attorneys for Canyon Community Bank NA

*/s/ Kristine Mitchell*