DAVID WM. ENGELMAN, SBA #004193
BRADLEY D. PACK, SBA #023973
**ENGELMAN BERGER, P.C.**
3636 NORTH CENTRAL AVENUE
SUITE 700
PHOENIX, ARIZONA 85012
―――――――
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: dwe@eblawyers.com
Email: bdp@eblawyers.com
―――――――

Attorneys for Pineda Grantor Trust II

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| DUNLAP OIL COMPANY, INC. and QUAIL HOLLOW INN, LLC, | Case No.: 4:12-bk-23252-BMW<br>Case No.: 4:12-bk-23256-BMW |
| Debtors. | (Jointly Administered) |
| This filing applies to all Debtors. | **PINEDA GRANTOR TRUST II'S EMERGENCY MOTION FOR IMMEDIATE STAY RELIEF AND TERMINATION OF CASH COLLATERAL AUTHORITY;**<br><br>**AND**<br><br>**ALTERNATIVE MOTION TO CONVERT TO CHAPTER 7 FOR CAUSE** |

It is now apparent why Debtors failed to file their June through September monthly operating reports for Quail Hollow Inn, LLC ("QHI") until October 25, when they were ordered to do so. Debtors were concealing an unauthorized transfer of $177,000 from QHI to a "related party" – presumably Dunlap Oil Company ("DOC"). As a result, the balance in QHI's bank account went from $191,739 as of May 31 to $6,901 as of June 30. As of September 30, 2013, the account was *overdrawn* by $1,704.

Pineda Grantor Trust II ("Pineda") holds a senior *Deed Of Trust, Assignment Of Rents, Security Agreement And Fixture Filing* on all of QHI's property. The funds in its account are Pineda's cash collateral. Pineda never consented to QHI's use of cash collateral to make

loans to "related parties," QHI never sought such authority from the Court, and the Court never authorized it. The cash collateral orders in this Court limit QHI to a maximum budget of $23,393.78 per month to fund *its own operations.*

QHI's undisclosed, unauthorized transfer of $177,000 is a serious violation of the Court's orders and of its duties as a debtor-in-possession. While Debtors now contend that *some* of those funds have been returned, the fact that they were ever transferred at all, and that the transfer was concealed for months, evidences the inability and untrustworthiness of Debtors' current management to continue managing this estate and to comply with their cash collateral duties. And it constitutes cause under 11 U.S.C. § 362(d) for the entry of an order immediately terminating the automatic stay with respect to all of Pineda's liens on the Debtors' property, both real and personal so that Pineda may obtain the appointment of a receiver and take such other actions as are necessary to protect its security interest. Any continuing authority for Debtors' use of cash collateral should also be terminated.

Alternatively, Debtors' actions constitute cause for the conversion of this case to Chapter 7. Cause includes substantial or continuing loss to the estate, gross mismanagement, unauthorized use of cash collateral, failure to comply with court orders, and failure to timely file monthly operating reports. 11 U.S.C. § 1112(b)(4)(A)-(F). All of the foregoing apply to this case. Debtors' own operating reports reflect losses of over $1.6 million since filing bankruptcy. And contrary to Debtors' "apples to oranges" mantra, it has lost nearly $500,000 since the beginning of July, when it abandoned its worst performing properties. The value of Debtors' cash and inventory has declined by over 55% since filing, from $1,376,439 to $611,507. There is no hope for reorganization, and the potential for recovery to creditors diminishes every day that Debtor's current management remains in control. They must be required to exit, so that any remaining assets may be preserved for the benefit of creditors.

This Motion is supported by the following Memorandum of Points and Authorities, the exhibits attached hereto, and the papers and pleadings on file, all of which are incorporated herein by this reference.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Cash Collateral Orders Limit QHI to a Budget of $23,000 Per Month to Fund its Own Operations.

1. As set forth in Pineda's motions for stay relief (Dkt. 151 and 186), Pineda is the holder of a series of promissory notes executed by DOC. The notes are secured by, among other things, a deed of trust and assignment of rents on the 83-room Best Western hotel owned by QHI (the "Hotel"). They are also secured by Deeds of Trust and a UCC-1 lien on certain real and personal property owned by DOC, including five gas stations/c-stores, a commercial warehouse/office, and a retail strip center.

2. Debtors filed their bankruptcy petition on October 24, 2012 (the "Filing Date").

3. On October 29, 2012, the Court entered an order (the "Interim Cash Collateral Order") authorizing Debtors to use cash collateral "to pay ordinary and necessary post-petition expenses in accordance with the Interim Cash Collateral Budgets … attached hereto as Exhibit 'A' and by this reference made a part of this Order." (Dkt. 33 at pp.3-4).

4. There were two separate budgets (collectively, the "Budgets") attached to the Interim Cash Collateral Order – one budget for DOC and one for QHI. The budget for QHI provides for monthly expenses of $23,393.78. (Dkt. 33 at p.8). All of the expenses relate to the operation of the Hotel. There are no expense items for loans to related parties. The Budget extended through April 2013.

5. On November 13, 2012, the Court entered a *Final Order Approving Debtors' Use Of Cash Collateral* (Dkt. 59) (the "Final Cash Collateral Order"), holding that "the Debtors' use of cash collateral, as further set forth in the Interim Order and budget attached as Exhibit A, is approved on a final basis without prejudice to any creditor seeking further relief upon motion for good cause shown."

6. On December 14, 2012, Pineda and Debtors entered into a *Stipulation Regarding Use of Cash Collateral*. (Dkt. 97 at p.3) (the "Cash Collateral Stipulation").

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

Under the terms of that stipulation, Debtors agreed among other things that they "shall continue to purchase and maintain a level of inventory that is reasonably consistent with the inventory maintained by the Debtors prior to the Filing Date." Additionally, Debtors agreed to "use all cash collateral in strict compliance with the terms of the Final Cash Collateral Order and the Budget." (*Id.*).

7. On May 1, 2013, following the expiration of the initial cash collateral budget, Debtors moved for authority to continue using cash collateral. (Dkt. 272).

8. On June 26, the Court entered an order authorizing Debtors' use of cash collateral "on the same terms and pursuant to the same budget as previously set forth in the Cash Collateral Orders, up through and including the continued confirmation hearing scheduled for July 11, 2013 and until the Court has issued its ruling on confirmation after the continued hearing." (Dkt. 346). The term "Cash Collateral Orders" was defined as the Interim Cash Collateral Order, Final Cash Collateral Order, and Cash Collateral Stipulation.

9. At no time did either of the Debtors ever request Pineda's consent or Court authority to use cash collateral to make loans to related entities, or to otherwise deviate from the Budget in any manner. Pineda would not have consented to any such request.

**B. Debtors Concealed a Transfer of at Least $177,000.**

10. QHI failed to timely file its monthly operating reports, as did DOC. On August 14, 2013, Canyon Community Bank ("CCB") filed a motion to compel the Debtors to file the reports. (Dkt. 376). On September 13, Debtors filed reports for DOC for the months of June and July (Dkt. 382, 383), but no reports for QHI for those months were filed.

11. On September 24, CCB filed a second motion to compel the Debtors to file their delinquent monthly operating reports. (Dkt. 384). Pineda filed a joinder in that motion (Dkt. 387), pointing out that QHI was then delinquent in filing reports for June, July, and August. The Court ordered Debtors to file the delinquent reports by October 25, 2013. (Dkt. 403).

12. Debtors filed the QHI operating reports for June through September (Dkt. 406 to 409) on October 25.

{00003085.0000/00471785.DOCX / 2} 4

Case 4:12-bk-23252-BMW    Doc 412    Filed 11/01/13    Entered 11/01/13 10:12:45    Desc
Main Document    Page 4 of 18

13. The June 2012 operating report for QHI reflects a $177,000 transfer of QHI's cash that was not authorized by the Court or consented to by Pineda, together with additional unauthorized transfers that QHI had previously made.

14. QHI's May operating report shows a $191,739 cash balance in QHI's bank account as of May 31. (Dkt. 343 at p.7). By June 30, the cash balance dropped to $6,901. (Dkt. 406 at p.7). Page 2 of the June report shows a disbursement described as "other" in the amount of $177,000. Between May and June 2013, there is a $177,000 increase on QHI's balance sheet line item for "notes receivable – related party." (Dkt. 343, p.7; Dkt. 406, p.7).

15. On page 9, under the heading "due from insider," there is $262,871 listed in "amount loaned since filing date." There is an asterisk stating that "In the ordinary course of business, QHI made an intercompany transfer that has since been returned and is expected to appear on the upcoming operating report." (Dkt. 406, p.9). No explanation is given for the additional $85,871 that QHI apparently transferred between the Filing Date and June 2013.

16. Despite QHI's statement that its "intercompany transfer" has "since been returned," QHI's most recent monthly operating report for the month of September shows that its bank account balance is *negative* $1,704. (Dkt. 409, p.7).

17. The Debtors' operating reports do not disclose the identity of the "related party" to whom QHI "loaned" $262,871 since the Filing Date.

18. On October 29, undersigned counsel spoke with Lindsi Weber to point ask if there was a reasonable explanation for the above transfers. Ms. Weber responded by stating that "The return of the intercompany transfer will appear on the October operating report." She did not immediately respond to undersigned counsel's request to provide confirmation that the funds had been returned to QHI. *See* correspondence attached hereto as **Exhibit "A."**

19. The following day, Ms. Weber provided an undated "screen shot" from a mobile phone banking application purporting to show that QHI's account had a balance of $172,048.03 (at an indeterminate point in time). Even if that is accurate, it still leaves over $90,000 in funds inappropriately transferred since the Filing Date unaccounted for.

### F. There Has Been Substantial and Continuing Loss to the Estate.

20. DOC's September 2013 reflects a year to date **net loss of $1,251,656**. (Dkt. 410, p.11). However, the report also reflects a "sale of fixed assets" of $354,115 in that month. (*Id.*). The Court never authorized any sales outside the ordinary course of business. The Debtors may be referring to the gas stations they abandoned in early July, which their plan proposes to deed to secured creditors in exchange for a "fair market value credit." Debtors did not receive any cash in exchange for abandoning these properties. They are not even entitled to any credit against the secured debt unless and until their plan is confirmed or the properties are foreclosed on – neither of which has occurred. Once the $354,115 is subtracted from DOC's bottom line, its net year to date loss is actually $1,605,771.

21. Throughout this case, Debtors' counsel has repeated the mantra that comparing Debtors' financial performance to date against their projected performance under their plan is akin to comparing apples to oranges, because the plan proposes that Debtors will divest themselves of their worst performing properties. But as of July 2, 2013, the Debtors had done just that, by abandoning the operation of five of their gas stations, leaving CCB and Pineda to operate them under receivership. If Debtors' argument were correct, their financial performance would have markedly improved between July and the present. It has not. Not only have Debtors failed to generate a profit, they have continued to lose money.

22. DOC's operating reports for June through September show a total loss of $540,677 over that four month period.

| Month | YTD Loss Current Month | YTD Loss Previous Month | Current Month Profit / (Loss) |
|---|---|---|---|
| June (Dkt. 382) | -$1,121,023 | -$1,065,094 | ($55,929) |
| July (Dkt. 383) | -$1,323,633 | -$1,121,023 | ($202,610) |
| August (Dkt. 388) | -$1,490,609 | -$1,323,633 | ($166,976) |
| September (Dkt. 410) | -$1,605,771[1] | -$1,490,609 | ($115,162) |
| | | **TOTAL LOSS** | **($540,677)** |

---
[1] Excluding credit for "sale of fixed assets" of $354,115.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

23. QHI has lost over $57,000 since June.

| Month | YTD Loss Current Month | YTD Loss Previous Month | Current Month Profit / (Loss) |
|---|---|---|---|
| June (Dkt. 406) | -$69,440 | -$83,776 | ($14,336) |
| July (Dkt. 407) | -$53,193 | -$69,440 | ($16,247) |
| August (Dkt. 408) | -$41,134 | -$53,193 | ($12,059) |
| September (Dkt. 409) | -$26,667 | -$41,134 | ($14,467) |
| | | **TOTAL LOSS** | **($57,109)** |

24. In violation of the express terms of the Cash Collateral Stipulation, DOC has failed to maintain a level of inventory consistent with its pre-petition levels. Its September 2013 monthly operating report (Dkt. 410, p.13) reflects that its cash balance and inventory (all of which constitute Pineda's collateral) have diminished by over 55% since the Filing Date.

| | Value on Filing Date | Value as of Sept 30, 2013 |
|---|---|---|
| Cash | $207,918 | $82,913 |
| Fuel | $501,400 | $169,617 |
| Grease | $110,183 | $107,894 |
| Other Inventory | $556,938 | $251,083 |
| **TOTAL** | **$1,376,439** | **$611,507** |

25. As set forth above, QHI's cash balance went from $191,739 as of May 31 to $6,901 as of June 30, to *negative* $1,704 as of September 30, 2013.

### G. Debtors Failed to Obey the Court's Order to List the Outstanding Post-Petition Property Taxes for each of their Properties.

26. In its minute entry for the October 17 hearing, the Court also ordered the Debtors to file, by October 25, "a report reflecting all outstanding post-petition tax obligations, both real and personal, on a property by property basis, with the amounts and dates of any payments made through October 25, 2013." (Dkt. 403).

27. DOC and QHI collectively own twenty (20) real properties. Their report (Dkt. 405), however, only lists the outstanding post-petition taxes for ten (10) properties. Thus, half of the Debtors' properties are unaccounted for.[2]

---

[2] Presumably, these are the properties Debtors propose to "deed back" to creditors under their plan. However, nothing in the Court's order limited the scope of the status report to properties DOC intends to retain. It appears the purpose of the order was to assist the Court in assessing the estates'

28. With respect to the ten properties that Debtors did report on, there were post-petition property taxes of $108,910.09. However, these are only for the *first half* of 2013. The Debtors' full 2013 property tax liability for these parcels is $217,820.18, assuming the accuracy of Debtors' figures.

29. Of the $108,910.09 in post-petition taxes for the first half of 2013 for the ten properties Debtors reported on, a total of $50,236.19 remains unpaid. Debtors contend that they "will be paid by 10/31," but provide no evidence of their ability to make these payments. They also do not explain why they chose to pay some taxes on October 25 (the same day the Court ordered them to file the report) and chose not to pay others.

## II. THERE IS CAUSE FOR IMMEDIATE STAY RELIEF

Under 11 U.S.C. § 362(d)(1), the Court shall terminate the automatic stay for cause, including lack of adequate protection. The term "cause" is "a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re A Partners, LLC,* 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006). Factors the court may consider in assessing whether cause exists include the good or bad faith of the debtor, injury to the movant if the stay is not modified, and the relative portionality of the harms from modifying or continuing the stay. *Id.* The lack of adequate protection, which is expressly mentioned in the statute, itself constitutes cause for stay relief.

Here, there is ample cause for the immediate termination of the stay to permit Pineda to exercise its rights as a secured creditor with respect to *all* of the Debtors' property, both real and personal, on which Pineda holds a lien. QHI's undisclosed, unauthorized transfer of at least $177,000 of Pineda's cash collateral constitutes an extraordinary violation of the cash collateral orders entered by this Court and its duties as a debtor-in-possession. It is also likely

---

liability for administrative tax claims. The post-petition taxes assessed against the properties DOC owned as of January 1, 2013, when the taxes were levied, are an administrative expense regardless of whether the Debtors intend to deed them to someone else. 11 U.S.C. § 503(b)(1)(B). And regardless of the Debtors' future intentions, they still own all of the properties.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

avoidable as a fraudulent transfer and/or an unauthorized post-petition transfer. Whether or not the funds have been returned, the fact that the Debtors' management transferred them in the first place demonstrates their inability and untrustworthiness to continue managing this estate and their creditors' cash collateral.

Pineda's interest in its remaining collateral is <u>not</u> adequately protected. The recently discovered misappropriation of several hundred thousand dollars of its collateral demonstrates that at best, Debtors' management has a complete lack of understanding of its responsibilities as a debtor-in-possession. At worst, it demonstrates Debtors' intentional disregard of those duties. In either case, Debtors' management has demonstrated that it is not sufficiently competent or trustworthy to protect and preserve its creditors' collateral. That is further evidenced by Debtors' loss of over $1.6 million since filing their bankruptcy petitions and the 55% decline in the value of Pineda's personal property collateral.

While the evidence at the stay relief and confirmation hearing demonstrated Debtors' inability to successfully reorganize, the operating reports filed by the Debtors since the close of that hearing firmly establish that reorganization is impossible, and that creditors will only be harmed by the Debtors' continuing management of their business. There is cause for immediate stay relief under the circumstances of this case.

Stay relief is also appropriate under 11 U.S.C. § 362(d)(2), as Debtors agree there is no equity in the properties securing Pineda's claim, and the Debtors have failed to meet their burden of proving those properties are necessary for an effective reorganization.

**III. DEBTORS' AUTHORITY TO USE CASH COLLATERAL SHOULD BE IMMEDIATELY TERMINATED**

At the request of a party with an interest in cash collateral, the Court must condition the debtor's use of cash collateral upon the provision of adequate protection. 11 U.S.C. § 363(c)(2), (e). The debtor has the burden of proving that the creditor's interest is adequately protected. 11 U.S.C. § 363(p)(1). For all of the reasons set forth above, the Debtors have

failed to meet that burden. Accordingly, their authority to use cash collateral should be immediately terminated.

## IV. IN THE ALTERNATIVE TO STAY RELIEF, THIS CASE SHOULD BE CONVERTED TO CHAPTER 7

Under 11 U.S.C. § 1112(b)(1), the Court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." For purposes of this statute, the term "cause" is defined to include, among other things:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate …;
>
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
>
> (E) failure to comply with an order of the court;
>
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter ….

All of the foregoing circumstances are present in this case. The Debtors' own operating reports demonstrate the substantial and continuing loss to the estate. The Debtors have had more than a year since filing their petitions to rehabilitate their financial condition, and have failed to do so. They have only made it worse. Their post-petition losses, coupled with the recently discovered unauthorized transfer of funds from QHI, amount to gross mismanagement. They have engaged in the unauthorized use of cash collateral, to the serious and substantial harm of Pineda. They have violated Court orders, including the cash collateral orders and the Court's order to file a complete report of post-petition taxes. And they have failed, without any legitimate excuse, to timely file their monthly operating reports.

Conversion of this case to Chapter 7, rather than dismissal, would better serve the interests of creditors and the estate. The continuing jurisdiction of this Court is necessary to prevent Debtors from undertaking further actions to dissipate or transfer their assets and place

them out of the reach of their creditors. It is also necessary to prevent Debtors from filing successive bankruptcy petitions or taking other actions to frustrate or delay creditors in the assertion of their remedies. Additionally, Debtors' schedules reflect their ownership of substantial unencumbered assets. Those assets should be liquidated by a Chapter 7 trustee so the proceeds can be fairly distributed to creditors – a result that would be extraordinarily unlikely outside of a bankruptcy proceeding.

## V. CONCLUSION

The Debtors' recent filing of their delinquent monthly operating reports reveals both an unauthorized transfer of at least $177,000 of Pineda's cash collateral and a continuing pattern of substantial loss to the estate. Coupled with Debtors' pre- and post-petition history of massive financial loss, and the lack of any equity in the properties securing Pineda's claim, there is ample cause for the immediate termination of the automatic stay with respect to Pineda's enforcement of its liens on all of Debtors' real and personal property.

Given the severity of the Debtors' misconduct, the Court should waive the automatic 14-day stay of Bankruptcy Rule 4001(a)(3), so that Pineda may take all actions necessary to obtain the appointment of a receiver immediately upon entry of the order. Additionally, given the lack of adequate protection of Pineda's security interest, Debtors' authority to use cash collateral should be immediately terminated.

Alternatively, there is cause for the conversion or dismissal of this case. Because the interests of creditors would be better served by conversion than dismissal, the Court should convert this case to a Chapter 7 proceeding.

**DATED** this 1st day of November, 2013.

**ENGELMAN BERGER, P.C.**

By */s/ Bradley D. Pack, SBA #023973*
David Wm. Engelman
Bradley D. Pack
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Attorneys for Pineda Grantor Trust II

**ORIGINAL** of the foregoing filed via the CM/ECF
Electronic Notification System and transmittal of a
Notice of Electronic Filing provided to all parties
that have filed a notice of appearance in the Bankruptcy Case.

**COPY** of the foregoing e-mailed
this 1st day of November 2013 to:

John R. Clemency
Lindsi M. Weber
Gallagher & Kennedy PA
2575 E. Camelback Rd.
Phoenix, AZ 85016
john.clemency@gknet.com
lindsi.weber@gknet.com
Attorneys for Debtor

Larry L. Watson
Office of the US Trustee
230 N. First Avenue, #204
Phoenix, AZ 85003
Larry.watson@usdoj.gov

Terry Bannon
Office of Cochise County Attorney
PO Drawer CA
Bisbee, AZ 85603
tbannon@courts.az.gov
kaguilar@chochise.az.gov
Attorneys for Marsha Bonham

John Barrett
James A. Jutry
DeConcini McDonald Yetwin & Lacy PC
2525 E. Broadway, #200
Tucson, AZ 85716
jbarrett@dmyl.com
jjutry@dmyl.com
Attorneys for Tucson Truck Terminal

Jeffrey G. Baxter
Pat P. Lopez III
Rebecca K. O'Brien
Rusing Lopez & Lizardi PLLC
6363 N. Swan Rd., #151
Tucson, AZ 85718
jbaxter@rllaz.com
plopez@rllaz.com
robrien@rllaz.com
Attorneys for Canyon Community Bank NA

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

| | |
|---|---|
| 1 | Sally M Darcy |
|   | McEvoy, Daniels & Darcy P.C. |
| 2 | Camp Lowell Corporate Center |
|   | 4560 E. Camp Lowell Dr. |
| 3 | Tucson, AZ 85712 |
|   | ccarter@mddlaw.com |
| 4 | Attorneys for Quail Hollow Inn LLC |

Dean M. Dinner
Nussbaum Gillis & Dinner, P.C.
14850 N. Scottsdale Rd., #450
Scottsdale, AZ 85254
ddinner@ngdlaw.com
Attorneys for Official Committee of Unsecured Creditors

Denise Ann Faulk
United States Attorney's Office
405 W. Congress, #4800
Tucson, AZ 85701-5040
denise.faulk@usdoj.gov
Attorneys for IRS

Wayne L. Gardner
Gunderson Denton & Peterson PC
1930 N. Arboleda, #201
Mesa, AZ 85213
Wayne@GundersonDenton.com
Attorneys for Trejo Oil Co., Inc.

Michael G. Helms
The Helms Law Firm, P.L.C.
2600 N. Central Ave., #940
Phoenix, AZ 85004
mghelms@mghlawfirm.com
Attorneys for Best Western International Inc.

Jill H Perrella
Jonathan M. Saffer
Snell & Wilmer LLP
One S. Church Ave., #1500
Tucson, AZ 85701
jperrella@swlaw.com
jmsaffer@swlaw.com
Attorneys for Bernard Magnussen

Jerome Romero
Jones Waldo Holbrook & McDonough PC
170 S. Main St., #1500
Salt Lake City, UT 84101
jromero@joneswaldo.com
Attorneys for Jackson Oil Co.

ENGELMAN BERGER, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012

1. Philip R. Rupprecht
Aiken Schenk Hawkins & Ricciardi PC
2390 E. Camelback Rd., #400
Phoenix, AZ 85016
prr@ashrlaw.com
Attorneys for Jackson Oil Co.

Alan R. Solot
2701 E. Speedway, #203
Tucson, AZ 85716
arsolot@gmail.com
Attorneys for Cox Investment Group LLC and
William & Cheryl Cox

Larry K. Udall
Curtis Goodwin Sullivan Udall & Schwab
501 E. Thomas Rd.
Phoenix, AZ 85012
ludall@cgsuslaw.com
Attorneys for Navopache Electric Cooperative Inc.

April J. Villarreal Theis
Office of the Attorney General
1275 W. Washington
Phoenix, AZ 85007
april.theis@azag.gov
Attorneys for ADOR

King Grant Winston
Pima County Attorneys Office
32 N. Stone Ave., #2100
Tucson, AZ 85701
pcaocvbk@pcao.pima.gov
Attorneys for Pima County

    */s/Kristine L. Mitchell*

# EXHIBIT A

# Bradley Pack

| | |
|---|---|
| **From:** | Bradley Pack |
| **Sent:** | Wednesday, October 30, 2013 4:15 PM |
| **To:** | 'Weber, Lindsi M.' |
| **Cc:** | Clemency, John R. |
| **Subject:** | RE: Dunlap Oil / Quail Hollow |

Lindsi:

Let's put the rhetoric to the side and address the issue. At least $177,000 of Pineda's cash collateral has been transferred without any authority. If there is an explanation, I would be happy to listen. But I cannot rely on your assurance that the return of this money will appear on the next operating report, whenever Debtor choses to file that. And it should not be necessary to wait until the October bank statement is available to provide this confirmation. If the money has been returned, there should be a cancelled check or transfer confirmation available now. At the very least, Debtor can take a screen shot of its current balance from Chase's website. Can you provide that?



Bradley D. Pack
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012
Phone: 602-271-9090
Fax: 602-222-4999



The information contained in this message is attorney/client privileged and/or confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or printing of this communication is strictly prohibited! If you have received this message in error, please notify us immediately by telephone at 602-271-9090 (or by reply e-mail) and delete this message. Thank You.

**From:** Weber, Lindsi M. [mailto:lindsi.weber@gknet.com]
**Sent:** Wednesday, October 30, 2013 4:06 PM
**To:** Bradley Pack
**Cc:** Clemency, John R.
**Subject:** RE: Dunlap Oil / Quail Hollow

Brad –

I have been tied up today, but will try to get a more complete response to you by Friday. In the meantime, there is no "emergency" and it appears that this is just another example of Pineda and/or CCB crying wolf to the Court. The return of the intercompany transfer will appear on the October operating report, and I will work to get you confirmation to put your mind at ease prior to the filing of the MOR (ie: via an October bank statement, etc. as soon as it is available). Thanks-

**From:** Bradley Pack [mailto:bdp@eblawyers.com]
**Sent:** Wednesday, October 30, 2013 2:02 PM
**To:** Weber, Lindsi M.
**Cc:** Clemency, John R.
**Subject:** Dunlap Oil / Quail Hollow

Lindsi:

To follow up on our phone call from yesterday, the June 2012 operating report for Quail Hollow appears to reflect a $177,000 "loan to related party" that was not authorized by the Court or consented to by Pineda, together with additional transfers made previously. The May operating report shows a $191,739 cash balance in QHI's bank account as of May 31. By June 30, the cash balance has dropped to $6,901. There is a $177,000 increase on the balance sheet line item "notes receivable – related party." Page 2 of the report shows a disbursement described as "other" in the amount of $177,000. On page 9, under the heading "due from insider," there is $262,871 listed in "amount loaned since filing date." There is an asterisk with the notation that "In the ordinary course of business, QHI made an intercompany transfer that has since been returned and is expected to appear on the upcoming operating report." Nothing has been returned, as the September report shows the bank account has been overdrawn by $1,700.

This is very disturbing. I asked you if there was an explanation that perhaps I was missing, and you said you would speak to your client and get back to me. I have not heard back from you yet.

At this point, our intention is to seek emergency relief for the apparent violation of the Court's cash collateral orders, unauthorized post-petition transfer and fraudulent transfer of Pineda's cash collateral, and to do so as soon as possible. In the interim, if you have any information that would explain these transfers, please let me know immediately.

Additionally, as we had discussed, your status report concerning the post-petition property taxes omits any statement as to the taxes due for a large number of the properties DOC owns. While these appear to be properties that DOC proposes to "give back" upon confirmation of its plan, there was nothing in the Court's order limiting the scope of the status report to the properties that DOC would retain if its plan is confirmed. It appears the purpose of the order was to assist the Court in assessing the estates' liability for administrative tax claims. The post-petition taxes assessed against the properties DOC owned as of January 1, 2013, when the taxes were levied, are an administrative expense regardless of whether the Debtor intends to deed them to someone else or not. 11 U.S.C. s 503(b)(1)(B). Please advise whether you will be supplementing the status report with the taxes assessed against the properties that were omitted. Thank you.



Bradley D. Pack
3636 North Central Avenue
Suite 700
Phoenix, Arizona 85012
Phone: 602-271-9090
Fax: 602-222-4999



The information contained in this message is attorney/client privileged and/or confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or printing of this communication is strictly prohibited! If you have received this message in error, please notify us immediately by telephone at 602-271-9090 (or by reply e-mail) and delete this message. Thank You.


This message and any of the attached documents contain information from the law firm of Gallagher & Kennedy, P.A. that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information, and no privilege has been waived by your inadvertent receipt. If you have received this transmission in error, please notify the sender by reply e-mail and then delete this message. Thank you.