**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520)529-4262

Pat P. Lopez III
plopez@rllaz.com
State Bar No. 006918
Rebecca K. O'Brien
robrien@rllaz.com
State Bar No. 021954
Attorneys for Canyon Community Bank, N.A.

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceedings |
|---|---|
| DUNLAP OIL COMPANY, INC., | No. 4:12-bk-23252 |
| QUAIL HOLLOW INN, LLC, | No. 4:12-bk-23256 |
| Debtors. | (Jointly Administered) |
| Filing Applies to: | **CANYON COMMUNITY BANK'S MOTION TO CONVERT TO A CHAPTER 7** |
| DUNLAP OIL COMPANY, INC. | |
| QUAIL HOLLOW INN, LLC | |
| BOTH                      X | |

Canyon Community Bank, N.A. ("CCB"), a secured creditor in the above captioned Chapter 11 cases, through counsel undersigned, pursuant to 11 U.S.C. §1112(b), hereby moves to convert this case to a Chapter 7 for the following reasons: (1) the Debtors' proposed Plan is not confirmable; (2) there is a substantial or continuing loss to or diminution of the estate and there is an absence of a reasonable likelihood of rehabilitation; (3) the Debtors have grossly mismanaged the estate; (4) Quail Hollow has used substantial cash collateral in an unauthorized manner; (5) the Debtors have insufficient cash or credit available to operate their business and pay their obligations as they become due, (6) the Debtors' principals continue to receive payments since the filing of this Chapter 11

proceeding, while movant, and the other creditors of Debtors, watch the estate dissipate, and (7) the Debtors' inability to timely pay taxes owed after the date of the order for relief.

This Motion is supported by the below Memorandum of Points and Authorities, and the entire court record.

DATED this 1st day of November, 2013.

RUSING LOPEZ & LIZARDI, P.L.L.C.

s/ Pat P. Lopez III
Pat P. Lopez, III
Rebecca K. O'Brien
Attorneys for Canyon Community Bank, N.A.

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. THE RELEVANT FACTUAL BACKGROUND

1. Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Court on October 24, 2011 ("Filing Date").

2. An Order was issued by the Court for Joint Administration of the two Debtors' cases [Dkt 38].

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 1112(b) and 157. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

4. The lending relationship between CCB and the Debtors is described at length in CCB's *Objection to Confirmation of Debtors' First Amended Plan of Reorganization Dated February 14, 2013* [Dkt. 260]. CCB is a secured creditor of Dunlap Oil Company, Inc. ("Dunlap") and is an unsecured creditor of Quail Hollow Inn, LLC ("Quail Hollow"). In brief summary, the loans CCB has made to Debtors' are secured by three locations and the rolling stock of Debtors. CCB's claims exceed the value of its security.

5. The Confirmation Hearing was held over two days on June 12, 2013 and July 11, 2013.

6. The Debtors filed monthly Operating Reports for the months of June, July, August and September after the Confirmation Hearing was held, after demand by its creditors, which the Court should consider in determining whether to confirm or deny the Plan.

## II. LEGAL ARGUMENT

**1. Debtors' Post Confirmation Hearing Filings Support Conversion Under `§1112(b).**

Bankruptcy Code Section 1112(b) provides that a "party in interest" may move for the conversion of a case from Chapter 11 to Chapter 7. Cause for conversion includes, but is not limited to, continuing loss to or diminution of the estate, and absence of a reasonable likelihood of rehabilitation, inability to effectuate a plan, and unreasonable delay by the debtor that is prejudicial to creditors.

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

The Debtors here have been in bankruptcy for over a year. During that time Debtors' principals have continued to draw salaries and diminish the collateral, in the form of both cash and inventory, of the creditors, while creditors have received no payments during the pendency of this Bankruptcy.

Under § 1112(b), the bankruptcy court is given wide discretion to convert a case under Chapter 11 to a proceeding under Chapter 7 for "cause." *In re Johnston*, 149 B.R. 158, 160 (B.A.P. 9th Cir. 1992). In that case, the Court, on motion of a creditor, converted the case from a Chapter 11 to a Chapter 7 because of the Debtors' apparent inability to reorganize. The Court based its decision on the grounds that the Debtor lacked the income which would indicate a reasonable likelihood of rehabilitation and the position of creditors was continuing to erode and creditors were not likely to be satisfied if the case remained in a Chapter 11.

A bankruptcy court is to consider all factors when it determines whether or not to convert a case and is not limited to the grounds set out in § 1112(b). *In re Larmar Estates, Inc.*, 6 B.R. 33 (Bankr.E.D.N.Y. 1980), *see also In re Products Intern. Co.*, 395 B.R. 101 (Bankr.D.Ariz. 2008).

**A.** **Dunlap Has, and Continues, To Operate With Cash Losses Every Month Constituting a Diminution of the Estate, Providing Cause for Conversion under §1112(b) of the Code.**

A debtor lacks a reasonable likelihood of rehabilitation where: (i) it lacks income, *Johnston*, 149 B.R. at 162; or (ii) it has an ongoing negative cash flow resulting in a net decrease in value, In re Original IFPC Shareholders, Inc., 317 B.R. 738 (Bankr.N.D.Ill.E.D. 2004).

As noted in the Court's Order lodged in Dkt 403, Debtors' counsel has asserted that "The Debtors are not losing money; they are accruing interest, based on its pre-petition debt load that will be restructured under the Plan." This is not accurate; Debtors have, and continue, to lose money, even on a cash basis, every month, which constitutes a substantial diminution of the estate.

Debtors' counsel has misread the Debtors' Operating Reports. Debtors' counsel is correct that the Reports show accrued interest on Dunlap's prepetition outstanding debts at the prepetition interest due. (*See*, for example, *September 2013 Operating Report – Dunlap Oil Company* [Dkt 410], on page 11, the line item entitled "Interest," which is under the broader heading "Other Income (Expenses)"). Debtors' counsel is also correct that, if the Plan is approved, the amount payable by Dunlap for interest post-Plan will be less than the interest amount accrued on the Operating Reports on file with the Court. (The amount accrued through September 2013 is $676,642, none of which has been paid by Dunlap.)

However, Debtors' counsel is wrong when he asserts that Dunlap is not losing money, or that Dunlap's operations have generated sufficient cash to meet Dunlap's obligations should the Plan be confirmed.

The inaccuracy of these assertions is demonstrated by Debtors' own Operating Reports, which have been filed with the Court. Attached as **Exhibit 1** is a summary of the June through September, 2013 Income Statements filed with the Court by Dunlap. The Income Statements are contained within Dunlap's monthly Operating Reports. The filed Income Statements, along with the Debtors' filed Plan Projections, is included as pages 2 through 11 of **Exhibit 1** with relevant information highlighted. The first page of **Exhibit 1** is a summary which does nothing more than compile the information already filed with the Court by the Debtor. An inspection of the Debtors' own filings shows that:

1. Dunlap has lost money every month since it filed this action, and continues to do so after it closed and abandoned its unwanted stations. It should be noted that, as reflected in the September, 2013 Operating Report, Debtor reported a total loss of $1,370,406, since filing. *September 2013 Operating Report, DKT,* page 11. Curiously, this loss includes a $354,115 gain in the "Sale of fixed assets" in September. (See discussion in Section B below.) Without the fixed asset sale, the loss would be over $1,700,000.

2. As of September 30, 2013, before considering non-operating income (*i.e.,* the "sale of fixed asset" accrual referenced below) and the unpaid accrued interest which

Dunlap's counsel has consistently argued should be ignored, **Dunlap has lost $954,555 in the first nine months of 2013**. *Id.*

3. Even if one ignores the accrued depreciation expense, as Dunlap has also argued should be disregarded, **Dunlap has lost $345,937 in the first nine months of 2013**. See **Exhibit 1** and *Id*.

4. **The 2013 losses would be $429,958 if one considers the creditor payments and repairs and maintenance projected by Dunlap in its Plan in place of accrued unpaid interest and depreciation. See Exhibit 1** and Dkt 309, Exhibit D at page 3.

### B. Dunlap's September 2013 "Profit" On "Sale Of Fixed Assets" Did Not Generate Any Cash To Shore Up A Failing Dunlap.

As noted above, Dunlap reported a gain on the "Sale of fixed assets" in September of 2013. *Id.* Because all of Dunlap's assets were encumbered by creditors and subject to this bankruptcy, we can only assume that this entry reflects the abandonment of Dunlap's unwanted stations to its creditors at the beginning of July, 2013. If this is the case, the recording of the transaction may be appropriate under "Generally Accepted Accounting Principles." However, in keeping with Dunlap's emphasis on cash transactions, it should be noted that this transaction did nothing to improve Dunlap's cash position. This entry simply reflects the debt relief provided Dunlap when it abandoned the stations. As Dunlap's creditors have pointed out in the past, Dunlap does not have sufficient capital/cash to implement its Plan, and its capital/cash position is getting worse every month. See section C of this Memorandum below.

### C. Dunlap Has Dissipated Its Cash and Key Inventory Assets.

Dunlap has consistently squandered and dissipated cash and the other collateral of its creditors. This is reflected in the Balance Sheets of Dunlap filed with the Court. Attached, for the Court's convenience is **Exhibit 2** - September, 2013 Balance Sheet of Dunlap, which is taken from the September 2013 Operating Report of Dunlap [Dkt 410] at pages 13 and 14. This Balance Sheet shows that **over 60% ($762,643) of the cash and current**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**assets essential to the operation of Dunlap's business have been lost**. Dunlap's own expert has conceded Dunlap's ability to acquire and maintain its inventory is essential to the Plan's success (*See Transcript of Confirmation Hearing June 12, 2013*, pp. 101:10 to 102:16). However, since the filing of this bankruptcy, Dunlap has dissipated its cash and inventory, as follows:

| Item | Oct 25, 2012 | Sept 30, 2013 | Increase (Decrease) |
|---|---|---|---|
| Cash | $ 207,918.00 | $ 82,913.00 | $ (125,005.00) |
| Inventory- Fuel | $ 501,400.00 | $ 169,617.00 | $ (331,783.00) |
| Inventory- Other | $ 556,938.00 | $ 251,083.00 | $ (305,855.00) |
| **TOTAL** | $ 1,266,256.00 | $ 503,613.00 | $ (762,643.00) |

One clear and unequivocal measure of a business's failure is the loss of its cash and merchandise inventory. Without inventory, a business has nothing to sell to raise cash. Without cash, a business has no ability to purchase inventory to sell. The depletion of both demonstrates once again that Debtors' assertion that is making a profit is false. Dunlap's cash and inventory is evaporating at a time when it has not paid creditors a dime in over a year, and continues to pay its owner operators regular salaries. The **cash and inventory** represent the most readily available collateral of the creditors, and it **has now been diminished by over three quarter of a million dollars.**

**D. Dunlap, or another Related Party, Has Raided the Cash Collateral of Quail Hollow Inn.**

The filings on October 25, by Quail Hollow demonstrate that Dunlap, or another related party, raided the cash of Quail Hollow in June, 2013. See **Exhibit 3** - May, 2013 Balance Sheet of Quail Hollow and Status of Assets, taken from the May Operating Report of Quail Hollow [Dkt 343] at pages 7, 8, and 9; **Exhibit 4** - June, 2013 Balance Sheet of Quail Hollow and Status of Assets, taken from the June 2013 Operating Report of Quail

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Hollow [Dkt 406] at pages 7, 8, and 9; **Exhibit 5 -** September, 2013 Balance Sheet of Quail Hollow and Status of Assets, taken from the September 2013 Operating Report of Quail Hollow [Dkt 409] at pages 7, 8, and 9.

In May of 2013, Quail Hollow Inn held $191,739 in cash and reported loans "Due from Insiders" of $85,781 "since the filing date." *See May Operating Report of Quail Hollow* [Dkt 343] at pages 7, 8, and 9 (attached as **Exhibit 3**). The May 2013 Operating Report, was the last Operating Report for Quail Hollow that was filed timely. On October 25, 2013, when Quail Hollow filed Operating Reports for June, July, August, and September, 2013, the creditors learned for the first time that:

1. In June of 2013, Quail Hollow "loaned" an additional $177,000 to a "Related Party." (As of the bankruptcy filing and in May, 2013, "Notes Receivable-Related Party" was $304,305. This increased to $481,305 in June, 2013. Also, the loans "due from Insiders" "since the filing date" increased to $262,871. *See June 2013 Operating Report – Quail Hollow* [Dkt 406] at pages 7, 8 and 9 (attached as **Exhibit 4**).

2. In June, because of the Loan, Quail Hollow's "Cash in Bank" fell from $191,739 at the end of May to $6,901 at the end of June. *Id*.

3. By September 30, 2013, Quail Hollow's **loans to "Related Party"** increased to $496,305, in total, with **$291,380** of this being reported as having been advanced **"since the filing date."** *See September 2013 Operating Report Quail Hollow* [Dkt 409] at pages 7, 8 and 9 (attached as **Exhibit 5**).

4. During this same period, **Quail Hollows "cash in bank" dropped from $191,739 in May to a negative ($1,704) in September, 2013**. *See May 2013 Operating Report Quail Hollow* [Dkt 343] at pages 7, 8 and 9 (attached as **Exhibit 3**); and *September 2013 Operating Report Quail Hollow* [Dkt 409] at pages 7, 8 and 9 (attached as **Exhibit 5**).

In a footnote, Quail Hollow asserts in the June, July, August, and September Reports that "In the ordinary course of business, QHI made an intercompany transfer that has since

been returned and **is expected to appear on next month's operating report**." Clearly, when this assertion was first made on the June Report, the funds were not returned to Quail Hollow in July, nor were they returned in August or September. **Quail Hollow has loaned $291,380 "since the filing date"** to an "insider." If the funds were loaned to Dunlap, Dunlap does not have the resources to repay this loan. Dunlap's total reported "cash on hand and in bank" has dropped to $82,913, which is insufficient to repay these loans. See September 2013 Operating Report Dunlap [Dkt 410] at page 13, (attached as **Exhibit 2**). If the funds were loaned to another "insider," there is no evidence that such loans "were in the ordinary course of business," that the borrower has the ability to repay the loans, and most importantly, that the loans were authorized by the Code or this Court. **Quail Hollow and its principals have raided the bankruptcy estate without permission or authority,** which violates §549 of the Code.

### E. Debtors' Filings Indicate a Discrepancy Between "Cash On Hand and In Bank" or, Alternatively, a Need for Significant Cash on Hand That is Unavailable to Meet Debtors' Operating Capital Needs.

In the four most recent operating reports filed by Dunlap (June, July, August and September 2013), Dunlap reported an average of $101,645.25 in cash on hand and in banks. During the same period, it had an average of only $53,088.61 in verified cash in its reported bank accounts. Therefore, an average of $48,556.64 of the reported cash was "cash on hand"- meaning cash held by Dunlap outside of banks for use in its day to day operations. There is no way for the Court or creditors to verify cash on hand other than to physically count the cash. If we accept Dunlap's Reports as accurate, they indicate that Dunlap requires a large supply of cash for day-to-day operations, which means this cash is not available for other needs. (See Sept, 2013 Operating Report, Dkt 410, page 13, where Dunlap reports $82,913 of "Cash on hand and in banks," with attached bank statements reflecting approximately $42,000 of cash in banks.) **With only approximately $42,000 of cash available to Dunlap at the end of September that is not being used in daily**

**operations, there is not enough cash available to meet Dunlap's obligations and operate its business.**

### F. Debtors Have Not Demonstrated the Ability to Finance its Inventory Needs to Meet Plan Projections.

Three weeks after the final Plan Confirmation Hearing, Debtors' filed a "Notice" with this Court asserting "very important creditor arrangements… that will occur upon Plan confirmation." In fact, the "creditor arrangements" referred to by Debtors in their *Notice of Credit Commitment and Update Regarding Canyon Community Bank's Motion to Compel Debtors to Provide Monthly Operating Reports* [Dkt. 380] ("Notice") is nothing more than a two sentence letter from Jackson Oil stating that it will extend "three (3) day" credit terms on fuel purchases, and that Jackson Oil will review the credit terms "every 180 days." No more details are provided, such as the applicable interest rate, the maximum amount of credit to be advanced, the repayment schedule, the security arrangements, etc. All of these terms are essential in determining the impact of this **proposed financing** on the feasibility of the Plan. For example,

1. Debtors' expert testified that fuel and merchandise inventory financing was essential in order for Debtors to meet Plan projections. *See Transcript of Confirmation Hearing June 12, 2013*, pp. 101:10 to 102:16.

2. Debtors project $34,914,000 in fuel sales in year one of the Plan. *See* Dkt 309 at Exhibit D, p. 2 and Exhibit 1. There is no way to evaluate if the two sentence financing arrangement referred to in the Notice will support the financing of $34,914,000 in annual fuel sales.

3. Without knowing the cost of the financing arrangement, there is no way to know if this cost was taken into consideration in Debtors' Plan projections.

4. Without knowing the repayment terms, there is no way to know if the financing can be supported by the cash flows projected in the Plan. Clearly no financing can be supported by Debtors' operating results in the past three months, when Debtors were

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

10

Case 4:12-bk-23252-BMW   Doc 414   Filed 11/01/13   Entered 11/01/13 13:27:50   Desc
Main Document   Page 10 of 14

unable to generate any profit or cash flow, even when disregarding payments to other creditors or depreciation expense.

5. Without knowing the security requirements, there is no way to know if Debtors will be able to satisfy the lender's terms and obtain the financing.

6. The Notice says nothing about how Debtors intend to finance the inventory needed to support the $5,366,000 in merchandise sales Dunlap projects in the first year of the Plan. See Id. and Exhibit 1.

### G. **Debtors Have Failed to Pay Administrative Expenses of the Bankruptcy Estate.**

In its Notice of Filing Post-Petition Tax Status Report [Dkt 405], Debtors list out the tax obligations Debtors have paid, or claim they will pay for the 1st half 2013 property taxes, which were due on October 1, 2013, and are delinquent as of November 1, 2013. However, Debtors fail to list the properties they abandoned to CCB and Pineda Grantor Trust II at the beginning of July, 2013, and clearly have not paid, and do not plan on paying these property taxes. The post-petition taxes assessed against these properties that Debtors owned, controlled, and operated through June, 2013, are clearly administrative expenses. 11 U.S.C. § 503(b)(1)(B). As an administrative expense, the real property tax amounts must be paid out of the Bankruptcy Estate, and Debtors have failed to account for these expenses in its Notice of Filing Post-Petition Tax Status Report [Dkt 405]. As noted above, Debtors' Financial Statements clearly demonstrate that Debtors do not have the ability to pay these 2013 real property taxes, which are now delinquent.

## III. CONCLUSION

For the preceding reasons, CCB respectfully requests that the Court enter an Order converting Debtors' case from a Chapter 11 to a Chapter 7 pursuant to §1112(b), and for such other and further relief as this Court deems just and appropriate.

Debtors have clearly demonstrated, through their own filings, their inability to operate their business in a manner capable of generating sufficient income to effectively

reorganize and to meet its proposed Plan obligations. Their recent operations have resulted in substantial and continuing losses and the diminution of the estate. **Dunlap has dissipated $762,643 in cash and inventory**, while **Quail Hollow now has a negative cash balance of ($1,704), after "loaning" $291,380 to an "Insider" "since the filing" of this bankruptcy case**. Debtors' have demonstrated an absence of a reasonable likelihood of rehabilitation, with **Dunlap having reported a total loss of $1,370,406, since filing**. Debtors' have grossly mismanaged the estate, have insufficient cash or credit available to operate their business and pay their obligations as they become due. Specifically, **Debtors have demonstrated no ability to pay real property taxes, which are now delinquent,** and there is **no evidence that Debtors can finance the $34,914,000 in fuel inventory and $5,366,000 merchandise inventory they project to sell** in the first year of the Plan. Finally, the Debtors' principals continue to receive payments since the filing of this Chapter 11 proceeding, while movant, and the other creditors of **Debtors**, watch the estate dissipate and **have not been paid any of the $676,642 in interest that has accrued on their loans since the inception of the bankruptcy**. Conversion of this case to a Chapter 7 proceeding will minimize the factors listed above, as well as the administrative costs, and is therefore in the best interest of the estate and the creditors.

DATED this 1st day of November, 2013.

RUSING LOPEZ & LIZARDI, P.L.L.C.

s/ Pat P. Lopez III
Pat P. Lopez, III
Rebecca K. O'Brien
Attorneys for Canyon Community Bank, N.A.

**ORIGINAL** of the foregoing filed via the CM/ECF
Electronic Notification System and transmittal of a
Notice of Electronic Filing provided to all parties
that have filed a notice of appearance in the Bankruptcy Case.

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**COPY** of the foregoing served via email
this 1st day of November, 2013 to:

John R. Clemency
Lindsi M. Weber
Gallagher & Kennedy PA
2575 E. Camelback Rd.
Phoenix, AZ 85016
john.clemency@gknet.com
lindsi.weber@gknet.com
Attorneys for Debtor

Dean M. Dinner
Nussbaum Gillis & Dinner, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
ddinner@ngdlaw.com
Attorneys for Unsecured Creditors Committee
of Dunlap Oil Company

Larry L. Watson
Office of the US Trustee
230 N. First Avenue, #204
Phoenix, AZ 85003
Larry.watson@usdoj.gov

Terry Bannon
Office of Cochise County Attorney
PO Drawer CA
Bisbee, AZ 85603
tbannon@cochise.az.gov
kaguilar@cochise.az.gov
Attorneys for Marsha Bonham

James A. Jutry
DeConcini McDonald Yetwin & Lacy PC
2525 E. Broadway, #200
Tucson, AZ 85716
jjutry@dmyl.com
Attorneys for Tucson Truck Terminal

David Wm. Engleman
Bradley D. Pack
Engelman Berger, P.C.
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
Attorneys for Pineda Grantor Trust II
dwe@eblawyers.com
bdp@eblawyers.com
Attorneys for Pineda Grantor Trust II

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

1  Wayne L. Gardner
   Gunderson Denton & Peterson PC
2  1930 N. Arboleda, #201
   Mesa, AZ 85213
3  Wayne@GundersonDenton.com
   Attorneys for Trejo Oil Co., Inc.

4  Alan R. Solot
5  2701 E. Speedway, #203
   Tucson, AZ 85716
6  arsolot@gmail.com
   Attorneys for Cox Investment Group LLC and
7  William & Cheryl Cox

8  Larry K. Udall
   Curtis Goodwin Sullivan Udall & Schwab
9  501 E. Thomas Rd.
   Phoenix, AZ 85012
10 ludall@cgsuslaw.com
   Attorneys for Navopache Electric Cooperative Inc.

11 King Grant Winston
   Pima County Attorneys' Office
12 32 N. Stone Ave., #2100
   Tucson, AZ 85701
13 pcaocvbk@pcao.pima.gov
   Attorneys for Pima County
14
   Eli Golob
15 Assistant Attorney General
   1275 W. Washington, Site Code 040A
16 Phoenix, Arizona 85007
   DESGeneralCounselPHX@azag.gov
17

18 s/ Elizabeth M. Webb
19
20
21
22
23
24
25
26
27
28